# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK        6-29

--------------------------------------------------------------X

JOHN MONTGORIS and SHEILA MONTGORIS,

Index No.: *106538-07*

Date Filed: *05/4/2007*

Plaintiff(s),

-against-

**VERIFIED
COMPLAINT**

A.O. SMITH WATER PRODUCTS CO.,
A.W. CHESTERTON COMPANY,
AMCHEM PRODUCTS, INC.,
    n/k/a RHONE POULENC AG COMPANY,
    n/k/a BAYER CROPSCIENCE INC.,
ANCHOR PACKING COMPANY,
AQUA-CHEM, INC.,
AURORA PUMP COMPANY,
BELL & GOSSETT COMPANY,
BMCE INC.,
    f/k/a UNITED CENTRIFUGAL PUMP,
BUFFALO PUMPS, INC.,
BW/IP INTERNATIONAL, INC.,
    f/k/a BORG WARNER INDUSTRIAL PRODUCTS
    successor to BYRON JACKSON PUMPS,
BYRON JACKSON PUMPS,
CARRIER CORPORATION,
    as successor in interest to BRYANT HEATING &
    COOLING SYSTEMS,
CBS CORPORATION, a Delaware Corporation,
    f/k/a VIACOM INC. successor by merger to CBS
    CORPORATION, a Pennsylvania Corporation,
    f/k/a WESTINGHOUSE ELECTRIC CORPORATION,
CERTAIN TEED CORPORATION,
CRANE CO.,
CRANE PUMPS & SYSTEMS, INC., WEINMAN DIVISION,
CRANE PUMPS & SYSTEMS, INC.,
    as successor to BURKS PUMPS, INC.,
DURABLA MANUFACTURING COMPANY,
EMPIRE-ACE INSULATION MFG. CORP.,
FAIRBANKS-MORSE PUMP CORPORATION,
FOSTER WHEELER, L.L.C.,
GARLOCK SEALING TECHNOLOGIES LLC,
    f/k/a GARLOCK INC.,
GENERAL ELECTRIC COMPANY,
GOODYEAR CANADA, INC.,
GOODYEAR TIRE AND RUBBER COMPANY,
GOULDS PUMPS, INC.,
H.B. FULLER COMPANY,
IMO INDUSTRIES, INC.,
INGERSOLL-RAND COMPANY,
J.H. FRANCE REFRACTORIES COMPANY,
OWENS-ILLINOIS, INC.,

RECEIVED
JUN 29 2007

LAW OFFICES
OF
WEITZ
&
LUXENBURG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

PREMIER REFRACTORIES, INC.,
    f/k/a ADIENCE, INC., f/k/a BMI,
RAPID-AMERICAN CORPORATION,
REYNOLDS METALS COMPANY,
    as successor in interest to ATLANTIC ASBESTOS CORP.,
U.S. RUBBER COMPANY (UNIROYAL),
UNION CARBIDE CORPORATION,
WARREN PUMPS, INC.,
YORK INDUSTRIES CORP.,

                                    Defendants.
-------------------------------------------------------------------------X

               Plaintiff(s), JOHN MONTGORIS and SHEILA MONTGORIS, by their

attorneys WEITZ & LUXENBERG, P.C., upon information and belief, at all times hereinafter

mentioned alleges as follows:

           1.     Plaintiff(s), JOHN MONTGORIS and SHEILA MONTGORIS, by their

attorneys, WEITZ & LUXENBERG, P.C., for their **verified complaint** respectfully alleges:

           2.     Defendant AQUA-CHEM, INC., was and still is a duly organized

domestic corporation doing business in the State of New York.

           3.     Defendant AQUA-CHEM, INC., was and still is a duly organized foreign

corporation doing business and/or transacting business in the State of New York and/or should

have expected its acts to have consequences within the State of New York.

           4.     Defendant AURORA PUMP COMPANY, was and still is a duly

organized domestic corporation doing business in the State of New York.

           5.     Defendant AURORA PUMP COMPANY, was and still is a duly

organized foreign corporation doing business and/or transacting business in the State of New

York and/or should have expected its acts to have consequences within the State of New York.

           6.     Defendant BELL & GOSSETT COMPANY, was and still is a duly

organized domestic corporation doing business in the State of New York.

LAW OFFICES
OF
WEITZ
&
LUXENBURG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

7.    Defendant BELL & GOSSETT COMPANY, was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

8.    Defendant BUFFALO PUMPS, INC., was and still is a duly organized domestic corporation doing business in the State of New York.

9.    Defendant BUFFALO PUMPS, INC., was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

10.    Defendant BW/IP INTERNATIONAL, INC., f/k/a BORG WARNER INDUSTRIAL PRODUCTS successor to BYRON JACKSON PUMPS, was and still is a duly organized domestic corporation doing business in the State of New York.

11.    Defendant BW/IP INTERNATIONAL, INC., f/k/a BORG WARNER INDUSTRIAL PRODUCTS successor to BYRON JACKSON PUMPS, was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

12.    Defendant BYRON JACKSON PUMPS, was and still is a duly organized domestic corporation doing business in the State of New York.

13.    Defendant BYRON JACKSON PUMPS, was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

14.    Defendant CARRIER CORPORATION, as successor in interest to BRYANT HEATING & COOLING SYSTEMS, was and still is a duly organized domestic corporation doing business in the State of New York.

15.    Defendant CARRIER CORPORATION, as successor in interest to BRYANT HEATING & COOLING SYSTEMS, was and still is a duly organized foreign

LAW OFFICES
OF
WEITZ
&
LUXENBURG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

16.    Defendant CRANE PUMPS & SYSTEMS, INC., WEINMAN DIVISION, was and still is a duly organized domestic corporation doing business in the State of New York.

17.    Defendant CRANE PUMPS & SYSTEMS, INC., as successor to BURKS PUMPS, INC., was and still is a duly organized domestic corporation doing business in the State of New York.

18.    Defendant FAIRBANKS-MORSE PUMP CORPORATION, was and still is a duly organized domestic corporation doing business in the State of New York.

19.    Defendant FAIRBANKS-MORSE PUMP CORPORATION, was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

20.    Defendant IMO INDUSTRIES, INC., was and still is a duly organized domestic corporation doing business in the State of New York.

21.    Defendant IMO INDUSTRIES, INC., was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

22.    Defendant WARREN PUMPS, INC., was and still is a duly organized domestic corporation doing business in the State of New York.

23.    Defendant WARREN PUMPS, INC., was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

Plaintiff(s), JOHN MONTGORIS and SHEILA MONTGORIS,   repeats and realleges

NYAL - WEITZ & LUXENBERG, P.C. STANDARD ASBESTOS COMPLAINT FOR

PERSONAL INJURY No. 7 as if fully incorporated herein as it pertains to the defendants in the

aforementioned caption.

Dated: *May 11, 2007*
       New York, New York

                                        Yours, etc.,

                                        WEITZ & LUXENBERG, P.C

                                        Attorneys for Plaintiff(s)
                                        180 Maiden Lane
                                        New York, NY  10038
                                        (212) 558-5500

STATE OF NEW YORK      )
                       )    SS:
COUNTY OF NEW YORK  )

The undersigned, an attorney admitted to practice in the Courts of New York State,

shows:

Deponent is an Associate of the firm WEITZ & LUXENBERG, P.C., Counsel for the

plaintiff(s) in the within action; deponent has read the foregoing **summons and verified**

**complaint** and knows the contents thereof; the same is true to deponent's own knowledge, except

as to the matters therein stated to be alleged on information and belief, and that as to those

matters deponent believes it to be true. This verification is made by deponent and not by

plaintiff(s) because plaintiff(s) resides outside of the County of New York where plaintiffs'

counsel and deponent maintain their office.


Dated: May 11, 2007
       New York, New York

MICHAEL ROBERTS


LAW OFFICES
OF
WEITZ
&
LUXENBURG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

Index No.: 106538-07

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

JOHN MONTGORIS and SHEILA MONTGORIS,

Plaintiff(s),

-against-

A.O. SMITH WATER PRODUCTS CO., et. al.,

Defendants.

## SUMMONS and COMPLAINT

**WEITZ & LUXENBERG, P.C.**
Attorneys for PLAINTIFFS
180 Maiden Lane
New York, NY 10038
212-558-5500

To
Attorney(s) for

Service of a copy of the within
is hereby admitted.
Dated, May 11, 2007

**Attorney(s) for**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------X   Index No.: *106538-07*

JOHN MONTGORIS and SHEILA MONTGORIS,

Date Filed: *05/14/2007*

                      Plaintiff(s),

Plaintiff Designates
**NEW YORK**
County as the Place of Trial

-against-

The Basis of Venue is
Defendants' Place of Business

A.O. SMITH WATER PRODUCTS CO.,
A.W. CHESTERTON COMPANY,
AMCHEM PRODUCTS, INC.,
    n/k/a RHONE POULENC AG COMPANY,
    n/k/a BAYER CROPSCIENCE INC.,
ANCHOR PACKING COMPANY,
AQUA-CHEM, INC.,
AURORA PUMP COMPANY,
BELL & GOSSETT COMPANY,
BMCE INC.,
    f/k/a UNITED CENTRIFUGAL PUMP,
BUFFALO PUMPS, INC.,
BW/IP INTERNATIONAL, INC.,
    f/k/a BORG WARNER INDUSTRIAL PRODUCTS
    successor  to BYRON JACKSON PUMPS,
BYRON JACKSON PUMPS,
CARRIER CORPORATION,
    as successor in interest to BRYANT HEATING &
    COOLING SYSTEMS,
CBS CORPORATION, a Delaware Corporation,
    f/k/a VIACOM INC. successor by merger to CBS
    CORPORATION, a Pennsylvania Corporation,
    f/k/a WESTINGHOUSE ELECTRIC CORPORATION,
CERTAIN TEED CORPORATION,
CRANE CO.,
CRANE PUMPS & SYSTEMS, INC., WEINMAN DIVISION,
CRANE PUMPS & SYSTEMS, INC.,
    as successor to BURKS PUMPS, INC.,
DURABLA MANUFACTURING COMPANY,
EMPIRE-ACE INSULATION MFG. CORP.,
FAIRBANKS-MORSE PUMP CORPORATION,
FOSTER WHEELER, L.L.C.,
GARLOCK SEALING TECHNOLOGIES LLC,
    f/k/a GARLOCK INC.,
GENERAL ELECTRIC COMPANY,
GOODYEAR CANADA, INC.,
GOODYEAR TIRE AND RUBBER COMPANY,
GOULDS PUMPS, INC.,
H.B. FULLER COMPANY,
IMO INDUSTRIES, INC.,
INGERSOLL-RAND COMPANY,
J.H. FRANCE REFRACTORIES COMPANY,

**SUMMONS**

NEW YORK
COUNTY CLERKS OFFICE
MAY 1 4 2007
NOT COMPARED
WITH COPY FILE

OWENS-ILLINOIS, INC.,
PREMIER REFRACTORIES, INC.,
    f/k/a ADIENCE, INC., f/k/a BMI,
RAPID-AMERICAN CORPORATION,
REYNOLDS METALS COMPANY,
    as successor in interest to ATLANTIC ASBESTOS CORP.,
U.S. RUBBER COMPANY (UNIROYAL),
UNION CARBIDE CORPORATION,
WARREN PUMPS, INC.,
YORK INDUSTRIES CORP.,

                                        Defendants.
                                                        ---X
------------------------------------------------------------
To the above named Defendant(s)


        **You are hereby summoned** to answer the **verified** complaint in this action and to serve a
copy of your answer, or, if the complaint is not served with this summons, to serve a notice of
appearance, on the Plaintiff's Attorney(s) within 20 days after the service of this summons,
exclusive of the day of service (or within 30 days after the service is complete if this summons is
not personally delivered to you within the State of New York); and in case of your failure to
appear or answer, judgment will be taken against you by default for the relief demanded in the
complaint.

Dated, May 11, 2007
       New York, New York

                                        WEITZ & LUXENBERG, P.C.
                                        Attorney(s) for Plaintiff
Defendant's address:                    Post Office Address
                                        180 Maiden Lane
**SEE ATTACHED DEFENDANTS RIDER**       New York, New York 10038
                                        (212) 558-5500

## DEFENDANTS' RIDER

**A.O. SMITH WATER PRODUCTS CO.**
11270 West Park Place
Milwaukee, WI 11270

**A.W. CHESTERTON COMPANY**
Joseph E. Riley
225 Fallon Road
Stoneham, MA 02180

**AMCHEM PRODUCTS, INC.,**
   **n/k/a RHONE POULENC AG COMPANY,**
   **n/k/a BAYER CROPSCIENCE INC.**
41 State Street
Albany, NY 11207

**ANCHOR PACKING COMPANY**
CT Corporation System
1635 Market Street
Philadelphia, PA 19103

**AQUA-CHEM, INC.**
7800 North 113th Street
Milwaukee, WI 53224

**AURORA PUMP COMPANY**
13515 Ballantyne Corporate Place
Charlotte, NC 28277

**BELL & GOSSETT COMPANY**
8200 North Austin Avenue
Morton Grove, IL 60053

**BMCE INC.,**
   **f/k/a UNITED CENTRIFUGAL PUMP**
Weiner Lesniak LLP
Anna M. DiLonardo
888 Veterans Memorial Highway
Hauppague, NY 11788

**BUFFALO PUMPS, INC.**
874 OLIVER STREET
N. TONAWANDA, NY 14120

**BW/IP INTERNATIONAL, INC.,**
   **f/k/a BORG WARNER INDUSTRIAL PRODUCTS**
   **successor to BYRON JACKSON PUMPS**
200 South Michigan Avenue
Chicago, IL 60604

**BYRON JACKSON PUMPS**
5215 N. O'Conner Boulevard
Suite 2300
Irving, TX 75039

**CARRIER CORPORATION,**
    **as successor in interest to BRYANT HEATING &**
    **COOLING SYSTEMS**
CT Corporation System
111 8th Avenue
New York, NY 10011

**CBS CORPORATION, a Delaware Corporation,**
    **f/k/a VIACOM INC. successor by merger to CBS**
    **CORPORATION, a Pennsylvania Corporation,**
    **f/k/a WESTINGHOUSE ELECTRIC CORPORATION**
Asbestos Litigation Support Manager
ECKERT SEAMANS CHERIN & MELLOTT, LLC
Case Management & Technology Center
USX Towers
600 Grant Street
Pittsburgh, PA 15219

**CERTAIN TEED CORPORATION**
CT Corporation System
111 8th Avenue
New York, NY 10011

**CRANE CO.**
100 First Stamford Place
Stamford, CT 06902

**CRANE PUMPS & SYSTEMS, INC., WEINMAN DIVISION**
CT Corporation
1300 East Ninth Street
Cleveland , OH 44114

**CRANE PUMPS & SYSTEMS, INC.,**
    **as successor to BURKS PUMPS, INC.**
420 3rd Street
Piqua, OH 45356

**DURABLA MANUFACTURING COMPANY**
CLEMENTE, MUELLER & TOBIA, P.A.
218 Ridgedale Avenue
P.O. Box 1296
Morristown, NJ 07962

**EMPIRE-ACE INSULATION MFG. CORP.**
c/o THE SECRETARY OF STATE
41 State Street
Albany, NY 12207

**FAIRBANKS-MORSE PUMP CORPORATION**
3601 Fairbanks Avenue
Kansas City, KS 66106

**FOSTER WHEELER, L.L.C.**
Route 173 at Frontage Road
Clinton, NJ 08809

**GARLOCK SEALING TECHNOLOGIES LLC,**
   **f/k/a GARLOCK INC.**
CT Corporation System
111 8th Avenue
New York, NY 10011

**GENERAL ELECTRIC COMPANY**
Electric Insurance Company
75 Sam Fonzo Drive
Beverly, MA 01915

**GOODYEAR CANADA, INC.**
450 Kipling Avenue
Atobicoke, Ontario CANADA M8ZSE1

**GOODYEAR TIRE AND RUBBER COMPANY**
Corporation Service Company
1133 Avenue of the Americas
Suite 3100
New York, NY 10036

**GOULDS PUMPS, INC.**
240 Fall Street
Seneca Falls, NY 13148

**H.B. FULLER COMPANY**
Charles Becker, Esq.
Meagher & Geer
4200 Multifoods Tower
33 South Sixth Street
33 South Sixth Street
Minneapolis, MN 55402-3788

**IMO INDUSTRIES, INC.**
997 Lenox Drive
Suite 111
Lawrenceville, NJ 08648

**INGERSOLL-RAND COMPANY**
CT Corporation Systems
111 8th Avenue
New York, NY 10011

**J.H. FRANCE REFRACTORIES COMPANY**
SPECIAL CLAIMS SERVICES, INC.
809 Coshocton Avenue
Suite 1
Mount Vernon, OH 43050-1931

**OWENS-ILLINOIS, INC.**
One Michael Owens Way
Perrysburg, OH 43551

**PREMIER REFRACTORIES, INC.,**
  **f/k/a ADIENCE, INC., f/k/a BMI**
Special Claims Services, Inc.
809 Coshocton Avenue, Suite 1
Attention: Donald E. Ward, President
Mount Vernon, OH 43050

**RAPID-AMERICAN CORPORATION**
2711 Centerville Road
Wilmington, DE 19808

**REYNOLDS METALS COMPANY,**
  **as successor in interest to ATLANTIC ASBESTOS CORP.**
Lori Elliott Guzman, Esq.
HUNTON & WILLIAMS
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

**U.S. RUBBER COMPANY (UNIROYAL)**
c/o Frank Degrim, Esq.
GREENFIELD, STEIN & SENOIR
600 Third Avenue, 11th Floor
New York, NY 10016-1903

**UNION CARBIDE CORPORATION**
CT Corporation Systems
111 8th Avenue
New York, NY 10019

**WARREN PUMPS, INC.**
82 Bridges Avenue
Warren, MA 01083

**YORK INDUSTRIES CORP.**
c/o John Ronca, Jr., Esq.
RONCA, MCDONALD & HANLEY
5 Regent Street, Suite 517
Livingston, NJ 07039

# EXHIBIT B

RECYCLED

# W E I T Z
## &
# L U X E N B E R G

A   P R O F E S S I O N A L   C O R P O R A T I O N
• LAW OFFICES •

180 MAIDEN LANE • NEW YORK, N.Y. 10038-4925
TEL. 212-558-5500          FAX 212-344-5461
WWW.WEITZLUX.COM

PERRY WEITZ
ARTHUR M. LUXENBERG
ROBERT J. GORDON ††

STANLEY N. ALPERT *
MICHAEL BECKER
BRYAN BELASKY
EDWARD B. BOSEK
MARISSA BOSEK
JOHN M. BROADDUS **
DANIEL C. BURKE
PATTI BURSHTYN ††
LISA NATHANSON BUSCH
DAVID A. CHANDLER
VINCENT CHONG
EILEEN CLARK
THOMAS COMERFORD ††
BENJAMIN DARCHE
CHARLES M. FERGUSON

STUART R. FRIEDMAN
STEVEN J. GERMAN ‡
LAWRENCE GOLDHIRSCH **
EDWARD J. HAHN *
CATHERINE HEACOX ††
RENEE L. HENDERSON **
MARIE L. VANFIELD ††
ERIK JACOBS
GARY R. KLEIN ††
JERRY KRISTAL **‡
RORY L LANGMAN
DEBBI LANDAU
ROBERTO LARAGUENTE *
DIANNE LE VERRIER *

HANNAH LIM JR. **
JAMES C. LONG, JR. **
VICTORIA MANATIS ††
RICHARD M. McGOWAN **‡‡ §
C. SANDERS McKEW *§
RICHARD MEADOW **
WILLIAM J. NUGENT
MICHAEL E. PEDERSON
PAUL J. PENNOCK ‡
STUART S. PERRY ‡
G. RUSSELL RAGLAND **
ELLEN RIELKIN *∆
STEPHEN J. RIEGEL ††
MICHAEL P. ROBERTS

CHRIS ROMANELLI ††
DAVID ROSENBAND
SHELDON SILVER *
SANFORD SMOKLER §
FRANKLIN P. SOLOMON ¶
BONNIE M. STEINWOLF
JAMES B. THOMPSON ††
JOSH VITOW
DOUGLAS D. von OISTE ‡
JOSEPH P. WILLIAMS
NICHOLAS WISE
LAUREN WOLPIN *
ALLAN ZELKOVIC
GLENN ZUCKERMAN

* Of Counsel
• Also admitted in CT
∆ Also admitted in FL
†† Also admitted in MA
‡‡ Also admitted in NJ
§ Also admitted in NC
¶ Also admitted in NJ and CT
* Also admitted in NJ and PA
∆ Also admitted in NJ and DC
¶ Admitted only in NJ and PA
* Also admitted in DC and TX
** Admitted only in DC, MD, PA and VA
∆ Also admitted in DC, VA
* Admitted only in CO

May 15, 2007

**BY HAND DELIVERY (letter application only)**
Honorable Helen E. Freedman
Supreme Court of the State of New York
60 Center Street
New York, New York 10007

Re:  NYCAL: Application to the November 2007 *In- Extremis* Trial Group

Dear Justice Freedman:

Please permit this letter to constitute the Letter Application on behalf of the following plaintiff.

**Mr. John Montgoris - Index No.: 106538-07      (Mesothelioma)**

Plaintiff files this Letter Application pursuant to Case Management Order section XV.

Plaintiff is serving Answers to Interrogatories with a copy of this letter upon all defendants in this case. Diagnosing medicals will be forwarded under separate cover. Duly executed authorizations permitting the release of plaintiff's records are being provided to RecordTrak.

Respectfully submitted,

*Gina M. Nicasio*

Gina M. Nicasio, Trial Paralegal

cc:   Laraine Pacheco, Special Master (via facsimile)
      All defense counsel (via Federal Express)

210 LAKE DRIVE EAST, SUITE 101  •  CHERRY HILL, NJ 08002  •  TEL 856-755-1115  •  FAX 856-755-1995
76 SOUTH ORANGE AVENUE, SUITE 201  •  SOUTH ORANGE, NJ 07079  •  TEL 973-761-8995  •  FAX 973-763-4020
215 SOUTH MONARCH STREET, SUITE 202  •  ASPEN, CO 81611  •  TEL 970-925-6101  •  FAX 970-925-6035

SUPREME COURT OF THE STATE OF NEW YORK
ALL COUNTIES WITHIN NEW YORK CITY
-----------------------------------------------------x
NEW YORK CITY ASBESTOS LITIGATION
-----------------------------------------------------x                Index No.:106538-07
JOHN MONTGORIS and
SHEILA MONTGORIS,

                                    Plaintiffs,

            -against-

AMCHEM PRODUCTS, INC., ET AL.,

                                    Defendants.

-----------------------------------------------------x

PLAINTIFF'S RESPONSES TO
DEFENDANT'S FOURTH AMENDED STANDARD SET OF INTERROGATORIES
AND REQUEST FOR PRODUCTION OF DOCUMENTS

      Defendants, pursuant to CPLR 3130 and in accordance with Section
VIII(A)(1)(b) of the February 19, 2003 Amended Case Management Order ("CMO"),
propound the following interrogatories to plaintiffs, to be answered under
oath within the time period specified by the CMO, and, pursuant to CPLR 3120
and in accordance with Section VIII (B)(2)(b) of the CMO, request that
plaintiffs produce (with copies to each defendant) such documents within the
time period specified by the CMO.
      These interrogatories are continuing in character and require you to
file supplementary answers if you obtain further or different information
after serving your initial answers and before trial, including in such
supplemental answers the date upon and the manner in which such further or
different information came to your attention.

EXPLANATION AND DEFINITIONS

      This document constitutes both interrogatories and a request for
production of documents. The documents to be produced are in each instance
identified by responses to the interrogatories contained herein. Hence, for
the convenience of the plaintiffs, and to prevent the need for duplicative
answers, these interrogatories and this request for production of documents
are being propounded concurrently.

      As used in these interrogatories and document requests, the terms
listed below are defined as follows. Under no circumstances should any of the
terms defined below (or any instructions set forth below) be read or
interpreted as a waiver of any applicable privilege under the CPLR, including
but not limited to the attorney-client and work product privileges.

      A.    "You," "Your," "Yourself," "Plaintiff," or "Plaintiffs" means
plaintiff and all other persons acting or purporting to act on his or her
behalf, other than his or her attorney.

      B.    "Defendants," unless otherwise specified, means any defendant
named as a party to this action as well as any predecessors in interest to
any named defendants, and all other subsidiaries or divisions of any named

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

defendants, and any Bankrupt Entity (see Exhibit A attached).

C.    "Bankrupt Entity" means any company or other entity (including parent and subsidiary companies, predecessors and successors in interest) who is a party or non-party potential tortfeasor whose Asbestos-Containing Product or Material may have contributed in any manner to plaintiff's or to plaintiff's decedent's exposure to asbestos and has filed for protection from creditors under Chapter 11 of the U.S. Bankruptcy Code.    Bankrupt Entity shall include all trusts established or currently contemplated pursuant to Chapter 11 of the U.S. Bankruptcy Code, any administrative or claims processing organization established thereto, the unsecured creditors committees, the trustee in any such proceeding, and any submissions to or declarations of the bankruptcy court.    Bankrupt Entity shall include all entities, without limitation, listed on Exhibit A, which list may be supplemented from time-to-time, as necessary.

D.    "Claim against Bankrupt Entity" includes, but is not limited to, any actual or stayed legal action, any proof of claim, trust claim, claims resolution, arbitration claim, liquidated claim, unliquidated claim, demand for payment, for remedy, of liability; demand reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, equitable, secured or unsecured, toxic personal injury claims, personal injury trust claims, or any kind of claim for payment of which you have filed against Bankrupt Entities or their parent companies, successor companies or subsidiary companies.

E.    "Asbestos-Containing Product or Material" shall mean any product or material containing asbestos without regard to whether plaintiff seeks damages or other relief with respect to that product or material.    The same definition shall apply to "Asbestos-Containing Product" and to "Asbestos-Containing Material."

F.    "Document" or "documents" means any writing of any kind, including originals and all non-identical copies (whether different from the originals by reason of any notation made on such copies otherwise), as well as, without limitation, correspondence, memoranda, notes, desk calendars, diaries, statistics, letters, telegrams, minutes, contracts, reports, studies, checks, invoices, statements, receipts, returns, warranties, guarantees, summaries, pamphlets, books, prospectuses, intraoffice and interoffice communications, offers, notations of any sort of conversations, telephone calls, meetings or other communications, bulletins, magazines, publications, printed matter, photographs, motion pictures, video tapes, computer printouts, teletypes, telefax, invoices, worksheets and all drafts, alterations, modifications, changes and amendments of any of the foregoing, tapes, tape recordings, transcripts, graphic or aural records or representations of any kind of which you have knowledge or which are now or were formerly in your actual or constructive possession, custody or control.

G.    "Possession," "custody," or "control" includes the joint or several possession, custody or control not only by the person or persons to whom these interrogatories and requests are addressed, but also the joint or several possession, custody or control by each or any other person acting or purporting to act on behalf of the person, whether as employee, attorney, accountant, agent, sponsor, spokesperson, or otherwise. This definition does not include documents in the "possession," "custody," or "control" of plaintiff's attorney unless such documents were provided by plaintiff to his/her attorney and are not privileged.

H.    "Relate," "Refer," "Pertain," and "Concern" means support, evidence, describe, comprise, constitute, analyze, discuss, report or comment on, inquiring about, setting forth, explaining, considering, referring to,

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

relating to pertaining to or mentioning in whole or in part.

I.     "Person" means any natural person, firm, corporation, partnership, proprietorship, joint venture, organization, group of natural persons, or other association separately identifiable, whether or not such association has a separate juristic existence in its own right.

J.     "Identify," "identity," and "identification," when used to refer to an entity other than a natural person, means to state its full name, the present or last known address of its principal office or place of doing business, and the type of entity (e.g., corporation, partnership, unincorporated association).

K.     "Identify," "identity," and "identification," when used to refer to a natural person, means to state the following:

(1)     the person's full name and present or last known home address, home telephone number, business address and business telephone number;

(2)     the person's present title and employer or other business affiliation;

(3)     the person's home address, home telephone number, business address and business telephone number at the time of the actions at which each interrogatory is directed; and

(4)     the person's employer and title at the time of the actions at which each interrogatory is directed.

L.     "Identify," "identity," and "identification," when used to refer to a document, means to state the following:

(1)     the subject of the document;

(2)     the title of the document;

(3)     the type of document (e.g., letter, memorandum, telegraph, chart);

(4)     the date of the document, or, if the specific date thereof is unknown, the month and year or other best approximation of such date;

(5)     the identity of the person or persons who wrote, contributed to, prepared or originated such document; and

(6)     the present or last known location and custodian of the document.

M.     "His" means him and/or her and "he" means he and/or she.

N.     "Physician" includes doctors, nurses, other health care providers or practitioners of healing arts.

O.     "Medical condition" means any condition for which you are making a claim, including any asbestos-related disease, any pre-existing condition, or any condition allegedly brought about by an asbestos-related disease, including, but not limited to physical or mental illness, disease or injury.

## INSTRUCTIONS

A.     With respect to each interrogatory, in addition to supplying the information asked for and/or identifying the specific documents referred to, identify all documents which were referred to in preparing your answer thereto.

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

B.    If any document identified in an answer to an interrogatory was, but is no longer, in your possession or subject to your custody or control, or was known to you but is no longer in existence, state what disposition was made of it or what became of it.

C.    If any document is withheld from production hereunder on the basis of a claim of privilege or otherwise, identify each such document and the grounds upon which its production is being withheld.

D.    A release for a record retrieval service to obtain from the Social Security Administration a record of plaintiff's employment and earnings history should be signed by plaintiff (or the person with proper authority). A separate release for each workers' compensation claim file referred to in these interrogatories should be signed by plaintiff (or the person with proper authority) and returned to the record retrieval service. A separate authorization for a record retrieval service to obtain plaintiff's employment records from each employer identified or referred to in these interrogatories should be signed by the plaintiff (or the person with proper authority). A separate authorization for a record retrieval service to obtain plaintiff's medical records, radiographs and pathology materials from each health care provider and each hospital or medical facility identified or referred to in these interrogatories should be signed by the plaintiff (or the person with property authority). An authorization for a record retrieval service to obtain plaintiff's income tax returns from the Internal Revenue Service for the past ten years should be signed by the plaintiff (or the person with proper authority).

E.    You are requested to furnish all information in your possession and all information available to you, not merely such information as you possess of your own personal knowledge but also all knowledge that is available to you, your representatives, attorneys, physicians and other agents, by reason of inquiry, including inquiry of their representatives. Where a response to the following interrogatories sets forth information that is not based upon your own personal knowledge, but rather upon the knowledge of your representatives and other agents, you should so indicate in your response to that interrogatory.

F.    Each interrogatory includes, but is not limited to, requests for information that relate to Bankrupt Entities.

G.    Documents produced which have been submitted in connection with a claim against a Bankrupt Entity and are not otherwise obtainable independently from a Bankrupt Entity are presumptively confidential and may not be disclosed other than to counsel, a party, the court or an expert in this action without consent of the Court. Nothing in these instructions precludes offering these documents as evidence at trial should the documents be ruled admissible by the Court. To the extent any such documents are submitted to the Court, they should be submitted in a manner that will protect their confidential status.

H.    Any portion of any document produced which indicates an amount demanded, offered or accepted in settlement shall be redacted to prevent disclosure of same.

Plaintiffs reserve their right to supplement any portion of these interrogatories. In addition, plaintiffs respond to defendants' standard interrogatories without conceding relevancy, materiality or admissibility.

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

## PRELIMINARY STATEMENT AND OBJECTIONS

Plaintiff, by and through her attorneys objects to Defendants' Fourth Amended Standard Set Of Interrogatories And Request For Production Of Documents, as well as the Explanation and Definitions and Instructions contained therein ("Interrogatories"), to the extent that they seek to impose upon plaintiff obligations or burdens which are greater than, or inconsistent with New York law.

Plaintiff further objects to these Interrogatories and to each individual request and/or interrogatory, to the extent that they seek information or request the production of documents that are protected from disclosure by the attorney-client privilege, the work product doctrine, and any other applicable privilege or doctrine protecting such documents from disclosure. The production of any document prepared by the plaintiff's attorneys is not a waiver of any privilege. The inclusion of or reference to any attorney's name on any responses is not a waiver of any privilege. Moreover, the documents produced are confidential and may not be disclosed other than to counsel, a party, the court or an expert in this action without order of the Court. Plaintiff, by providing documents in response to these Interrogatories specifically does not admit the competency, relevancy, materiality, privilege and/or admissibility of such document or of the information or subject matter. Should any such disclosure by Plaintiff occur, it is inadvertent and shall not constitute a waiver of any privilege.

Plaintiff has not completed investigating the facts relating to her case, has not completed her discovery, and has not completed preparing her case. Therefore, these responses are preliminary and without prejudice to plaintiff's right to discover and/or produce evidence of additional facts and/or additional evidence of existing facts. Plaintiff has made a good faith effort to respond to the Interrogatories, but reserves the right to object to, and to move to have vacated, all of these Interrogatories.

Plaintiff objects to the Interrogatories, and to each individual request and/or interrogatory, to the extent that they seek information that is not within plaintiff's own first-hand knowledge or request the production of documents that are not within plaintiff's possession, custody or control.

Plaintiff further objects to the Interrogatories as overly broad and burdensome and demanding an investigation into matters which are neither relevant to these proceeding nor designed to lead to the discovery of evidence relevant to these proceedings.

Plaintiff does not waive and specifically preserves the following objections:

1. Any and all objections to the competency, relevancy, materiality, privilege and admissibility of the information or the subject matter thereof, as evidence for any purpose and any proceeding in this action (including trial) and in other actions.

2. The right to object on any grounds at any time to demand for further responses or further documents to these or any other discovery requests or other discovery proceedings involved or related to the subject matter of the discovery to which information or documents are provided; and,

3. The right at any time to review, correct, add to, supplement or clarify any of these responses.

These objections are incorporated by reference into any amendment and/or supplement to these interrogatories. Moreover, each of these

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

objections is incorporated  by reference into to each specific response without regard to whether an additional objection is made in such response.

Subject to these objections and reservations, plaintiff, by and through her attorneys responds as follows:

### INTERROGATORY ANSWERS

1Q.   State the following:
    (a)   your full name, and all other names by which you have been known;
    (b)   age, and date and place of birth;
    (c)   whether you were an adopted child;
    (d)   present marital status, date of current marriage, spouse's maiden name, date of any prior marriages and the names of any prior spouses, if applicable
    (e)   present home address; and
    (f)   social security number.

1A.   (a)   Full name: John Anthony Montgoris
          Other names: n/a
    (b)   Age: 75
          DOB: July 17, 1935
          Birthplace: New York, NY;
    (c)   Not Adopted;
    (d)   Marital Status: married September 23, 1958;
          Spouse: Sheila Montgoris;
    (e)   Address: 135 Lockwood Avenue, Farmingdale, NY 11735;
    (f)   Social security: 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.

2Q.   State the following with regard to your father and mother:
    (a)   names;
    (b)   current address (if deceased, state last known address);
    (c)   the current condition of each one's health, including any specific medical problems. If either of your parents are deceased, please state for each deceased parent:
          i.    specific physical problems;
          ii.   date and place of death;
          iii.  age and cause of death for each parent.

2A.
    (a)   Father: Elias Montgoris
    (b)   Father's last known: 282 Broome Street, New York, NY;
    (c)   Father – deceased;
          (i)   diabetes;
          (ii) DOD: 1954; place: New York, NY
          (iii)Age: 62 years old; Cause: stroke.

    (a)   Mother: Delia Truppo
    (b)   Mother's last known address: Queens nursing home – name and address unknown;
    (c)   Mother – deceased:
          (i)   none;
          (ii) DOD: unknown; place: Queens, NY
          (iv) Age: 83 years old; Cause: heart failure.

3Q.    State the following with regard to each of your children:

     (a)    full name;
     (b)    the date of birth;
     (c)    sex;
     (d)    current address (if deceased, state the last known address)
     (e)    social security number;
     (f)    whether birth child or adopted child;
     (g)    current state of each one's health. If any of your children are deceased, state for each deceased child:

         i.     specific physical problems;
         ii.    date and place of death; and
         iii.   age and cause of death for each child.

3A.     (a) Catherine Montgoris;
       (b) 2/22/59;
       (c) Female;
       (d) 17 Huntington Avenue, Kings Park, NY;
       (e) to be provided;
       (f) birth;
       (g) good

4Q.    State the complete address of all places you have resided since birth giving the inclusive dates of residence for each place named and as to each state:

     (a)    fuel used for heating and cooking;
     (b)    significant home improvements (e.g., additions, reinsulation, re-wiring, etc.);
     (c)    number of family units co-occupying said structure.

4A.     (1)    Born 7/17/1931 - Cherry Street, New York, NY;
       (2)    1932 to 1943 - Chrystie Street, New York, NY;
       (3)    1943 to 1951 - Broome Street, New York, NY;
       (4)    1951 to 1962 - 43rd Street, Borough Park, Brooklyn, NY;
       (5)    1962 to present - 135 Lockwood Avenue, Farmingdale, NY 11735;

5Q.    For every physician or other health care provider who ever tested, treated, consulted with or examined you up to and including the present date, for any reason whatsoever, please state the following separately as to each:

     (a)    name and address of physician or health care provider and, if ongoing, the approximate frequency of said treatment and services;
     (b)    date(s) of test, examination and/or treatment;
     (c)    symptoms complained of at the time, if any;
     (d)    any diagnosis made;
     (e)    treatment or examination given and reason for treatment or examination; and
     (f)    any drugs or medications prescribed.

5A.     Although it is possible that the plaintiff consulted other doctors, nurses and health care providers, at the present time, plaintiff is aware of the following doctors and treatment rendered:

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

5A.   (1)  Childhood physicians - Dr. Mondello and Dr. Gillsepie -
            routine well visits;
      (2)  October 5, 2006 - admitted to Winthrop University Hospital
            for a hip operation - performed by Dr. DeMaio;
      (3)  March 2007 - saw Dr. Gregorio for shortness of breath;
      (4)  March 9, 2007 - x-ray performed by Dr. Jacob - fluid found
            in right lung;
      (5)  March 13, 2007 - saw Dr. ian Newmark at Syossett Hospital
            for fluid removal;
      (6)  March 16, 2007 - Dr. Tiniti - PET scan, CT scan, right
            lung decortication and performed biopsy, which revealed
            mesothelioma;

6Q.   For every hospital, clinic or health care institution in which you have
ever been admitted, treated, tested, or examined, whether as an "in-patient"
or as an "out- patient," please state the following for each such visit:

      (a)  name and address of the facility;
      (b)  dates and description of test, treatment, examination or
            hospitalization and, if ongoing, the approximate frequency
            of said treatment and services; and
      (c)  reason for visit to the facility.

6A.   Although it is possible that plaintiff may have been treated or
      examined in other institutions, at the present time plaintiff is
      aware of the following institutions and treatment rendered:

      (a) through (c) please see answer to 5 (a) through (f).

7Q.   State each of your asbestos-related injuries and/or diseases,
describe the nature of those symptoms that you contend are related to your
asbestos-related condition(s), and state the date when you first experienced
each such symptom and the date of diagnosis and the name of any diagnosing
physician and, if different, indicate the date you first became aware of the
diagnosis.

7A.   Plaintiff was diagnosed with Mesothelioma in March 2007.  At
      various and numerous times, plaintiff has experienced a variety
      of different and differing symptoms related to his injury which
      are numerous and frequent.

8Q.   Describe any pain, incapacity, inability to lead a normal life,
inability to work, or disability (including retirement) alleged to have
resulted from your medical conditions), including the date and basis
therefore.

8A.   Since his diagnosis with mesothelioma, plaintiff has experienced
      increasing shortness of breath, fear of cancer, mental and
      emotional distress, and inconvenience.  Plaintiff's asbestos-
      related condition has disrupted his life, limiting him in his
      everyday activities and interfered with his living a normal
      life.

9Q.   Have you ever had any biopsies or tissue samples taken?  If so,
please state for each such procedure:

      (i)  the name of the physician performing such procedure;

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

(ii)  the address where such procedure was performed;
(iii) the date when such procedure was performed; and
(iv)  the results, conclusions, and/or diagnosis arising
      from such procedure.

9A.   (a-d) Plaintiff has had biopsies and/or tissue samples taken at
hospitals, however, the medical records may or may not reflect
other locations.  See answers 5 and 6, as well as plaintiff's
medical records.

10Q.  Have you ever had any chest x-rays, CT Scans and/or pulmonary
function tests?  If so, state:

(a)   the dates and places;
(b)   the reasons;
(c)   the results and/or diagnosis resulting therefrom;
(d)   the location of all chest X-ray films and CT Scans; and
      provide appropriate authorization to obtain all X-rays, CT
      Scans and pulmonary function tests.

10A.  Plaintiff has had chest x-rays, CT Scans, and pulmonary function
tests performed at hospitals, however, the medical records may
or may not reflect other locations. See answers 5 and 6, as well
as plaintiff's medical records.

11Q.  Have you ever been exposed to, used, inhaled or ingested any of
the following substances on a regular basis or at work.  If so, state the
date(s), place(s), and circumstances thereof.

| II.     acids | III.   aluminum | IV.    arsenic |
|---------------|-----------------|----------------|
| V.      barium | VI.    beryllium | VII.   butanol |
| VIII. cadmium | IX.    Carborundum | X.     chloroethylene |
| XI.   chlorine | XII.   chromate | XIII.  chromite |
| XIV.  chromium | XV. coal dust (coal) | XVI.   coal tar |
| XVII. cotton dust | XVIII.      epoxy | XIX.   ethanol |
| XX. grinding dust | XXI.   iron | XXII.       isocyanates |
| XXIII. isopropanol | XXIV.  lead | XXV.   live chickens |
| XXVI. manganese | XXVII. nickel | XXVIII. nitrogen dioxide |
| XXIX. nuclear radiation | XXX. ozone | XXXI. petroleum distillates |
| XXXII. phosgene | XXXIII. radiation | XXXIV. silica |
| XXXV. titanium | XXXVI. toluene | XXXVII. welding smoke or fumes |
| XXXVIII. zylene | XXXIX. zinc. | |

11A.  At various times during his employment but not necessarily on a regular basis, Plaintiff may have been exposed to some of these substances.

12Q.  Do you use or have you ever used cigarettes, cigars, pipes, smokeless tobacco, or any other tobacco substance, from birth to the present time? If so, state the following:

    (a)  the brand and type of tobacco product(s) used (e.g., filter, non-filter, chewing tobacco);

    (b)  the dates during which you used each such product;

    (c)  the amount of the product used per day, during each period of time (e.g., 2 packs of cigarettes per day);

    (d)  whether you have ever been told by a physician that you are or were suffering from any disease or illness caused by or contributed to by tobacco; and

    (e)  whether you were ever advised by any physician or any other person that use of tobacco products could adversely affect your health and whether you were ever advised to stop using tobacco products, and if so, identify each physician or person who gave you any such advice, the dates on which the advice was given, and state exactly what, if anything, you did in response to that advice.

12A.  (a) through (c) not applicable as plaintiff has never smoked

    (d)  No. Plaintiff was never told by a physician that he is or was suffering from any disease or illness caused by or contributed to by tobacco.

    (e)  No.

13Q.  For each spouse and member of your household, from your birth to the present time, state whether they use or have ever used cigarettes, cigars, pipes, smokeless tobacco, or any other tobacco substance, and if so, state the following:

    (a)  the brand and type of tobacco product(s) used (e.g., filter, non-filter, chewing tobacco); and

    (b)  the dates during which they used each such product.

13A.  (a) Plaintiff's spouse smoked filtered cigarettes;
    (b) Plaintiff's spouse smoked on and off for 40 years.

14Q.  Do you presently consume or have you in the past consumed alcoholic beverages. If so, state the following:

    (a)  the type of alcoholic beverages consumed;

    (b)  the dates during which you consumed each such alcoholic beverage;

    (c)  the amount of such beverage you consumed each day; and

    (d)  whether you have ever been treated for any illness or disease related to your consumption of alcoholic beverages.

14A.  Plaintiff states that he has consumed alcoholic beverages only on social/weekend occasions.

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

15Q.  Have you ever been a member of the Armed Forces of the United States?  If so, state the following:

(a)  the branch of the service, serial number, and highest rank held;
(b)  the beginning and ending dates of your military service;
(c)  the type of discharge that you received; and
(d)  whether you sustained any injuries or incurred any illness during military service.
(e)  if you received a medical discharge, attach a copy hereto and set forth the medical reasons.

15A.  (a)  Plaintiff was a member of the United States Army.
(b)  He was a member of the United States Army from 1951 to 1953.

(c)  Plaintiff was honorably discharged;
(d)  Plaintiff did not sustain any injuries nor did he incur any illness during military service;
(e)  Plaintiff did not receive a medical discharge.

16Q.  As to each and every employer (including military service) you have had form the time you were first employed to the present, set forth the following:

(Use the attached Chart A)

Include on the chart all employers where you have worked, and all job sites , _regardless_ of whether or not you believe you were exposed to asbestos during the employment. Also include the source of any product identification information provided on Chart A.

16A.  See attached; defendants are also directed to plaintiff's social security printout which will be obtainable from RecordTrak.

17Q.  Please state the following with respect to each Asbestos-Containing Product identified on Chart A:

(a)  the color, dimensions, shape, form, texture, weight, appearance and flexibility of each product;
(b)  the appearance of the package or container indicating the manner of packaging, size, dimensions, color and weight; and
(c)  the name, logo, label, numerical and alphabetical markings and other markings or words including warnings on the product and package or container.

17A.  Plaintiff recalls, at the present time, that he was likely to have been exposed to a variety of different asbestos containing products, during his employment as a coppersmith and as a worker for the City of New York Waste Treatment Plant, including but not limited to: pipecovering, block, cement, cloth/clothing, fireproofing spray, gaskets, firebrick, tape, sheetrock, compound, floor tile, ceiling tile, brakes, clutches, engine gaskets and insulation used on equipment such as boilers, pumps and turbines, which products were manufactured by various

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

companies, some of which the plaintiff may identify at his deposition.

Plaintiff's counsel alleges that, at the present time and upon information and belief, the plaintiff was exposed to asbestos-containing products manufactured by, or insulation used on equipment manufactured by, or was exposed to asbestos due to the negligence of, the defendants named in the Plaintiff's lawsuit as well but not limited to some of the companies (or their legal predecessors) listed on Exhibit A: UNR Industries, Johns-Manville, Amatex, Forty-Eight Insulations, PACOR, Celotex, National Gypsum, Eagle-Picher, H.K. Porter, Kentile, Keene, Rockwool, M.H. Detrick, Rutland Fire & Clay, Babcock & Wilcox, Pittsburgh Corning, Burns & Roe, Owens Corning, Armstrong World Industries, G-1 Holdings, W.R. Grace, United States Gypsum, Federal Mogul, Eastco Industrial Safety, North American Refractories, Kaiser Aluminum, Plibrico Refractories, Porter-Hayden, Harbison-Walker Refractories, A.F. Green, Alra Group, A.C.&S. and others.

Plaintiff's counsel further states that identification of the manufactures, sellers, distributors and users of the products to which the plaintiff was exposed, as well as any and all tort-feasors liable to plaintiff for causing or contributing to his contraction of an asbestos-related disease may be established by other witnesses, Interrogatory Answers of the tort-feasors, sales invoices and other evidence. Plaintiff and Plaintiff's counsel reserve the right to amend and/or supplement this answer, as additional information becomes available.

18Q.  If you have retired from your employment, set forth the
following:
    (a)  whether said retirement was voluntary or involuntary;
    (b)  the effective date of said retirement;
    (c)  the name of your employer at the time of retirement;
    (d)  the reason for your retirement;
    (e)  whether your retirement was related to any claimed asbestos-related injury; and
    (f)  the amount of pension and/or retirement benefits you are receiving or entitled to receive.

18A.  (a)  Plaintiff entered voluntary retirement;
     (b)  Plaintiff is retired as of 1990;
     (c)  At the time of retirement plaintiff was employed by the City of New York;
     (d)  Plaintiff retired due to meeting his age requirement;
     (e)  His retirement was not related to his asbestos related disease.
     (f)  Plaintiff receives retirement benefits in the amount of $2,300.00 per month.

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.O.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

19Q.  State whether you were exposed (either directly, through a co-worker or otherwise), to any Bankrupt Entity's Asbestos-Containing Materials, or products either mined or manufactured, sold, or distributed by a Bankrupt Entity.  If so, state the following;

(a)    As to each and every employer (including military service) you have had from the time you were first employed to the present, set forth the following, concerning Bankrupt Entities' products only:

i.     Name of employer;
ii.    Dates of employment;
iii.   Asbestos-related jobsite and address where Bankrupt Entity's products were being used;
iv.    Dates you were at the jobsite;
v.     Job duties at the particular jobsite;
vi.    Bankrupt Entity's asbestos-containing materials or products to which you were exposed;
vii.   Other companies using Bankrupt Entity's asbestos-containing materials or products at the jobsite; and
viii.  Whether you received any warnings with respect to the use of said product and the nature of those warnings.

(b) If you were exposed to, used, ingested or inhaled any Bankrupt Entity's Asbestos-Containing Products at any time other than in the scope of your employment, state for each such exposure:

i.     the date, location and circumstances; and
ii.    the type of product and the name of the manufacturer, distributor, and miner.

19A.  See Answer to Question 17.

20Q.  If you were exposed to, used, ingested or inhaled asbestos or asbestos-containing products at any time other than in the scope of your employment, state for each such exposure:
(a)    the date, location and circumstances; and
(b)    the type of product and the name of the manufacturer, distributor, and miner.

20A.  Plaintiff states that he is unaware of any non-occupational exposure.

21Q.  Have you ever been a member of any labor union? If so, state:I. the name and address of each local, national and international labor union;

(a)    the inclusive dates of your membership; and
(b)    any positions you have held with each such labor union, and the dates during which you held such positions.

21A.  (a)    Plaintiff was a member of DC-37 Union Local #: 1320 located at New York, NY;
(b)    Plaintiff was a member of said union from 1962 to 1990;
(c)    Plaintiff did not hold any positions as a member of said union.

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

22Q.  State whether you have ever seen or received any information, instruction, direction, warning, or directive, from any source whatsoever, concerning alleged dangers of exposure to asbestos or asbestos-containing products, and if so, identify:

    (a)  each such warning, directive, notification, direction, instruction, or information;
    (b)  the means by which such was given to you;
    (c)  the source and the date on which it was received by you; and
    (d)  your response or reaction, including any complaints made or changes in work habits.

22A.  Plaintiff states that he was never warned of the harmful effects of exposure to asbestos before his asbestos-related injuries manifested themselves.

23Q.  State whether you had available for use during any period of your employment, respirators or masks or other dust inhalation inhibitor, or protective gear and, if so, state the following:

    (a)  the period of time during which said items were available;
    (b)  what instructions were given with regard to the use of each of said items;
    (c)  whether you used said items and the dates of your use;
    (d)  whether you ever requested said items, and, if so, when, where and to whom the request was made, and the response to the request.

23A.  Plaintiff states that he does not have a recollection of masks becoming available until later on in his career, at which time they were available only sporadically.

24Q.  If you are making a claim for loss of earnings or impairment of earning power because of your medical conditions, state the following:

    (a)  date of commencement of any loss or impairment;
    (b)  the name and address of your employer, your job title and your monthly or weekly rate of pay at the time of the alleged commencement of any loss or impairment;
    (c)  if you had more than one employer during the three year period prior to the date of the commencement of any loss or impairment, as indicated on Chart A, provide your monthly or weekly rate of pay and inclusive dates of such employment during the three year period;
    (d)  your total earnings for the period of three years prior to the commencement of any loss or impairment;
    (e)  the inclusive dates during which you allege that you were unable to work as a result of any loss or impairment and the total amount of pay you claim you lost because of this absence;
    (f)  the date on which any loss or impairment ended; and
    (g)  your monthly or weekly rate of pay which you have received, from the date of any loss or impairment ended through the present time.

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

24A.  (a) through (g) Plaintiff is not making a claim for lost earnings.

25Q.  Do you claim damages for loss of consortium, society, affection, services, or sexual enjoyment? If so, please set forth in complete detail all facts on which this claim is based, including a complete description of the loss suffered.

25A.  Yes. Due to plaintiff's injuries and symptoms as described in Interrogatory Answer #7, the marital relationship between plaintiff and his spouse has been fundamentally altered and severely damaged. Plaintiff's spouse has been deprived of the support and services formerly provided by plaintiff. Plaintiff's debilitated condition has hampered the ability to provide the love, solace and emotional support previously enjoyed by and relied upon by plaintiff's spouse as integral elements of their sacred marital relationship.

26Q.  For each person who is or was partially or totally dependent upon you for financial support and assistance during the last ten years, state:

(a)   the name, address, sex, age and relationship; and
(b)   the amounts you contributed during the last ten years for support and assistance.

26A.  (a)   Sheila Montgoris, see answer 1(d);
(b)   Plaintiff provided complete and partial support for his wife for all and part of the past ten years.

27Q.  State, in the form of an itemized list, all special damages alleged in this lawsuit including, but not limited to, hospital charges, medical charges, medicines, lost wages, etc., naming the person or organization to whom each item of expense was paid or is due, and, if paid, by whom each item of expense was paid.

27A.  Plaintiff's counsel is presently coordinating this information, which will be forwarded upon receipt; defendants are also directed to records received from RecordTrak.

28Q.  Identify and give the substance of all written statements, recordings, or videotapes which relate to the facts of this lawsuit and the damages you claim given by plaintiff or any witness (provided such information is in plaintiff's possession, custody or control and/or such statements, recordings or videotapes are not protected by attorney-client privilege) in the above-captioned matter.

28A.  Objection. Unduly broad and vague. Subject to the objection, Plaintiff responds as follows: At this time, Plaintiff has no such written statements, recordings, or video tapes which relate to the facts of this lawsuit, and has no basis for knowing of any witnesses except for those previously listed.

29Q.  Have you ever made any claim for, or received any, health or accident insurance benefits, social security benefits, state or federal benefits for disabilities, workers' compensation benefits, veterans' benefits, tort claims or suits, Federal Employers Liability Act claims or suits, Longshoremen and Harbor Workers Act claims or suits, unemployment

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

compensation insurance benefits, or early payment from any public or private pensions due to disability or your medical condition? If so, state the following:

(a)  the date and place where each such claim was made;

(b)  the name and nature of the entity with which the claim was made;

(c)  any identifying number, such as a docket or petition number, for each claim;

(d)  the defendant, agency, insurer, employer or other entity to or against whom the claim was made and its file number;

(e)  the nature of the claim;

(f)  whether you were examined by a physician and if so, the name and address of that physician;

(g)  the result of such claim, including the amount realized by way of settlement, judgment or award upon the claim;

(h)  the name and address of any attorney who represented you with regard to such claims; and

(i)  whether you are presently receiving such benefits.

29A.  (a) through (i) Plaintiff has not received any health or accident insurance benefits, social security benefits, state or federal benefits for disabilities, workers' compensation benefits, veterans' benefits, tort claims or suits, Federal Employers Liability Act claims or suits, Longshoremen and Harbor Workers Act claims or suits, unemployment compensation insurance benefits, or early payment from any public or private pensions due to his disability or medical condition.

30Q.  State the following with regard to your asbestos-related legal action:

(a)  Did you file an asbestos-related claim in more than one jurisdiction;

(b)  Identify all of the jurisdiction(s) where an asbestos-related claim has been filed (whether or not these claims have been dismissed or discontinued or otherwise resolved) on your behalf;

(c)  Did you file your asbestos-related claim(s) under more than one Index Number; and

(d)  Provide all of the Index Numbers for all of your asbestos-related claim(s), including all multiple Index Numbers for claims filed in New York County.

30A.  Plaintiff's counsel, on behalf of plaintiff, has filed only this lawsuit, in New York State, County of New York, under Index Number 106538-07.

31Q.  State whether or not you have made, filed, or submitted a Claim Against Bankrupt Entity or received funds in settlement from a Bankrupt Entity. If so, for each claim state the following:

(a)  the date and place where each such claim was made;

(b)  the name and nature of the entity with which the claim was made;

(c)  any identifying number, such as a docket or petition number, for each claim;

(d)  the defendant, agency, insurer, employer or other entity

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

<table>
<tr><td></td><td>to or against whom the claim was made and its file number;</td></tr>
<tr><td>(e)</td><td>the nature of the claim;</td></tr>
<tr><td>(f)</td><td>whether you were examined by a physician and if so, the name and address of that physician; and</td></tr>
<tr><td>(g)</td><td>whether you received any compensation as a result of such claim, but not the amount.</td></tr>
</table>

31A.   Plaintiff has not filed a claim against nor received any funds from any Bankrupt Entities.
Plaintiff's counsel, on behalf of the plaintiff, has not filed claims against any Bankrupt Entities.

32Q.   State whether you have applied to any Bankrupt Entity or Bankruptcy Court to lift the stay as to your claim or otherwise have attempted to join a Bankrupt Entity to this action.

32A.   Neither plaintiff nor plaintiff's counsel on plaintiff's behalf has applied to any Bankrupt Entity or bankrupt Court to lift the stay as to plaintiff's claim or otherwise attempted to join a Bankrupt Entity to this action.

33Q.   Have you or your spouse ever been a party to or a witness in any lawsuit, court or administrative proceeding? If so, please state:

<table>
<tr><td>(a)</td><td>whether you or your spouse were a party or witness and if party, whether plaintiff or defendant;</td></tr>
<tr><td>(b)</td><td>the precise name of the lawsuit or proceeding, the court agency in which it was brought and the docket number;</td></tr>
<tr><td>(c)</td><td>the nature of the charges or claims and, if you or your spouse were a witness, the subject matter of the testimony; and</td></tr>
<tr><td>(d)</td><td>the disposition of the case.</td></tr>
</table>

33A.   (a) through (d) Neither plaintiff nor his spouse have ever bee a party or witness to any lawsuit, court or administrative proceeding.

34Q.   Have you or your spouse filed a claim seeking compensation for any alleged asbestos-related condition from any entity, including settlement trusts? Specify "Yes" or "No" only.

34Q.   See Answer to Question 31.

35Q.   Identify all entities, whether or not parties to this lawsuit, with whom you have settled or agreed to settle this lawsuit.

35A.   Plaintiff has not settled nor agreed to settle this lawsuit with any entities at this juncture.
Plaintiff's counsel, on behalf of plaintiff, has not settled or agreed to settle plaintiff's lawsuit with any entity at this juncture.

36Q.   Identify all persons, other than your attorneys, who provided you with any information used in answering these interrogatories, and state the particular information each person supplied.

36A.   The plaintiff relied upon himself in answering these interrogatories except where indicated otherwise.

## REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Section VIII (B)(2)(b) of the CMO, the defendants request that plaintiffs produce for inspection and copying, the documents and things identified below. The documents and things identified herein shall be produced for inspection and copying at such time as the answers to the interrogatories herein are filed. The following requests include, but are not limited to, documents that relate to Bankrupt Entities.

You are hereby requested to produce the following documents and things:

1.    All documents identified in your answers to these interrogatories.

> R.1. All the documents in our possession are attached.

2.    All documents relating to the plaintiff's job qualifications and professional licenses held.

> R.2. To the extent that any exist, they will be provided.

3.    All documents relating to the plaintiff's membership in any labor trade association or professional organization.

> R.3. To the extent that any exist, they will be provided.

4.    All documents relating to the plaintiff's military or foreign service, including and not limited to, personnel records, discharge papers, military occupational specialty qualification, promotions, reductions or disciplinary actions.

> R.4. To the extent that there are an available, RecordTrak has been provided with a duly executed authorization.

5.    All documents relating to any claim or demand ever made by the plaintiff or the plaintiff's decedent for damages, compensation or other benefits allegedly resulting from any illness or injury, including but not limited to, Claims Against Bankrupt Entities, Industrial Accident Board records, social security disability claim records, federal or state employment compensation claim records, social disability records, pension claim record or any other health or accident insurance claim records.

> R.5. See attached or To be provided (or N/A).

6.    All documents in the plaintiff's possession. custody or control relating in any way to the plaintiff's exposure or possible exposure to asbestos, asbestos-containing products and/or asbestos-containing materials.

> R.6. Objection, attorney/client privilege; to the extent that this request does not invade such privileges, Plaintiff does not have any such material.

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

7. All documents relating in any way to the plaintiff's exposure or possible exposure to silica, acids, beryllium, nuclear radiation, ammonia, cadmium, chlorine, chromates, phosgene, grinding dust, coal dust, cotton dust, nickel, welding smoke or fumes.

    R.7. Plaintiff does not specifically recall if he was ever exposed to the substances listed, but nonetheless does not have any of the materials asked for.

8. All documents, of which you have ever become aware, relating in any way to warnings, potential health hazards, instructions or precautions regarding the use or handling of, or exposure to, asbestos, asbestos-containing products, and/or asbestos-containing materials.

    R.8. To the extent that there are any available, RecordTrak has been provided with a duly executed authorization.

9. All applications prepared or submitted by or on behalf of the plaintiff for life insurance, medical insurance, health and accident insurance, and/or disability insurance.

    R.9. Plaintiff has no such documents in his possession.

10. All statements, recorded interviews, films, videotapes, reports, questionnaires, forms or other documents made, submitted, compiled, prepared or filled out by, on behalf of, or under the direction of, plaintiff relating in any way to exposure or alleged exposure to asbestos, asbestos-containing products and/or asbestos-containing materials or any other issues relating to this lawsuit, except that information prepared by, for, or at the request of plaintiff's counsel must be identified (including the date made), but need not be produced without any order by the Court, provided that written or recorded communication between plaintiff and counsel, made after an attorney-client relationship has been established need not be produced or identified.

    R.10. Objection. Attorney/client privilege; work product privilege. To the extent that this request does not invade any such privilege, Plaintiff does not have any such material.

11. All records relating to comments, complaints, suggestions, or proposals made to your employer or your union, by yourself or by other employees or union members regarding asbestos exposure.

    R.11. Plaintiff has no such material in his possession.

12. All written, recorded, filmed, transcribed or videotaped statements of all parties and non-party declarants pertaining to the subject of this lawsuit, except that information prepared by, for, or at the request of plaintiff's counsel must be identified (including he date made), but need not be produced without an order by the Court, provided that written or recorded communication between plaintiff and counsel, made after an

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

attorney-client relationship has been established need not be produced or identified.

> R.12. Objection. Attorney/client privilege; work product privilege. To the extent that this request does not invade any such privilege, Plaintiff does not have any such material.

13. All photographs of the plaintiff at work or in work clothes and all photographs of all products or conditions complained of in the plaintiff's place of employment.

> R.13. To the extent that they exist, they will be provided.

14. Copies of all itemized bills covering all the special damages and losses and expenses claimed in this matter.

> R.14. To be provided; Defendants are also directed to RecordTrak.

15. Copies of all reports, correspondence and records from any doctor who has examined the plaintiff, any hospital where plaintiff has been treated either as an inpatient or as an outpatient, except for any reports, records, correspondence, or communications issued by any consulting physicians who have been retained or specially employed in anticipation of litigation or preparation for trial and who are not expected to be called as a witness at trial.

> R.15. RecordTrak has all available medical records.

16. All tissue specimens, tissue slides, and x-ray films pertaining to the plaintiff.

> R.16. RecordTrak has all available medical records.

17. Copies of plaintiff's income tax records for the last ten years as well as any other documents, including economic loss reports, upon which plaintiff relies in support of his claims. If loss of earnings or earning capacity is alleged or claimed to have occurred before the current year, include copies of the income tax returns of the plaintiff from ten years prior to the claimed loss and up to the current tax year.

> R.17. RecordTrak has all available income tax records.

18. Any asbestos and/or asbestos-containing products of the type to which the plaintiff alleges exposure which the plaintiff has in his possession, custody or control.

> R.18. To the extent that any exist, they will be provided.

19. All photographs, charts, drawings, diagrams or other graphic representations depicting work conditions at work sites where plaintiff claims he was exposed to asbestos or asbestos-containing products.

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

R.19. To the extent that any exist, they will be provided.

20.   All invoices, bills, statements and any other writings or records which plaintiff contends evidence the sale of any products containing asbestos to the place of plaintiff's employment at which plaintiff claims that he was exposed to asbestos.

R.20. To the extent that any exist, they will be provided.

21.   Any written advice, publication, warnings, order, directive, requirement, or recommendation, which advised or warned of the possible harmful effects of exposure to or inhalation of asbestos or asbestos-containing products in the possession, custody or control of the plaintiff.

R.21. Plaintiff has no such material in his possession.

22.   Any accident or incident reports which relate to the facts, circumstances or incidents which form the basis of plaintiff's complaint.

R.22. To the extent that any exist, they will be provided.

Dated:    New York, New York
          May 14, 2007

                                    Respectfully submitted,
                                    WEITZ & LUXENBERG, P.C.
                                    Attorneys for Plaintiffs

                                    By: _____
                                         Michael P. Roberts
                                    180 Maiden Lane
                                    New York, NY 10038
                                    (212) 558-5500

TO: All parties per attached rider

## EXHIBIT A

Bankrupt Entity includes, without limitation: UNR Industries, Inc., Johns-Manville Co., Amatex Corp., Waterman Steamship Corp., Wallace & Gale Co., Forty-Eight Insulations, Inc., PACOR, Prudential Lines, Inc., Standard Insulations, Inc., US Lines, Nicolet, Inc., Gatke Corp., Chemetron Corp., Raytech, Delaware Insulations, Celotex Corp., Hillsborough Holdings, National Gypsum Co., Standard Asbestos Mfg. & Insul., Eagle-Picher, H.K. Porter Co., Cassiar Mines, Keene Corp., American Shipbuilding, Inc., Lykes Brothers Steamship, Rock Wool Mfg., SGL Carbon, M.H. Detrick, Brunswick Fabricators, Fuller-Austin Insul., Harnischfeger Corp., Joy Technologies, Rutland Fire & Clay, Babcock & Wilcox, Pittsburgh Corning, Burns & Roe Enterprises, E.J. Bartells, Owens Corning, Armstrong World Industries, G-1 Holdings (GAF Corp.), W.R. Grace, Skinner Engine Co., USG (US Gypsum) Corp., Federal Mogul, Eastco Industrial Safety Corp., Washington Group Int'l, Inc., Bethlehem Steel, North American Refractories, Kaiser Aluminum, Plibrico Refractories, Porter-Hayden, American Club, Huxley Development Corp., Harbison-Walker Refractories Co., Continental Producers Corp., A.P. Green Indus., Shook & Fletcher, Atra Group, Inc. (Synkoloid), and ACandS, Inc; C.E. Thurston.

LAW OFFICES
OF
WEITZ
&
LUXENBERG, P.C.
180 MAIDEN LANE
NEW YORK, N.Y. 10038

CHART A

EMPLOYER/JOBSITE HISTORY FOR JOHN MONTGORLIS

| Name of Employer | Dates of Employment | Asbestos-related Jobsite & Address | Dates You Were at Jobsite | Job Duties | ACM* Used, Personally, By Coworkers, BY Other Companies On Site And To Which You Were Otherwise Exposed | Coworkers on Jobsite, Including supervisor |
|---|---|---|---|---|---|---|
| See Social Security Printout | to be provided | Detecto Scales, Brooklyn, New York | 1948 to 1951 | Fabricated hampers and wastebaskets in a factory setting | see Interrogatory Answer #17 | see Interrogatory Answer #17 |
| See Social Security Printout | to be provided | Detecto Scales, Brooklyn, New York | 1953 to 1956 | Fabricated hampers and wastebaskets in a factory setting | see Interrogatory Answer #17 | see Interrogatory Answer #17 |
| See Social Security Printout | to be provided | Brooklyn Navy Yard, Brooklyn, New York | 1956 to 1962 | Coppersmith | see Interrogatory Answer #17 | see Interrogatory Answer #17 |
| See Social Security Printout | to be provided | City of New York Sewage Treatment Facility | 1962 to 1990 | Senior sewage treatment worker | see Interrogatory Answer #17 | see Interrogatory Answer #17 |
| | | | | | | see Interrogatory Answer #17 |
| | | | | | | see Interrogatory Answer #17 |
| | | | | | | see Interrogatory Answer #17 |
| | | | | | | see Interrogatory Answer #17 |
| | | | | | | see Interrogatory Answer #17 |
| | | | | | | |
| | | | | | | |
| | | | | | | |

* ACM - Asbestos Containing Materials or Products.

** Identify brand and manufacturer names, if known.

*Index No.* *Year 20*

# SUPREME COURT OF THE STATE OF NEW YORK
# COUNTY OF NEW YORK

JOHN MONTGORIS and
SHEILA MONTGORIS,

Plaintiffs,

- against -

AMCHEM PRODUCTS, INC., ET AL.,

Defendants.

**PLAINTIFF'S RESPONSE TO DEFENDANT'S FOURTH AMENDED STANDARD SET OF
INTERROGATORIES**

WEITZ & LUXENBERG, P.C.

*Attorneys for*

**Plaintiffs** Maiden Lane
New York, NY 10038
(212) 558-5500

*Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and belief and reasonable inquiry, the contentions contained in the annexed document are not frivolous.*

*Dated:*................................     Signature.....................................................................

Print Signer's Name.....................................................

*Service of a copy of the within*                                                    *is hereby admitted.*

*Dated:*

...............................................................................

*Attorney(s) for*

*PLEASE TAKE NOTICE*

☐  *that the within is a (certified) true copy of a*
NOTICE OF   *entered in the office of the clerk of the within named Court on*                    *20*
ENTRY

☐  *that an Order of which the within is a true copy will be presented for settlement to the*
NOTICE OF   *Hon.                                     one of the judges of the within named Court,*
SETTLEMENT  *at*
            *on                                20        , at               M.*

*Dated:*

WEITZ & LUXENBERG, P.C.

*Attorneys for*

180 Maiden Lane
New York, NY 10038

*To:*

EXHIBIT C

```
00001
 1  THE STATE OF NEW YORK
    ALL COUNTIES WITHIN NEW YORK CITY
 2  - - - - - - - - - - - - - - - - - - - -x
    In Re:  NEW YORK CITY ASBESTOS LITIGATION
 3  - - - - - - - - - - - - - - - - - - - -x
         This Document Relates To:
 4       JOHN MONTGORIS
    - - - - - - - - - - - - - - - - - - - -x
 5
                    101 James Doolittle Blvd.
 6                  Uniondale, New York

 7
                    June 4, 2007
 8                  12:00 p.m.

 9
            EXAMINATION BEFORE TRIAL of John
10  Montgoris.

11

12

13

14

15

16

17

18

19

20

21

22

23

24  PRIORITY-ONE COURT REPORTING SERVICES, INC.
              899 Manor Road
25       Staten Island, New York  10314
```

**Montgoris, John 2007-06-04**                    **Page 1**

00002

```
 1                    INDEX

 2

 3  EXAMINATION BY                 PAGE NO.

 4  Ms. DeMario                7

 5

 6

 7

 8              RULING

 9          PAGE - LINE

10           91  -  12

11          118  -  9

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

00003

```
 1  A P P E A R A N C E S:

 2     WEITZ & LUXENBERG, PC

 3     Attorneys for the Plaintiffs

 4         180 Maiden Lane

 5         New York, New York  10038

 6     BY:  MICHAEL ROBERTS, ESQ.

 7

 8     MALABY CARLISLE & BRADLEY, LLC

 9     Attorneys for Defendants Warren Pumps,

10     Adience, Inc., and Cleaver Brooks

11         150 Broadway

12         New York, New York  10038

13

14      BY:  GRACE DeMARIO, ESQ.

15

16     CULLEN & DYKMAN, LLP

17     Attorneys for Defendant Goulds Pumps, Inc.

18         177 Montague Street

19         Brooklyn, New York  11217

20

21      BY:  JEFFREY FEGAN, ESQ.

22

23

24

25
```

**Montgoris, John 2007-06-04**                    **Page 3**

00004

1 (Continued.)

2

3     McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP

4     Attorneys for Defendant A.O. Smith Corp.

5         1300 Mount Kemble Avenue

6         Morristown, New Jersey 07962-2075

7

8     BY: ALEX MENDOZA, ESQ.

9

10     LYNCH, DASKAL, EMERY, LLP

11     Attorneys for Defendant Goodyear

12         264 West 40th Street

13         New York, New York 10018

14

15     BY: ADAM DEUTSCH, ESQ.

16

17     AHMUTY, DEMERS & McMANUS, ESQS.

18     Attorneys for Defendant Carrier Corp.

19         200 I.U. Willets Road

20         Albertson, New York 11507

21

22     BY: KEITH V. TOLA, ESQ.

23

24

25

**Montgoris, John 2007-06-04**　　　　　　**Page 4**

00005
1  (Continued.)

2

3       SEGAL, McCAMBRIDGE, SINGER & MAHONEY, LTD

4       Attorneys for Defendants BW/IP, H. B. Fuller

5           830 Third Avenue

6           New York, New York  10022

7

8       BY:  AMY FENNO, ESQ.

9

10      McGUIRE WOODS, LLP

11      Attorneys for Defendant B & G

12          1345 Avenue of the Americas

13          New York, New York  10105

14

15      BY:  KATHLEEN MARRON TRABOLD, ESQ.

16

17      THE LAW OFFICES OF WEINER LESNIAK, LLP

18      Attorneys for Defendant BMCE

19          888 Veterans Memorial Highway

20          Suite 540

21          Hauppauge, NY  11788

22

23      BY:  MATTHEW R. STRAUSS, ESQ.

24

25

00006

1  (Continued.)

2

3    WILSON, ELSER, MOSKOWITZ, EDELMAN &

4    DICKER, LLP

5    Attorneys for Defendant A. W. Chesterton Co.

6        150 East 42nd Street

7        New York, New York  10017-5639

8

9    BY:  AMY J. BARRETT, ESQ.

10

11
     KIRKPATRICK & LOCKHART, PRESTON, GATES, ELLIS, LLP
12

13    Attorneys for Defendants Crane Co., Crane Pumps

14    And Systems, Inc.

15        One Newark Center, 10th Floor

16        Newark, New Jersey  07102

17

18    BY:  STEPHANIE HAGGERTY, ESQ.

19

20    PEHLIVANIAN, BRAATEN & PASCARELLA, LLC

21    Attorneys for Defendant Ingersoll Rand Co.

22        2430 Route 34

23        Manasquan, New Jersey  08736

24

25    BY:  MICHELE MITTLEMAN, ESQ.

00007

1

2   (Continued.)

3

4        SEDGWICK, DETERT, MORAN & ARNOLD, LLP

5        Attorneys for Defendants GE, Foster Wheeler

6                Three Gateway Center, 12th Floor

7                Newark, New Jersey  07102-5311

8

9        BY:  ROBERT GILMARTIN, ESQ.

10

11       WILBRAHAM, LAWLER & BUBA, PC

12       Attorneys for Defendant Buffalo Pump

13               1818 Market Street, Suite 3100

14               Philadelphia, Pennsylvania  19103

15

16       BY:  JOHN S. HOWARTH, ESQ.

17

18       LEADER & BERKON, LLP

19       Attorneys for Defendant IMO

20               630 Third Avenue, 17th Floor

21               New York, New York  10017

22

23       BY:  GLORIA KOO, ESQ.

24

25

**Montgoris, John 2007-06-04**                    **Page 7**

00008

1

2  (Continued.)

3

4       ANDERSON, KILL & OLICK, PC

5       Attorneys for Defendants AMCHEM Products,

6       Certainteed, Union Carbide

7          1251 Avenue of the Americas

8          New York, New York  10020-1000

9

10      BY:  JONATHAN KROMBERG, ESQ.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

00009

1  IT IS HEREBY STIPULATED AND AGREED by and between the

2  attorneys for the respective parties hereto that

3  filing, sealing and certification of the within

4  Examination Before Trial be waived; that all

5  objections, except as to form, are reserved to the

6  time of trial.

7       IT IS FURTHER STIPULATED AND AGREED that

8  the transcript may be signed before any Notary Public

9  with the same force and effect as if signed before a

10  Clerk or Judge of the court.

11       IT IS FURTHER STIPULATED AND AGREED that

12  the within examination may be utilized for all

13  purposes as provided by the CPLR.

14       IT IS FURTHER STIPULATED AND AGREED that

15  all rights provided to all parties by the CPLR shall

16  not be deemed waived and the appropriate sections of

17  the CPLR shall be controlling with respect thereto.

18       IT IS FURTHER STIPULATED AND AGREED by and

19  between the attorneys for the respective parties

20  hereto that a copy of this Examination shall be

21  furnished, without charge, to the attorney

22  representing the witness testifying herein.

23

24

25

**Montgoris, John 2007-06-04**                    **Page 9**

00010

1  J O H N  M O N T G O R I S,

2  called as a witness, having been first

3  duly sworn by a Notary Public of the

4  State of New York, was examined and

5  testified as follows:

6  EXAMINATION BY

7  MS. DeMARIO:

8        MS. DEUTSCH:  The client that I

9     represent, normally represent, has not been

10     served in this action.  My appearance here today

11     does not constitute a waiver of any defenses,

12     including those of jurisdiction.

13        MS. TRABOLD:  I join.

14        MR. KROMBERG:  My name is Jon Kromberg.

15     I join, with respect to my clients.

16        MR. GILMARTIN:  I join.

17        MR. HOWARTH:  John Howarth, I join.

18        MS. FENNO:  Why don't we say on behalf of

19     all of the defendants who have not been served,

20     all of us reserve our rights.

21        MR. ROBERTS:  Absolutely.

22     Q    Good afternoon, sir.

23     A    Good afternoon.

24     Q    My name is Grace DeMario.  I'm from the

25  law firm of Malaby Carlisle and Bradley.

**Montgoris, John 2007-06-04**                    **Page 10**

00011

1   And I'm going to be asking you the

2 majority of the questions today.

3  A Okay.

4  Q When I'm finished, some of the other

5 attorneys may have some questions for you.

6  A Okay.

7  Q Before we begin, I'm just going to go

8 over a few ground rules.

9   Try to let me finish asking the question,

10 before you begin your answer because the court

11 reporter is taking down everything that we say.  And

12 she can't take down both of us speaking at the same

13 time.

14  A Okay.

15  Q If, at any time, you need to take a

16 break, let me know or let your attorney know.  This

17 is not a marathon.  We'll be happy to accommodate

18 you.  Don't be shy about taking a break or asking for

19 one.

20   Thirdly, if, at any time, I ask you a

21 question and you don't understand the question I'm

22 asking, just tell me that don't understand, tell me

23 that you don't hear, and I'll do my best to rephrase

24 that question and ask it again.

25   When I ask you a question, please give

**Montgoris, John 2007-06-04**     **Page 11**

00012

1   verbally responses.  Sometimes, people have a

2   tendency to nod their heads to say yes or no, but the

3   court reporter can't take down nods of your head.

4   So, it's got to be verbal.

5       A   Okay.

6       Q   If, at any time, I ask you a question and

7   you don't know the answer to the question, that is

8   perfectly acceptable, since I'm going to be asking

9   you questions about things that happened 30 or

10  40 years ago.  I don't recall is a perfectly

11  acceptable answer, okay, sir?

12      A   Yes.

13      Q   Sir, have you ever had your deposition

14  taken before?

15      A   No.

16      Q   Have you ever been involved in a law

17  suit, besides the one we are present here for today?

18      A   One.

19      Q   Can you tell me when that was?

20      A   Yeah.  A woman bought a car from me and

21  she sued.

22          And then I was in court another time

23  about a lumber situation, for a garage.

24      Q   The incident with the car, when did that

25  happen?

00013

1    A    The car -- I'd say -- it happened -- I'm

2  trying to think -- 1994, something like that.

3    Q    Was that here in Nassau County?

4    A    Yes.

5    Q    And since, has that lawsuit been resolved

6  or is it still pending?

7    A    Oh, yeah.  She told me to keep quiet.

8  And that was it.  She said you won already, don't add

9  anything.

10    Q    And you said you were involved in another

11  law suit?

12    A    Yeah.  The lumber yard, they paid me a

13  few hundred dollars.  I never came to possess it.

14    Q    Were you the plaintiff or the defendant,

15  in that action?

16    A    I was the plaintiff.

17    Q    Was that also in Nassau County?

18    A    Yes.

19    Q    Do you remember when that was?

20    A    No.  That was way back.

21    Q    And has that since been resolved?

22    A    Yes.

23    Q    Sir, have you taken any medication today?

24    A    Medication, I took a water pill.

25    Q    A water pill?

**Montgoris, John 2007-06-04**                    **Page 13**

00014

1    A    Yes.  I'm supposed to take it every day.

2    Q    Is that once a day you take it?

3    A    Yes.

4    Q    What doctor prescribed that for you?

5    A    That was Dr. Jacob.

6    Q    And how long have you been taking that

7 pill?

8    A    I would say maybe five or six years, she

9 started that with me.  Five years ago, I guess.

10    Q    Have you taken any other medication taken

11 today?

12    A    No.

13    Q    Do you feel that medication will affect

14 your memory to testify?

15    A    Oh, no.

16    Q    Okay, great.  Aside with your attorney, I

17 don't want to know what you spoke about with your

18 attorney, did you do anything else in preparation for

19 today?  And by anything else I mean did you search

20 the internet or look at any pictures?  Did you do

21 anything like that?

22    A    Yes, I went on the internet.

23    Q    What did you do, when you went on the

24 internet?

25    A    I wanted to find out about asbestos and

00015
1   mesothelioma and find out maybe how long I've got to

2   live.

3        Q   Did you just read about the disease or

4   did you read about products associated with asbestos?

5        A   Yes.

6        Q   Yes to what?

7        A   Yes, products associated with asbestos.

8        Q   What sorts of products did you read

9   about?

10       A   What sorts, well, I went to the navy yard

11   actually to look.  And I found out that the ships

12   used asbestos all over the place, which I was not

13   aware of.  And -- and I found out that used it in

14   talcum powder, as far as that goes, but, basically

15   just to find out about my condition.

16       Q   Did you, actually, physically, go down to

17   the navy yard or are you talking about on the

18   internet?

19       A   Did I go down?

20       Q   You said you went down to the navy yard.

21   And my question is --

22       A   No, I was the internet.

23       Q   On the internet?

24       A   Yeah.

25       Q   Sir, when is the first time you met with

00016

1  either your attorney or anyone from Weitz and

2  Luxenberg?

3      A    Well, I got in touch with Weitz and

4  Luxenberg, when I was diagnosed with mesothelioma.

5      Q    And when was that?

6      A    That was about May.

7      Q    May of this year, 2007?

8      A    Yeah.

9      Q    Sir, will you state your full name for

10  the record?

11     A    John Anthony Montgoris.

12     Q    Sir, where were you born?

13     A    I was born in New York City.

14     Q    And what is your date of birth?

15     A    7/17/31.

16     Q    '31?

17     A    1931, yes.

18     Q    What is your Social Security number?

19     A    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.

20     Q    And where do your presently live?

21     A    I live in Farmingdale, New York, at 135

22  Lockwood Avenue.

23     Q    And is that a home or an apartment?

24     A    A home.

25     Q    Do you own that home?

00017

1    A   Excuse me.

2    Q   Do you own that home?

3    A   Yes.

4    Q   Is there any outstanding mortgage on it?

5    A   No.

6    Q   Are you married?

7    A   Yes.

8    Q   What is your wife's name?

9    A   Sheila Ann Montgoris.

10    Q   What is her date of birth?

11    A   3/7/35.

12    Q   Sir, when were you married?

13    A   When -- September 23, 1958.

14    Q   You better get that answer right.  That's

15 the most important one.

16    A   Right.

17    Q   Sir, has your wife ever worked outside of

18 the home?

19    A   Yes.  She was a nurse.

20    Q   During what time period?

21    A   Well, she retired after me.  So, she

22 retired after 1990, maybe 1995.  I don't know.

23    Q   Was she a nurse from the time that you

24 got married in 1958?

25    A   Yes.

00018

1    Q    She was working as a nurse from 1955

2  until 1995?

3    A    Well, she gave birth.  She stayed home.

4  And then she went back to work.  She worked in

5  Brooklyn.  And then she ended up working in Queens

6  Park Psychiatric Hospital.  That was her last

7  employment.

8    Q    Does she receive any sort of pension or

9  anything from the nursing profession?

10    A    Excuse me?

11    Q    Does she receive a pension from her

12  nursing profession?

13    A    No.

14    Q    Is she financially dependent on you?

15    A    No, I don't think so.

16    Q    You mentioned that she gave birth.  How

17  many children do you have?

18    A    I have one child.  Her name is Catherine.

19    Q    What is her date of birth?

20    A    2/22/1959.

21    Q    The interrogatories state February 22nd;

22  is that wrong?

23    A    February 22nd.

24    Q    I'm sorry.  February 22nd?

25    A    I said 2/22.

00019

| | | |
|---|---|---|
| 1 | Q | Where does she live? |
| 2 | A | She's in Kings Park. |
| 3 | Q | Is she married? |
| 4 | A | She lost her husband. |
| 5 | Q | Does she have any children? |
| 6 | A | Yes. She has two children. |
| 7 | Q | And what are their names? |
| 8 | A | Scott and Eric. |
| 9 | Q | How old are they? |
| 10 | A | Scott is 19. I guess Eric is 16. |
| 11 | Q | Does Catherine work? |
| 12 | A | Yes. She's a school teacher. |
| 13 | Q | Is she, in any way, financially dependent |

14 on you?

| | | |
|---|---|---|
| 15 | A | No. |
| 16 | Q | Do you know if Catherine or either of her |

17 children have any history of any lung or breathing

18 problems?

| | | |
|---|---|---|
| 19 | A | No. |
| 20 | Q | Any history of any cancer or other |

21 diseases, Catherine or her children?

| | | |
|---|---|---|
| 22 | A | Her husband died of cancer. |
| 23 | Q | What was her husband's name? |
| 24 | A | Daniel Werner. Her name is Werner. |
| 25 | Q | Do you know what he did for a living? |

00020
1     A   Excuse me?

2     Q   Do you know what Daniel did for a living?

3     A   He was an accountant.

4     Q   Was Catherine or her husband a smoker?

5     A   No.

6     Q   What about their children?

7     A   They might try it now, but they are not

8   ready for that yet.  They can't afford it.

9     Q   Let me ask you about your wife.

10    A   Yes.

11    Q   Has your wife ever been a smoker?

12    A   Yes.

13    Q   Is she still a smoker today?

14    A   Yes.

15    Q   Do you know when she started?

16    A   Oh, she might have started -- oh, maybe

17  40 years ago, 41 years ago.  I don't know.

18    Q   Has she been a smoker since you met her

19  and married her?

20    A   Well, she tries to stop.  She's not a

21  heavy smoker.

22    Q   Would you be able to tell us how much she

23  smoke a day, a pack a day or --

24    A   No, not a pack a day.  Usually, she opens

25  a pack after a week.


**Montgoris, John 2007-06-04**                    **Page 20**

00021

1    Q    Has that always been the case, a pack per

2  week?

3    A    Yeah, maybe a little longer because she

4  is trying.

5    Q    Do you know what type of cigarettes she

6  smokes?

7    A    Marlboro Lights.

8    Q    That's filtered or unfiltered?

9    A    Filtered?

10    Q    Does your wife have any history of any

11  lung disease or breathing problems?

12    A    No.

13    Q    Does she have any cancer history?

14    A    No.

15    Q    Is that your only marriage, to Catherine

16  or have you been married before?

17    A    No.  That's my first.  It was Sheila.

18    Q    I'm sorry.  So, that's her only marriage

19  as well?

20    A    Yes.

21    Q    I'm going to talk to you about your

22  parents.  What were your parents' names?

23    A    My father's name was Elias Montgoris and

24  Delia Cooper.

25    Q    Are your parents living or deceased?

00022

1    A    They are dead -- deceased.

2    Q    How old was your father when he passed

3  away?

4    A    I believe 62.

5    Q    Do you know what his cause of death was?

6    A    Yes.  He had a stroke.

7    Q    What about your mother, how old was she,

8  when she passed away?

9    A    She was 83.

10    Q    Do you know what her cause of death was?

11    A    She died of a heart attack.  She was in a

12  nursing home, at the time.

13    Q    Was your mother or father ever a smoker?

14    A    My father smoked cigars.  My mother, no,

15  I don't remember her smoking at all.

16    Q    What did your father do for a living?

17    A    Well, my father worked at a cafe on -- I

18  think Madison Street.  And then I remember him going

19  to Jersey.  And he had like a news stand there, where

20  he sold cigarettes and newspapers.  And then he came

21  home.

22    Q    What about your mother, did she work

23  outside the home?

24    A    No.

25    Q    Did either of your parents, either your

**Montgoris, John 2007-06-04**                    **Page 22**

00023

1 father or your father, have a history of cancer?

2    A   No.

3    Q   Do you have any brothers or sisters?

4    A   Yes.

5    Q   How many?

6    A   I have four brothers and -- I'm sorry,

7 three brothers and four sisters.  There were eight of

8 us.

9    Q   That's a big family.

10   A   Yes.

11   Q   Can you list them in order for me, from

12 the eldest to the youngest?

13   A   I'll try.

14   Q   Okay.

15   A   Okay.  There was an argument about that.

16 I would say my sister, Mary.

17   Q   Okay.

18   A   And my sister, Helen.  I don't know if

19 I'm putting them in the right age group, but.

20   Q   I'm not going to argue with you about it.

21   A   Yeah.  My sister, Clara.

22   Q   What was that?

23   A   My sister, Clara.

24   Q   Okay.

25   A   And my sister, Sophie.

00024

```
 1          And Renee.

 2          And for brothers -- can I get some water?

 3     Q    Yes.  Any time you need a break, please

 4  tell me or your attorney.

 5          MS. DeMARIO:  Let the record reflect we

 6  are going to take a short break.

 7          (Whereupon, a recess was held.)

 8          MS. DeMARIO:  Let's go back on the

 9  record.

10     Q    You were listing your brothers?

11     A    My brother, Willie, William.  He was my

12  older brother, Nick, and myself and my younger

13  brother, Frank.

14          MS. DeMARIO:  Will you just read that

15  back?

16          (Whereupon, the requested testimony was

17  read back.)

18     Q    Is Mary living or deceased?

19     A    No, Mary is deceased.

20     Q    How old was she, when she passed away?

21     A    Not that long ago.  I think she was about

22  75 or so.  I don't know.

23     Q    Do you know what she passed away from?

24     A    Maybe missing her husband.

25     Q    Was she a smoker?
```

**Montgoris, John 2007-06-04**                    **Page 24**

00025

1     A    No.

2     Q    What about Clara, is she living or

3 deceased?

4     A    She's gone also.

5     Q    How old was she, when she passed away?

6     A    Not too long ago.  I don't know -- maybe

7 75.  All of them were pretty good -- except Sophie.

8     Q    Let's take it one at a time.

9     A    Okay.

10     Q    Do you know what Helen passed away from?

11     A    She had Parkinson's, I believe.

12     Q    Okay.

13     A    But I really don't know.

14     Q    Do you know if she was a smoker?

15     A    No, she was not.

16     Q    Now I was not sure of this sister, Renee?

17     A    Renee, yeah.

18          She's still living.

19     Q    Where does she live?

20     A    She's in Southbury, Connecticut.

21     Q    How old is she?

22     A    I think she's about 83.

23     Q    Okay.  Do you know if she's a smoker?

24     A    No, she never smoked either.

25     Q    Do you know if she has ever had any

00026

1 history of any cancer or respiratory problems?

2    A   No.

3    Q   Sophie, is she living or deceased?

4    A   Yeah, she died, maybe 12, 13 years ago.

5 She died I think of pneumonia.

6    Q   Do you know if she was a smoker?

7    A   I didn't even get to know her that well.

8    Q   Your brother, you said was your older

9 brother?

10    A   William was my older brother.

11    Q   Is he living or deceased?

12    A   No, he's gone.  In fact, he died a couple

13 of years ago.  And I think he was 85, 86.

14    Q   Do you know what he passed away from?

15    A   Well, he had a heart problem.  And I

16 think that probably got him in the end.  And he had

17 bypass surgery.

18    Q   Okay.  Was he a smoker?

19    A   No.

20    Q   Is Nick living or deceased?

21    A   No, Nick is gone also.  He died in 1987,

22 from mesothelioma.  He worked in the Navy Yard, a

23 couple of years with me.  He was working there.  And

24 he was a smoker and a drinker.

25    Q   How old was he, when he passed away?

00027

1     A    He passed away in 1987.  He was 62.

2     Q    And you said he worked with you in the

3  Navy Yard?

4     A    Yeah.  Not with me, you know, in

5  different trades.  We used to meet each other.

6     Q    Okay.  And I think Frank is your last

7  brother, is that correct?

8     A    Yes.

9     Q    Is he living or deceased?

10     A    He's living.

11     Q    Where does he live?

12     A    He's in Smithtown -- no, Hauppauge.  I'm

13  sorry.

14     Q    Is he a smoker?

15     A    No.

16     Q    How is his health, any history of any

17  cancer or respiratory problems?

18     A    No.  He's diabetic.  He's got neuropathy.

19  And he's having a hard time.

20     Q    Sir, your siblings that are living, are

21  any of them financially dependent on you?

22     A    None.

23     Q    Sir, your brother, Nick, that worked in

24  the Navy Yard, do you know if he ever had an

25  asbestos-related law suit?

**Montgoris, John 2007-06-04**                     **Page 27**

00028

1    A    Did he, yeah.

2    Q    Do you know what firm represented him?

3    A    The same firm.

4    Q    Weitz and Luxenberg?

5    A    Yes, Weitz and Luxenberg.

6    Q    Do you know when that lawsuit was?

7    A    Well, he died in 1987.  So, it had to be

8  around that time.

9    Q    Okay.  And, sir, I want to kind of turn

10  your attention to all of the places that you've ever

11  lived.  And I want to go in chronological order, as

12  best you can, starting from the home that you lived

13  in when you were born until your present residence,

14  okay?

15    A    Okay.

16    Q    Do you remember the first place you

17  lived?

18    A    I think it was Cherry Street, in

19  Manhattan.

20    Q    Is that where you were born?

21    A    I believe so.

22    Q    How long did you live there?

23    A    I don't know.  All I know is on Chrystie

24  Street, I was there when I was about five years old.

25  So, it had to be between that time.  I don't know how

**Montgoris, John 2007-06-04**                    **Page 28**

00029

1 long I lived on Chrystie Street.

2     Q    And, sir, I forgot to mention this

3 earlier; whenever I ask you a question, if you can

4 give me an estimate that's fine. I'm not asking you

5 to just flat out guess. So, if you can give me a

6 approximation, that works.

7     A    Okay.

8     Q    You were born there and remained there

9 until you were about five years old?

10     A    I would say earlier.

11     Q    Do you remember anything about that home,

12 was it a single family or apartment?

13     A    Yes. Well, it was an apartment building.

14 That's all we had there.

15     Q    Do you remember if there was any

16 renovation or repair work done to that apartment?

17     A    No. It would be pretty good, if I did.

18     Q    Absolutely.

19          Okay. The next place you lived you said

20 was Chrystie Street; is that right.

21     A    81-83 Chrystie Street.

22     Q    How long did you live there?

23     A    Well, we lived there until -- I guess I

24 was maybe 16, which would be '47. We moved over then

25 to Broome Street.

**Montgoris, John 2007-06-04**                    **Page 29**

00030

1    Q    The home On Chrystie Street, was that a

2    home or an apartment?

3    A    An apartment building.

4    Q    Do you remember if any renovations or

5    repair work was performed at that apartment?

6    A    Not that I remember.

7    Q    Do you have any reason to believe you had

8    been exposed to asbestos from living in that

9    apartment?

10    A    I have no idea.

11    Q    Now, I think you said when you were about

12    16 or 17 you moved to Broome Street?

13    A    282 Broome Street.

14    Q    Was that also in the City?

15    A    In the City.

16        Also an apartment building.

17    Q    And how long did you live there for?

18    A    Until I got married.

19    Q    Until about 1958?

20    A    No.  We lived -- no.  It had to be

21    earlier.  Maybe 1956, I guess.

22    Q    Okay.

23    A    Let me see.  Wait a minute.  We lived

24    there.  I was in the service.  I came back.  Married

25    my wife.  I guess we lived in Brooklyn a couple of

00031

1    years. So, I guess it would have to be in 1950 --

2    I'm trying to think now. Okay. The only reason I

3    moved was with my wife. So, it had to be 1958.

4        Q    Okay, until 1958.

5            Do you ever remember any renovation or

6    repair work being performed to that apartment?

7        A    No.

8        Q    Do you have any reason to believe you

9    would have been exposed to asbestos, when living in

10   that apartment building on Broome Street?

11       A    No.

12       Q    Where was the next place that you lived?

13       A    I lived only a few years in Borough

14   Park.

15       Q    In Brooklyn?

16       A    In Brooklyn.

17       Q    And is that where you lived with your

18   wife, when you got married?

19       A    Yes. We had an apartment.

20       Q    And that was from about 1958 until when?

21       A    Until we moved out to Long Island, in

22   1962.

23       Q    Okay. Was that a home or an apartment?

24       A    It's a home.

25       Q    The one in Borough Park was a home?

00032

1    A    No.  That was an apartment.  The one in

2  Farmingdale is a home, our home.

3    Q    With respect to the apartment in Borough

4  Park, do you ever remember any renovation or repair

5  work being performed there?

6    A    No.

7    Q    Do you have any reason to believe you may

8  have been exposed to asbestos from living in that

9  apartment?

10    A    No.

11    Q    Now, the next place you lived, is that

12  where you told me you live now, on Lockwood Avenue?

13    A    Yes.

14    Q    And you have been living there since

15  about 1962?

16    A    1962, yes.

17    Q    And you told me know that's a home; is

18  that correct?

19    A    That's correct.

20    Q    Is that a one family or a two family?

21    A    No, it's a one family.

22    Q    Have you ever performed any renovation or

23  repair work to that home?

24    A    Yes.

25    Q    Okay.  What sort of things?

00033
1    A    We built a garage.

2    Q    That's it?

3    A    Put a door in.  Basically, that's it.  We

4  redid the kitchen.

5    Q    Anything else?

6    A    No, I can't think of anything.

7    Q    Did you, personally, build the garage?

8    A    Yes, I did.

9    Q    You did it?

10    A    With help.

11    Q    What about the kitchen, did you,

12  personally, do that or did you hire people to do

13  that?

14    A    What is that?

15    Q    When you redid the kitchen, did you hire

16  people to --

17    A    I did that myself.

18    Q    What year did you build a garage?

19    A    I would say -- it's hard to say.  It was

20  about 1975 -- I can't recall, really.

21    Q    Let me ask you this; when you moved into

22  that home in 1962, was that a new home?

23    A    No, no.

24    Q    How old was it?

25    A    I think the home was built in 1954 or

00034

1  1955.

2     Q    How long did it take you to build that

3  garage?

4     A    How long -- three or four months.

5     Q    I think you said earlier that you had

6  assistance; is that right?

7     A    Yes.

8     Q    Who helped you?

9     A    Friends from the sewage plant where I

10  worked.

11     Q    Do you remember any names?

12     A    Bob Gregory, Larry Smith, Teddy Regan,

13  Tony Caposie and the mechanic or the carpenter

14  whatever.  He was supposed to lead us.  I forgot.

15     Q    Are they all living or deceased?

16     A    I would imagine they are gone.  Well,

17  Smith isn't gone.

18     Q    Smith is not gone?

19     A    No.

20     Q    Where does he live, if you know?

21     A    Union Park.

22     Q    When is the last time you spoke with him?

23     A    Just today.  He called up.  I forgot he

24  was building the garage with me.

25     Q    Do you regularly speak to him?

00035

1 A No.

2 Q Have you spoken to him about your

3 asbestos-related lawsuit?

4 A No.  Well, I told him I was going down to

5 this deposition, but I told him I couldn't talk to

6 him about it.

7 Q Okay.  Sir, do you have any reason to

8 believe you may have been exposed to asbestos from

9 building this garage.

10 A Well, we had asbestos shingles.  That's

11 about all.

12 Q Why don't you tell me about that?

13 A Well, they were on the side of the house.

14 And the character -- the carpenter I hired to help

15 me, he had to break them to put the beam to attach

16 the garage.

17 Q Did you participate in that work?

18 A Not really.

19 Q Okay.

20 A Because he was putting up the beam

21 himself.  Then we held the beam up.

22 Q Were you present, when he was working

23 with these shingles?

24 A I imagine so, yes.

25 Q Do you know the brand, trade or

00036

1  manufacturer of the shingles he was removing?

2  A  I have no idea.

3  Q  Can you describe for me what they looked

4  like?

5  A  Well, they were green.  I really can't

6  tell.

7  Q  How long did that process take?

8  A  Oh, just to put a beam up across, within

9  a day.

10  Q  Aside from him breaking down the shingles

11  to put a beam up, is there any other way you believe

12  you may have been exposed to asbestos, while the

13  construction of the garbage was going on?

14  A  We had a driveway put in, the base was

15  the concrete for the garage.  I don't know.

16  Q  Did you put down that driveway or did

17  someone else do that?

18  A  No.  Somebody else did that, a

19  contractor.

20  Q  Okay.

21  A  I was working.  I came home and it was

22  done.

23  Q  Okay.  What year did that take place in?

24  A  Just shortly before the garage was built.

25  I don't have those dates.

00037

1    Q    Okay.  You said you redid the kitchen.

2  What year was that?

3    A    After I retired, 1992, 1993.  I don't

4  know.

5    Q    Did you have help?

6    A    I really don't know the dates.

7    Q    Okay.  Did you have help with that?

8    A    No, my wife.

9    Q    Your wife.

10         How long did that take?

11    A    Not too long.

12    Q    When you say --

13    A    Maybe -- maybe a week, a week and a half.

14    Q    When you say you redid the kitchen, what

15  exactly did you do?

16    A    Well, I ripped down the old cabinets.  We

17  bought new cabinets and put them up.  And a guy came

18  in and put the counter top on.

19    Q    Do you have any reason to believe you may

20  have been exposed to asbestos from that work?

21    A    No, not there.

22    Q    When you were working on the garage, did

23  you wear a mask or a respirator?

24    A    No.  We were out in the open air.

25    Q    What about with respect to the work you

**Montgoris, John 2007-06-04**                    **Page 37**

00038

1  did in the kitchen, did you wear a mask or a

2  respirator?

3     A   No.  There was no need for it, really

4  because everything was precut.

5     Q   Okay.  I just want to go back to the

6  garage for a minute.  I know you said earlier you

7  hired a carpenter to kind of lead you through it?

8     A   Yes.

9     Q   Were you present and participating in

10  every step of that project or --

11    A   He was there right to the end with us.

12    Q   But I'm asking you, were you present and

13  participating in every step of that process or did

14  you work only at time?

15    A   Oh, when he was there, we put up the

16  frame on the garage.  And then they left.  And it was

17  up to me to finish the garage.

18    Q   Okay.  You finished the garage, with the

19  help of the other gentlemen?

20    A   No.  Basically, after the frame went up,

21  I was on my own.

22    Q   Can you walk me through that, after the

23  frame was up, exactly, what you were doing?

24       MR. ROBERTS:  I'll give you another

25       couple of seconds.  This is not where his

**Montgoris, John 2007-06-04**                    **Page 38**

00039

1  exposure was.  We're not claiming exposure here.

2      MS. DeMARIO:  I understand that, but I

3  think we're entitled to ask him.  I only have a

4  few questions on this.  We're going pretty

5  quick, as it is.

6      MR. ROBERTS:  I know you are.  I'm just

7  saying.  I'll give you a little leeway.

8      MS. DeMARIO:  Just a few minutes.

9   Q   After you put the frame up, what did you

10 do?

11  A   Put the plywood up.

12  Q   What else?

13  A   Put the -- I forget what you call it

14 there -- the tarpaper, put that up.  And then we

15 hired somebody to come in and shingle it for us.

16  Q   With respect to the tarpaper?

17  A   Excuse me?

18  Q   With respect to the tarpaper --

19  A   Yes.

20  Q   Can you describe for me what that looked

21 like?

22  A   It was black.  It comes in sheets.  And

23 you put it up so the wood is protected.

24  Q   How long did that process take?

25  A   I don't know.

00040

1    Q    Do you know the brand name, trade name or

2    manufacturer of the tarpaper that you used?

3    A    No.

4    Q    After you put the tarpaper up, you said

5    that someone else came in to do the rest of the work;

6    is that right?

7    A    They did the shingles.

8    Q    Okay. And was it then complete after

9    that?

10    A    What?

11    Q    Was it then complete after the shingles

12    were up?

13    A    Then I hired a roofer to put the roof on.

14    Q    Okay. Was it then complete?

15    A    What?

16    Q    Was it then complete, after the roof was

17    put on?

18    A    Yes, it was complete.

19    Q    Now, was this work that you did on a

20    daily basis or was it after work? I'm just trying to

21    figure out --

22    A    It was after work.

23    Q    Sir, have you ever had any of your homes

24    tested for radon?

25    A    Radon, no.

00041

1     Q    Sir, what's the highest level of

2   education you've obtained?

3     A    I was a high school graduate.

4     Q    What school?

5     A    Machine and Metal Trades.

6     Q    Where is that?

7     A    96th Street, Manhattan.

8     Q    What year did you graduate?

9     A    1948, I believe -- or 1947.  I don't

10  know.

11    Q    Okay.  Aside from your high school

12  degree, did you ever have any other formal type of

13  education?

14    A    No.

15    Q    Sir, I want to talk to you about all

16  the jobs you've ever held.

17    A    Okay.

18    Q    Can you remember the first job that you

19  held?

20    A    I worked for Detecto Scales -- no, no.

21  I'm sorry.  The first job was Recording Devices.  I

22  was working there.

23    Q    Is Recording Devices the name of the

24  place where you worked?

25    A    Yes, the company.  They used to put

00042

1 clocks in, like Nedick Stores. And they would tell

2 you what time the guy came in and what time the guy

3 left, you know, by opening the door. I used to check

4 the times.

5    Q  That was when you were in high school?

6    A  Yeah.

7    Q  How long did you hold that job?

8    A  Until I got out of high school.

9    Q  The entire time, four years?

10    A  No, maybe three years.

11    Q  Was that company located in the City?

12    A  Yes. They were at Broadway. I think 28

13 Broadway.

14    Q  Do you have any reason to believe you

15 were exposed to asbestos from that job?

16    A  No, not at all.

17    Q  Was Detecto Scales the next place you

18 worked?

19    A  Yes.

20    Q  Where is that company located out of?

21    A  I believe now, that's on Park Avenue, in

22 Brooklyn. I don't remember that one.

23    Q  Okay. What year or years did you work

24 there?

25    A  Okay. I worked there, when I got out of

**Montgoris, John 2007-06-04**       **Page 42**

00043

1  high school, probably '49, if I got out then, to

2  1951, when I went into the service.  And when I got

3  out of the service in 1953, I did go back there for a

4  couple of years more, I guess.

5      Q    Do you know until about what year or what

6  decade?

7      A    Well, I got out in 1953 -- 1954, 1955,

8  probably two years.

9      Q    Did you hold the same title in '49 to '51

10  as you did '53 to '55?

11     A    Yeah.  I was a power press operator.

12     Q    Can you describe for me what tasks that

13  included?

14     A    Well, Detecto Scales made hampers and

15  waste paper baskets.  And that's what we did.

16     Q    What exactly did you do?

17     A    I worked the power press.

18     Q    What does that mean?

19     A    We used to get the sheets of metal, put

20  them on there, perforate them, put a design.  And

21  then we would put them on another cart to go out.

22  They would go on their way.  And you would put the --

23  basically, that was it, putting wires, rolling them

24  in there and getting it ready to be assembled.

25     Q    Where would you put these wires?

**Montgoris, John 2007-06-04**                    **Page 43**

00044

1      A     They would have a curling machine.  You

2  put them in.  And the machine curls it, goes over it.

3  And it gives it stability.

4      Q     Okay.  What did these wires look like?

5          MR. ROBERTS:  Why don't you ask him if he

6  was exposed to asbestos?  If he was not exposed,

7  you know.

8      Q     You can answer the question.

9      A     They were maybe like a quarter inch rods.

10     Q     Do you know the brand name, trade name or

11  manufacturer of these wires?

12     A     I have no idea.

13     Q     Did your duties include anything, aside

14  from what you've already told me so far?

15     A     No.

16     Q     Do you have any reason to believe that

17  you were exposed to asbestos while working as a power

18  press operator for Detecto Scales?

19     A     Power Press Operator.

20     Q     Yes.  Do you have any reason to

21  believe you were exposed to asbestos?

22     A     No.  I think you said power plant.

23     Q     I might have.  I mean power press.  Thank

24  you.

25          You told me that you worked at Detecto

00045

1   Scales from '49 to '51 and then you went back to them

2   in '53 to '55.  So, from '51 to '53, is that when you

3   were in the service?

4       A    From '51 to '53, yeah.

5       Q    Let's talk about that,  What branch were

6   you in?

7       A    Army.

8       Q    Did you enlist or were you drafted?

9       A    I was drafted.

10      Q    What is the highest rate you achieved?

11      A    Private First Class.

12      Q    Were you ever injured in the service?

13      A    No.

14      Q    Did you ever receive any awards or

15  decorations?

16      A    No.

17      Q    Did you receive an honorable discharge?

18      A    Yes.

19      Q    Were you ever disciplined?

20      A    No.

21      Q    Where did you do basic training?

22      A    Basic training, where did I take it?

23      Q    Yes.

24      A    I took it in Pennsylvania.  I took the

25  second eight weeks in El Paso, Texas.

**Montgoris, John 2007-06-04**                     **Page 45**

00046

1    Q    How long was your basic training?

2    A    Sixteen weeks.

3    Q    Where was that, in Pennsylvania?

4    A    Irving Town Gap.

5    Q    Will you repeat that?

6    A    Irving Town Gap.

7    Q    When you did your basic training, where

8 did you sleep?

9    A    Where did I sleep, in the barracks.

10    Q    When you were in the barracks, did you

11 ever observe any pipes running?

12    A    Pipes, no.

13    Q    Do you have any reason to believe you

14 were exposed to asbestos when you were doing your

15 basic training?

16    A    No.

17    Q    Then you moved on to El Paso, Texas?

18    A    Yes.

19    Q    How long were you there?

20    A    I was there eight weeks.

21    Q    What did that consist of, your time in El

22 Paso, Texas?

23    A    I was learning artillery, antiaircraft,

24 to be precise.

25    Q    What does that mean, exactly?

00047

1   A   Well, we learned how to fire 90

2  millimeter guns, cannons, whatever you want to call

3  them.

4   Q   Where did you sleep, when you were in El

5  Paso, Texas?

6   A   Basically, the same, the barracks.

7   Q   Did you ever observe any pipes running

8  there?

9   A   No.

10   Q   Do you have any reason to believe you

11  were exposed to asbestos while you were in El Paso,

12  Texas?

13   A   No.

14   Q   After El Paso, Texas, where did you go?

15   A   Germany.

16   Q   Where in Germany?

17   A   Dornstadt.

18   Q   How long were you there?

19   A   Until I got out of the service.

20   Q   What were you doing there?

21   A   I was a radio operator.

22   Q   What, exactly, did that entail?

23   A   Well, in my case, it was taking the

24  radios, which were located in the back of the jeep, I

25  took them out to the field, tested them out.  And if

**Montgoris, John 2007-06-04**               **Page 47**

00048

1 they had to go out in the field, I would bring the

2 jeep out there. And the general's driver would

3 drive. And I would hand them out and wait there for

4 him to come back with the jeep.

5     Q  Do you have any reason to believe you

6 were exposed to asbestos in that way?

7     A  No.

8     Q  Again, in Germany, where did you sleep?

9     A  In the barracks -- well, it was more like

10 a building, but there were barracks.

11     Q  Did you observe any pipes in those

12 barracks?

13     A  No pipes.

14     Q  You said you were there until you left

15 the service; is that right?

16     A  Correct.

17     Q  Then you went back to Detecto Scales; is

18 that right?

19     A  Right.

20     Q  After you left Detecto Scales -- you said

21 it was in '55; is that right?

22     A  Yes.

23     Q  Where did you work next?

24     A  Well, I worked 14 hours in the post

25 office. And I said that was enough of that.

00049

1    Q    Fourteen hours?

2    A    Fourteen hours.

3    Q    Okay.

4    A    Reading all the cards from Florida and

5  everything, I said that's just too much for me.

6    Q    Okay.  After those long 14 hours, where

7  did you work next?

8    A    Well, then my brother told me, you know,

9  that I should take a test for the Navy Yard.

10    Q    Okay.

11    A    Because he worked there in the Navy Yard,

12  William.

13    Q    William worked in the Navy Yard?

14    A    Yes, also.

15    Q    Did William and Nick work in the Navy

16  Yard?

17    A    Yes.

18    Q    Okay.

19    A    And he got me the application.  And I

20  took the test.  I passed it.  And I was hired.

21    Q    What sort of test did you have to take?

22    A    We had to take a test with skills and

23  whatever.  You needed mechanical skills.  And they

24  just gave you a test, I guess an aptitude test.  I

25  don't know.  Whoever scores the highest, gets picked.

**Montgoris, John 2007-06-04**                    **Page 49**

00050

1    Q   You said you needed mechanical skills?

2    A   Well, I think I was thinking of the

3  sewage treatment plant because I learned some

4  mechanical skills at the Navy Yard.

5    Q   Did you have to undergo any course or

6  undergo any type of schooling or training to take the

7  test for the Navy Yard?

8    A   To take the test for the Navy Yard?

9    Q   Yes.

10   A   No, no, no course or anything.

11   Q   You took the test.  I guess you scored

12  high enough and you got in; is that correct?

13   A   Correct.

14   Q   What years did you work at the Navy Yard?

15   A   I started there in 1956.

16   Q   Okay.

17   A   I end in 1962.

18   Q   Did you hold the same title from 1956 to

19  1962?

20   A   No.

21   Q   What titles did you hold?

22   A   In 1956, I was hired as a coppersmith

23  apprentice.  And then in 1960, I became a journeyman.

24  I was a full-fledged mechanic then.

25   Q   So, you were coppersmith apprentice from

00051

1  1955 until 1960?

2     A   Yes.

3     Q   Though your title changed, did your

4  duties stay the same or did they change as well?

5     A   No.  Well, I worked for one boss.  That's

6  about all.

7     Q   Let me ask you this; as a coppersmith

8  apprentice, what did your duties entail?

9     A   Okay.  A coppersmith, I want to clarify,

10  they used to call it a glorified pipe fitter because

11  you can work with pipe and you can work with copper.

12     Q   So, what, exactly, did your duties

13  entail?

14     A   As an apprentice?

15     Q   Yes.

16     A   We worked with different -- there are a

17  lot of phases in pipe fitting.

18     Q   Okay.  You can walk me through them.

19     A   Okay.  There's pipe fitting.  There's

20  lagging.  There is coppersmiths, which I did, bending

21  copper pipe and restoring like refrigeration systems,

22  which I did.  And then you have your natural

23  components like piping problems with sinks, faucets

24  and anything that has to do with pipe fitting, we

25  were learning.

00052

1    Q   Okay.

2    A   It was a learning basis.

3    Q   As a journeyman, what did your daily

4  tasks consist of?

5    A   I worked mostly on the aircraft carrier,

6  Constellation, putting in a refrigeration system in

7  the lower deck.

8      MS. DeMARIO:  Will you read that back,

9    please?

10      (Whereupon, the requested testimony was

11    read back.)

12    Q   As a coppersmith apprentice, was there a

13  group or a particular person that you were assigned

14  to work with, on a daily basis?

15    A   No.  We would be given different

16  mechanics, because everybody else has got different

17  knowledge and learning.  We would maybe work six

18  months with one crew.  And we would get transferred

19  to another phase of pipe fitting and work another six

20  months or so.

21    Q   Is there anyone's name that you recall

22  that you worked with while you worked as a

23  coppersmith apprentice?

24    A   My boss, Walter Shapiro, which I think

25  he's gone by now.  There was Charley Gappin, another

**Montgoris, John 2007-06-04**                    **Page 52**

00053

1  boss.

2  Q  Is he living or deceased?

3  A  I don't know.  I have not been in touch

4  with these people.

5  Q  Is there anyone else that you can recall?

6  A  Well, I had my -- people that I trained

7  with, when I first got there.  I remember them.

8  Q  Okay.

9  A  Robert Lampert.

10  Q  Is he living or deceased?

11  A  Like I said, I have not seen him.

12  Q  Okay.  Is there anyone else that you

13  remember?

14  A  No.

15  Q  Okay.  What I want to try to do is to

16  first talk about your time as a coppersmith

17  apprentice and then we'll talk about your time as a

18  journeyman, all right?

19  A  All right.

20  Q  When you were a coppersmith apprentice,

21  what was your shift?

22  A  What was my shift?

23  Q  Yes.

24  A  We went there 8:00 or 7:00 and left eight

25  hours later, unless there was overtime.

**Montgoris, John 2007-06-04**                    **Page 53**

00054

1    Q    Where would you report to every day?

2    A    We would report to the supervisor that I

3 was assigned to.

4    Q    And what Navy Yard was that?

5    A    Brooklyn Navy Yard.

6    Q    Is that the only yard you worked at?

7    A    Yes.

8    Q    Did you work five days a week?

9    A    Sometimes seven days a week.

10    Q    I'm just talking about your time as a

11 coppersmith apprentice.  Do you believe you were

12 exposed to asbestos?

13    A    Yes.

14    Q    How so?

15    A    How so?

16    Q    Yes.

17    A    Well, as an apprentice, you do

18 modifications, piping work and everything like that.

19 So, if they are going to modify a pipe, and it is

20 covered with what I know is asbestos, we'd have to

21 cut out the asbestos, take out the pipe and modify it

22 and run it the way they planned we had to run it.

23    Q    How often did you have to modify a pipe?

24    A    Well, it's not only modifying -- how

25 often, it was quite often because they were doing

00055

1  repairs on the ships.  And where my mechanic told me

2  to go, I went.

3      Q  How did you come to learn that the pipes

4  contained asbestos?

5      A  Because it was obvious that it contained

6  asbestos.  The laggers were there.  They were coming

7  in right after us, putting asbestos on.

8      Q  What did this asbestos look like?

9      A  A white sheet.

10      Q  Were you, actually, responsible for

11  removing the asbestos?

12      A  Yes.

13      Q  Do you know the brand name or

14  manufacturer of the asbestos on the pipes you were

15  removing?

16      A  Excuse me?

17      Q  Do you know the brand name or the

18  manufacturer of the asbestos on the pipes that you

19  were removing?

20      A  No.  We were using carbo nickel pipe, we

21  were using, you know, regular pipe, iron pipe.  I

22  don't know the names.

23      Q  Okay.  So, I just want you to walk me

24  through it.  If you would be modifying the pipe or

25  doing something else to the pipe, you would first be

00056

1  removing the asbestos from it?

2      A    Right.

3      Q    Then what would you have to do next?

4      A    Then we would repair it.  If it was leaky

5  valve, we would have to replace the valve.  And if it

6  had to be soldered, I would have to solder it or my

7  mechanic would have to solder it.

8      Q    A lot of times you say if it needs

9  repair, but did you actually repair it?

10     A    Oh, no.  I mean, if it was not being

11  modified then it was being repaired.

12     Q    Okay.

13     A    And we would have to repair the pipe or

14  modify it.  That was the most circumstances that we

15  were there doing that job.

16     Q    Okay.  Do you have any reason to believe

17  that you would have been exposed to asbestos from

18  repairing the valves?

19     A    Oh, definitely.  It was covered.  You had

20  to take the covering off to get to the valve.

21     Q    And that was the covering that you just

22  described?

23     A    Yes.

24     Q    With respect to these valves, what did

25  the valves look like?

00057

1     A    They would come in all different sizes.

2  They had a handle to turn it on or they would have a

3  wrench that you would have to use to open and close

4  them.

5     Q    What sizes did they come in?

6     A    What sizes -- in the Navy Yard they would

7  come in all different sizes.  We had a range.  The

8  valves, sometimes you would need two men to turn

9  them.  Sometimes you can turn them yourself.

10     Q    Can you give me a range of the sizes?  If

11  you can't, that's fine.

12     A    I would say various sizes.

13     Q    Do you remember the brand name or

14  manufacturers of any of the valves that you worked

15  on?

16     A    Well, I was thinking of that because he

17  asked me if I remembered anything.  And Crane comes

18  to mind quite often.

19     Q    Okay.  Would Crane be the name of the

20  valves that you were removing?

21     A    No.  I wouldn't be able to name the

22  valves that we removed because -- I'm going to get

23  ahead of myself a little.  In the sewage plant, they

24  used valves also.  And I know I've seen Cranes all

25  over the place.  And I don't know with the Navy Yard,

**Montgoris, John 2007-06-04**                **Page 57**

00058

1  though.

2      Q    So, Crane is a name that you know, but

3  you're not sure if that was a valve that you were

4  working on in the Navy Yard?

5      A    I'm not sure.

6      Q    I just want to understand.  Would you be

7  removing old valves and installing new valves?

8      A    Yeah.  You take out the valves, if you

9  had to remove the pipe.

10     Q    Okay.

11     A    Reroute it.  You put hangers on there and

12  put the valve back on.

13     Q    Do you know the brand name or

14  manufacturer of the new valves that you may have been

15  installing?

16     A    No.  That was too long ago.

17     Q    Okay.  Aside from working on valves and

18  removing old asbestos on the pipes, what else did you

19  do?

20     A    What else did we do?

21     Q    I'm just trying to keep it to that time

22  that you worked as an apprentice.

23     A    Yes.  We bent copper pipe, galvanized

24  pipe, up on the deck.  And then we would have to

25  bring it downstairs or up, wherever you had to go

00059

1  because sometimes you had them going up and they had

2  them going down.

3      Q    Do you believe you were exposed to

4  asbestos doing that work?

5      A    Definitely.

6      Q    Okay.  Tell me how so?

7      A    Well, we always worked in closed

8  compartments, cutting the pipe out.  And there was a

9  welder there.  He had a blower on.  And everything

10  was blowing.  It was dusty.  And I used to change a

11  handkerchief every day.  I used to throw away a

12  handkerchief every day.

13      Q    And when you were working with the pipe,

14  do you believe you were exposed to asbestos, in the

15  same manner that you told us earlier from the

16  covering on the pipe?

17      A    Oh, yes.

18          And the laggers were, you know, close by.

19  They were cutting the asbestos and putting it on

20  there, which didn't help, I'm sure.

21      Q    When you say close by, how close?

22      A    Well, if we were working here

23  (indicating) and they are working there (indicating)

24  and the blowers are over there (indicating).  It was

25  that close.

00060

1  Q   Well, the report can't reflect when you

2  say you were working there and the blowers were over

3  there.

4  A   Well, I pointed to the door. I'm sorry.

5  Q   And how far is that?

6  A   Fifteen feet, 20 feet.

7  Q   You said you wore a handkerchief? Is

8  that right, you wore a handkerchief every day?

9  A   I said every day, I used to blow my nose

10  with the handkerchief. It was all sooty. I said I

11  couldn't use the handkerchief.

12  Q   Oh, okay.

13      Did you wear a mask or a respirator,

14  doing any of that work?

15  A   No.

16  Q   Were you present when the laggers would

17  be doing their work?

18  A   Oh, yes. Even as an apprentice, we had

19  to learn what they were doing.

20  Q   Did you, actually, do the work that the

21  laggers were doing?

22  A   I don't recall doing that.

23  Q   Do you know who employed the laggers?

24  A   It was shop 56. That was all part of our

25  trade.

00061

1    Q   Is there any other way you believe you

2 were exposed to asbestos, while working at the Navy

3 Yard, working as a coppersmith apprentice?

4    A   No.  It's probably pretty much so --

5 whatever I said there.

6    Q   We spoke about laggers being present, the

7 work they were doing on the pipe with respect to the

8 asbestos covering, your work on some valves.  Is

9 there any other way, while you were a coppersmith

10 apprentice, that you believe you were exposed to

11 asbestos?

12    A   Not that I recall.

13    Q   You mentioned that a welder was present.

14 What was the welder doing?

15    A   Well, if we had that lay pipes there, we

16 would have to put hangers.  And as an apprentice, we

17 learned how to use the welder to tack the hangers

18 down.  And then they would have to do the job because

19 you couldn't just leave the piping there.

20    Q   So, were you, actually, doing the welding

21 work?

22    A   Cold spot welding, yeah.

23    Q   Do you believe you were exposed to

24 asbestos from this welding work?

25    A   Well, I would say I don't know if you can

00062

1  get asbestos from the gloves you wear, which I had

2  to.  Yeah.

3      Q   What did those gloves look like, that you

4  were wearing?

5      A   Canvas.

6      Q   Okay.  And how high did they come up?

7      A   Maybe up to your forearm.

8      Q   What color were they?

9      A   Gray.

10     Q   Do you know the brand name or

11  manufacturer of the gloves that you were wearing?

12     A   No.  I never took notice.

13     Q   Is there any other way you believe you

14  may have been exposed to asbestos from your time

15  working as an apprentice at the Navy Yard, that we

16  have not yet discussed?

17     A   I don't think so.  I don't know.

18     Q   Let's move on to your time as a

19  journeyman.  Did you have the same shift again?

20     A   The same, yes.  The same shift.

21     Q   Okay.  Was there a particular person that

22  you reported to daily, when you were a journeyman?

23     A   Yes.  I was in Walter Shapiro's gang.

24  That's what we used to call our group of workers

25  there.

00063

1    Q    Okay.  Do you have any reason to believe

2 you would have been exposed to asbestos, while

3 working as a journeyman?

4    A    Oh, yes.

5    Q    How so?

6    A    Well, we were, basically, doing the same

7 job as we were doing as an apprentice.  And working

8 in the refrigeration unit, you would have

9 compressors.  And you would have to have asbestos on

10 those lines also, for insulation.

11    Q    I think, earlier, you told me that you

12 were doing work on the Constellation; is that right?

13    A    Yes.

14       Can I go to the rest room?

15    Q    Absolutely, sure.

16       (Whereupon, a recess was held.)

17       MS. DeMARIO:  Let's go back on the

18    record.

19    Q    Sir, when we left off, you were telling

20 me about your work on the refrigeration units on the

21 Constellation.  Where were the units located?

22    A    Well, I don't know how far down, but they

23 were all the way down.

24    Q    Okay.

25    A    Just they have decks.  And I don't know

**Montgoris, John 2007-06-04**                    **Page 63**

00064

1  if it was fourth, fifth, sixth or seventh deck.

2      Q   Do you remember how many decks in total

3  there were on this ship?

4      A   Oh, no.

5      Q   Do you remember the hull number of the

6  ship?

7      A   CVA-54.

8      Q   Do you know what class it was?

9      A   Excuse me?

10     Q   Do you know what class it was?

11     A   I don't know.

12     Q   Can you give me an approximation of the

13  size of the ship?

14     A   Well, I remember thinking.  I know the

15  hull size.  I think they said 5,000 men.  And I think

16  it was over -- a 1,084 comes to mind.

17     Q   Sir, how long did you work on the

18  Constellation?

19     A   I think maybe a year and a half.

20     Q   Is that a year and a half continually?

21     A   Pretty much with the refrigeration, yeah.

22     Q   Okay.

23     A   But then we also worked down there, you

24  know, with the centrifugal pumps and the compressors

25  and the boilers.

**Montgoris, John 2007-06-04**                    **Page 64**

00065

1    Q    We'll get there.  First, let's talk about

2  the refrigeration unit work.

3    A    Okay.

4    Q    Was that just one unit that you were

5  working on?

6    A    One unit?

7    Q    One refrigeration unit?

8    A    It was maybe about three times the size

9  of this room.

10    Q    Can you describe that for us, the size?

11  Again, the record can't reflect the size of this

12  room.

13    A    Well, this room -- what would you say, is

14  50 feet?  I don't know.  If it was, it would be maybe

15  100, 150 feet.

16    Q    You believe it was 150 feet wide, right?

17    A    No.  It was a big unit because we had the

18  pipes in there.  I would say maybe double the size of

19  this room.

20    Q    Okay.  Can you give us an estimate?

21    A    I have no idea.  You better guess.

22    Q    You've got to answer the questions, not

23  me.

24    A    No.  I don't know.  I have no idea.

25        MR. ROBERTS:  How big do you think this

**Montgoris, John 2007-06-04**                    **Page 65**

00066

1   room is?

2       A   I don't know.  I would say 20 feet, 40

3   feet.  If this room is 20 feet, maybe it was 40 feet.

4       Q   You're saying that was the size of the

5   refrigeration unit?

6       A   Yes.

7       Q   Is that 40 feet wide, 40 feet long, what

8   is it?

9       A   I don't know.  I can't remember.  I know

10  it was big.

11      Q   Okay.  What, exactly, were you doing

12  there with this refrigeration unit?

13      A   Well, we were putting the coil up.  I had

14  to bend the pipe, put the coils up because the

15  refrigeration was going to go in.

16      Q   Do you know the brand name or

17  manufacturer of the refrigeration unit itself?

18      A   York is very familiar to me.

19      Q   Okay.  And how do you believe you were

20  exposed to asbestos from your work on this

21  refrigeration unit?

22      A   The refrigeration unit and with the

23  compressors.

24      Q   What were you doing to the compressors?

25  .    A   What did I do, well, we helped with the

**Montgoris, John 2007-06-04**                    **Page 66**

00067

1  freon in the lines.  And we had to insulate it.

2     Q    Did you insulate it?

3     A    Not me, no, the laggers.

4     Q    Do you know the brand name on the back of

5  the compressor?

6     A    The compressor, no.  Like I said, I don't

7  know.

8     Q    Is it fair to say that you didn't have

9  any responsibilities with respect to the compressor?

10    A    Did I have -- well, I would have to put

11  the freon in the lines, you know, evacuate the lines,

12  just work like that.

13    Q    Do you have any reason to believe that

14  you were exposed to asbestos from your work on the

15  compressor?

16    A    I don't know if there is asbestos in the

17  compressor or not, no.

18    Q    What else did you have to do to the

19  refrigeration unit?

20    A    Basically -- well, sometimes, we wouldn't

21  be in the refrigeration unit.  They would call us out

22  because, usually, you take the pipes out and bring

23  them over to the shop.  And they put them in acid and

24  everything.  And they would give us another job.

25    Q    Okay.  I want to know; do you believe you

00068

1  were exposed to asbestos from your work on the

2  refrigeration unit?

3      A    With the asbestos that they were putting

4  on the pipes, yeah.

5      Q    And that was the asbestos that the

6  laggers were putting on the pipes; is that correct?

7      A    Yes.

8      Q    Do you know the brand name or

9  manufacturer of that asbestos material?

10     A    No.

11     Q    What did that material look like?

12     A    It was white asbestos that I identified

13 before.

14     Q    Okay.  And earlier when I asked you if

15 you knew the brand name or manufacturer, I think you

16 told me about different pipes.

17         Do you know the brand name or

18 manufacturer of the asbestos material that you were

19 describing before?

20     A    No.  I don't remember.

21     Q    Okay.  You said you were not always

22 working on the refrigeration unit.  What other things

23 were you working on?

24     A    Well, sometimes they put us down by the

25 boilers where they had centrifugal pumps.  And they

00069

1  had the turbines. And we would have to be working on

2  that, the same thing.

3       Q   Okay. Was that still on the same ship?

4       A   I don't know.

5       Q   Was the Constellation the only ship that

6  you worked on?

7       A   No.

8       Q   Do you remember the names of the other

9  ships that you worked on?

10       A   The first ship that I worked on was the

11  Battleship New Jersey. And then I worked on the

12  Cooper's Island. And I worked on a couple of

13  destroyers, which I can't remember the names of. I

14  worked on an aircraft carrier, the Intrepid. And I

15  worked on the carrier, the Constellation, which is

16  the one that caught fire.

17       Q   When you worked on these ships, were you

18  working as a journeyman or were you working as an

19  apprentice?

20       A   Apprentice.

21       Q   Did the work you just described for me

22  when you were on the Constellation with respect to

23  the refrigeration unit --

24       A   I was a journeyman.

25       Q   Okay. Did you do any other work on that

**Montgoris, John 2007-06-04**                    **Page 69**

00070

1  ship, besides the work you described on the

2  refrigeration unit?

3      A   Oh, yeah.  As an apprentice -- I served

4  my whole apprenticeship, you know, working on these

5  ships.  They were building that aircraft carrier and

6  we were on there too.

7      Q   Well, I want to talk to you about one

8  ship at a time.  Was there any other area or any

9  other work that you performed, while you were on the

10  Constellation?

11     A   We worked in the pump room.

12     Q   How many pump rooms were there?

13     A   I don't know how many.

14     Q   How many rooms did you work in?

15     A   I worked in a couple of them, I would

16  imagine.

17     Q   You worked in a couple of the pump rooms

18  on the Constellation?

19     A   Yeah.  I was in and out of them.

20     Q   What were the size of those rooms, if you

21  can recall?

22     A   I can't recall.

23     Q   What were you doing in the pump rooms?

24     A   Installing piping in there.  And -- it's

25  been a long time.

00071

1    Q    Okay, do you have any reason to believe

2  you would have been exposed to asbestos while you

3  were in the pump room?

4    A    In the pump room, well, there was the

5  boilers also. I don't recall if they were in the

6  pump room, at that time, but they were covered with

7  asbestos I know. And the waste heater pumps. I

8  don't recall.

9    Q    You don't remember if the boilers were in

10  the room with the pumps; is that correct?

11    A    Yes.

12    Q    Is it fair to say that you had no duties

13  with respect to the pumps itself?

14    A    With the pumps, I don't know what the --

15  I really don't know.

16    Q    You mentioned something about the boilers

17  being covered with asbestos. Do you remember how

18  many boilers were on the Constellation?

19    A    No.

20    Q    Did you have any duties, with respect to

21  working on the boilers?

22    A    Did I have what?

23    Q    Did you have any duties to work on the

24  boiler?

25    A    Well, the boilers, all had pipes going in

**Montgoris, John 2007-06-04**                **Page 71**

00072

1  there.  So, we were always near them.

2      Q    Do you know the brand names or

3  manufacturers of the boilers on the Constellation?

4      A    No.

5      Q    What would you have been doing with these

6  pipes going into the boilers?

7      A    You're talking about on the

8  Constellation?

9      Q    Yes.  We're only talking about the

10  Constellation.

11      A    I don't recall.

12      MR. ROBERTS:  Can you separate the ships,

13  generally, Mr. Montgoris?

14      THE WITNESS:  Can I separate them?

15      MR. ROBERTS:  In other words, I know it

16  was a long time ago.  I know you worked in

17  various places.  As you sit here today, can you

18  say what you did on each ship, as best as you

19  can?  She is not trying to trick you.  She's

20  just trying to get your memory.

21      A    Well, the Battleship New Jersey, they

22  were going to mothball it.  So, we were modifying it,

23  whatever they were going to do to it to get it ready

24  for mothballs.  And I was taking pipes out, replacing

25  them.

00073

1        On Compass Island, it was more of the

2  same.  It was all plumbing work, all pipe fitting

3  work.  And, you know, it was not a nice place to

4  work.  You know, it was all dusty, the blowers were

5  blowing.  That's all I really remember, like that.

6      Q    Well, let me ask you this; if we go ship

7  by ship --

8      A    Yeah.

9      Q    -- can you, specifically, tell me what

10  you did on each ship and the brand name or

11  manufacturer of the equipment or products on the

12  ship?

13     A    Well, the only products I really remember

14  is GE and Westinghouse -- yeah, for the turbine

15  pumps.

16     Q    What I want to ask you; you only remember

17  GE and Westinghouse, with respect to the turbine

18  pumps.  Was that on a particular ship?

19     A    Not on a particular ship, but I remember

20  making a comment that I thought they only made

21  refrigerators.

22     Q    I'm sorry?

23     A    I only thought they made refrigerators,

24  when I looked at the pump.

25     Q    Okay.

00074

1    A    The turbine.

2    Q    If I ask you specifics about your ships,

3    with respect to the hull number, or how large or how

4    many decks, would you be able to tell me?

5    A    I couldn't tell you that.  The only one I

6    know is the 64.  That was the most notable.

7    Q    That was the Constellation?

8    A    Yeah.

9    Q    Then why don't we do this; can you,

10    generally, tell me when you were aboard these ships

11    and what your general duties were?

12    A    Mostly --

13        MR. ROBERTS:  We did that.

14    A    Mostly cutting out pipes, you know,

15    reinstalling the pipes, working on the compressors,

16    putting them in and the refrigeration unit, as far as

17    the boilers, with the centrifugal pumps down there.

18    I don't know, it was just every day duties.

19    Q    Okay.  Let's start with cutting out the

20    pipes and installing the pipes.  Generally speaking,

21    do you believe you were exposed to asbestos from that

22    work?

23    A    Oh, yes.

24    Q    How so?

25    A    How so, by cutting the asbestos and

**Montgoris, John 2007-06-04**                    **Page 74**

00075

1   installing the pipe.

2      Q   Okay. Do you know the brand name or

3   manufacturer of the asbestos that you were cutting?

4      A   No, no.

5      Q   What did it look like?

6      A   You asked me that. I answered it

7   already. It was white.

8      Q   Did it always look the same?

9      A   Well, unless when we were taking it out,

10  it didn't look white. You know, it was dirty, dusty.

11     Q   Did you breathe that dust?

12     A   I'm sure I did.

13     Q   Did you wear a mask or a respirator, when

14  you were cutting the pipes?

15     A   No.

16         And neither did my mechanic.

17     Q   Okay. You said, generally speaking, you

18  worked on compressors and refrigeration units. Did

19  you generally do that or just on the Constellation?

20     A   Well, just in my later years, as a

21  journeyman.

22     Q   And that was on the Constellation; is

23  that right?

24     A   Right.

25     Q   Now, you said something about the boilers

**Montgoris, John 2007-06-04**                    **Page 75**

00076

1  and the pumps.  And I think I asked you earlier if

2  you specifically had any duties with respect to

3  working on the boiler or the pumps.  And you said no;

4  is that right?

5      A  No.

6          MR. ROBERTS:  No.  That is not what he

7  said.

8          THE WITNESS:  No.

9          MR. ROBERTS:  Wait.

10         If that is what he said, don't ask him

11  again.  You have it on the record.

12     Q  I just want to clear this up.

13  Originally, we were going to go ship by ship.

14     A  No.  I did work on the Constellation,

15  doing other jobs, besides the refrigeration, as an

16  apprentice or as the crew.

17     Q  Okay.

18     A  Now, that entailed going down by the

19  boiler room and working down there, whatever jobs we

20  had to do.

21     Q  Do you, specifically, recall what jobs

22  you were doing on the Constellation in the boiler

23  room?

24     A  Well, it would have to be with the

25  piping, but I don't remember, you know, going into

00077

1    the boiler or anything, to do work like that.

2        Q    Okay.  And I'm not trying to trick you.

3    I just want to be sure that we're clear?

4        A    Right.

5        Q    The only work that you did on this ship

6    was with respect to either the refrigeration unit or

7    working with the piping on the ship; is that correct?

8            MR. ROBERTS:  No.  He's already testified

9        he worked in the pump room, the boiler room, the

10       turbine room, the valves.

11           MS. DeMARIO:  He just said he didn't work

12       in the boiler room.

13           MR. ROBERTS:  That's not what he

14       testified to.

15       A    I said I don't recall going into the

16   boiler.

17       Q    Into the boiler?

18       A    Right.

19           MR. ROBERTS:  Itself.

20       Q    Okay.  Did you ever work on any boilers,

21   on any ships, during your time at the Navy Yard?

22       A    Boilers, no.

23       Q    Did you ever work on any pumps, on any

24   ships, during the time --

25       A    Yes.  We worked with GE and Westinghouse,

**Montgoris, John 2007-06-04**                    **Page 77**

00078

1  but they were in the area. It's not that I did work

2  on them, you know, worked on that particular pump.

3  It was the piping going to it.

4      Q    Okay.

5      A    We put that in. That's the closest I got

6  to the pump.

7          MS. FENNO: Will you please read the

8      question and answer?

9      Q    Sir, did you want to say something, when

10  the court reporter was reading back?

11      A    I don't know. I don't know what I was

12  going to say, really.

13      Q    What did these GE and Westinghouse pumps

14  look like?

15      A    Well, they were large. And they looked

16  like a centrifugal pump, really. That's about all I

17  can remember.

18      Q    Can you give me dimensions of the GE or

19  Westinghouse pump?

20      A    No. It was just very impressive to me.

21      Q    Would one man be able to carry the pump?

22      A    Excuse me?

23      Q    I'm trying to figure out how large or

24  small the pump was.

25      A    Oh, no, it wasn't a one man or anything

**Montgoris, John 2007-06-04**                    **Page 78**

00079

1  like that. I don't recall. It's a huge -- just a

2  huge piece of equipment. That's all.

3      Q    What was the function of it?

4      A    What's the function -- well, they take

5  the water and put it through the coils for the

6  heating. That's about all I could remember.

7      Q    Okay. Do you remember what color these

8  pumps were?

9      A    No.

10     Q    You said that these pumps were in the

11  area. Do you recall these pumps on a particular

12  ship?

13     A    No.

14     Q    Do you remember the model of these pumps?

15     A    There was no reason to, really, you know,

16  take note of all of these things.

17     Q    How do you know it was a Westinghouse

18  pump?

19     A    Because when we looked at them, I said I

20  thought they only made refrigerators.

21     Q    Okay. Did you --

22     A    That was the name I was familiar with.

23  And I could put a refrigeration on it or a washing

24  machine or something like that.

25     Q    Did you ever see the word Westinghouse

**Montgoris, John 2007-06-04**                    **Page 79**

00080

1 written on the pump?

2    A    I believe so.  I would say so, yes.

3    Q    Do you remember where it may have been?

4    A    No.

5    Q    Do you know what system the pump was

6 attached to?

7    A    No.

8    Q    If I asked you the head speed or the RPM

9 of the pumps; would you know that?

10    A    I have no idea.

11    Q    With respect to the Westinghouse pump,

12 you recall it being a Westinghouse because of what

13 you said earlier, that you thought they just made

14 refrigerators or you may have seen their name on

15 their someplace.

16    A    Yeah.

17    Q    But you didn't, actually, work on the

18 Westinghouse pump; is that right?

19    A    No, just the piping leading to the pump.

20    Q    And what did you do with that piping

21 leading to the pump?

22    A    Well, whatever I might have to fit in

23 there.  If it was my job to fit it, I would put it

24 on.

25    Q    Do you have any reason to believe that

00081

1  you would have been exposed to asbestos from doing

2  that work?

3      A    Well, it was always dusty in there.  And

4  the laggers were everywhere.  So, I don't know how

5  far asbestos travels.  You know, does it travel from

6  that room to this room, I would say yes.

7      Q    So, if I'm correct, you believe you would

8  have been exposed to asbestos from the material that

9  the laggers were putting on the pipes?

10     A    Well, what they were cutting, yeah.

11     Q    Do you know the brand name or

12  manufacturer of the material that the laggers were

13  putting on?

14     A    No.

15     Q    Sir, earlier, when I was asking you if

16  you could distinguish your work from one ship to the

17  next, I think you were able to distinguish your work

18  on the Battleship New Jersey.

19     A    Well, that was the first ship I worked

20  on.

21     Q    Okay.  And that's when you were an

22  apprentice?

23     A    As an apprentice, my mechanic told me --

24  you know, it was a hard job, to take the lagging off.

25  We were going to replace the valve down there, which

**Montgoris, John 2007-06-04**                    **Page 81**

00082

1   we did.  And I remember now, it was copper.  Because

2   he even gave me the torch.  I almost burned myself

3   trying to solder the joint or whatever, when we were

4   finishing the job.

5       Q   You were doing pipe work on the

6   Battleship New Jersey?

7       A   Yes, just regular pipe work.  Like I

8   said, it was a learning experience.

9       Q   Do you know the hull numbers that went

10  along with the Battleship New Jersey?

11      A   No.

12      Q   Or the Intrepid?

13      A   The Intrepid, I thought was 11, but I

14  think it's 9 now.  I don't know.  It was lying in the

15  east side so long, I don't know.

16      Q   Do you know how long you worked on the

17  Battleship New Jersey?

18      A   Oh, six months or something.  I don't

19  think I worked there six months.  I have no idea.

20      Q   What about on the Compass Island; do you

21  remember how long you worked on that?

22      A   We were in and out of different ships all

23  the time.

24      Q   What about the Intrepid?

25      A   That came in for just repairs, but not

00083

1  very long. I have no idea.

2      Q    And you say you worked on some destroyers

3  and you can't recall their names; is that correct?

4      A    Yeah. We did some piping for -- I

5  believe it was radar that they needed. And that was

6  about all.

7      Q    Do you remember how long or can you

8  quantify for me how much time was spent on the

9  destroyer?

10      A    No, it was just too long ago.

11      Q    When you were an apprentice and you would

12  come in every day and report, where did you report

13  to?

14      A    Well, like I said, we would report to a

15  different supervisor for a particular job.

16      Q    Was there a particular area in the yard

17  that you reported to?

18      A    Oh, no. If it was on -- well, on the

19  ships, each gang had their own little compartment,

20  you know, where they would set up their coffee. And

21  on the aircraft carrier, it was mostly a hangar deck

22  where you would go -- well, not even that. You would

23  have a compartment below. You had a meeting place

24  for each supervisor. And you would go there. And

25  you would get job and get the papers, the tools you

00084

1 needed. And you would do your job.

2    Q    Where would you get your tools from?

3    A    The tool room, which was off the ship,

4 except on the aircraft carrier, because you couldn't

5 get back in time to do anything.

6    Q    I am talking about; did you work around

7 the Yard or a specific building in the Yard or always

8 on ships? I'm just trying to get a feeling for where

9 you were working.

10    A    Oh, no. I worked -- like I said before,

11 you know, if we had copper piping, we had to take it

12 back to the shop. And they would give it an acid

13 bath and clean it up, so we could have it to

14 reinstall it. And they used to pack it with sand and

15 it would have sand in it.

16    Q    And where was the shop located? Was that

17 in a specific building?

18    A    Yes. It was called 56 Shop.

19    Q    Is there any way for you to quantify for

20 me how much time you spent in the 56 Shop, as opposed

21 to other areas?

22    A    No. You visit them all, maybe every day,

23 for one reason or another, you know, for picking up

24 tools, pipe, whatever. I can't really say.

25    Q    Okay. Sir, would it be an accurate

**Montgoris, John 2007-06-04**                    **Page 84**

00085

1  statement, and tell me if I'm wrong, that you believe

2  you were exposed to asbestos from working with pipe

3  and pipe installation, throughout the entire time

4  that you were at the Navy Yard?

5      A    Yes.

6      Q    And would it be accurate to say that that

7  was the only way you believe you were exposed to

8  asbestos, while at the Navy Yard?

9          MR. ROBERTS:  No, no.  You know, he has

10         already told you about the valves, turbines,

11         pumps.  That's not a proper question.  You ask

12         one question, you can't put words in his mouth.

13         MS. DeMARIO:  I'm not trying to put words

14         in his mouth.

15         MR. ROBERTS:  He testified he worked

16         around pumps, turbines, pipes, valves, laggers,

17         pipe coverers, asbestos workers.  That's how he

18         was exposed to asbestos.

19     A    Let me tell you something.  The sewage

20  plant was almost identical to the ship yard because

21  the sewage plant runs on ships -- on pipes, pumps,

22  boilers, everything you have on a ship.  And, so, you

23  know, it's all the same to me.  See, I don't recall

24  what happened 50 years ago, as far as names, you

25  know, except for the names I told you.  And I

00086

1  wouldn't remember that, if I didn't make that remark.

2      MR. ROBERTS:  Just answer her questions.

3      MS. DeMARIO:  Let me say something now.

4  This is the plaintiff's deposition and not your

5  deposition.  He is testifying, not you.  And I

6  would like to keep it to that.

7      Number two, my question --

8      MR. ROBERTS:  No, no.  You are the one

9  that is trying to testify.

10     MS. DeMARIO:  I'm not.

11     MR. ROBERTS:  But go ahead, go, but

12  you're trying to recap things inaccurately.

13     MS. DeMARIO:  Well, that's why said, I'm

14  asking him if it is accurate.

15     MR. ROBERTS:  He has told you several

16  times.

17  Q   I've asked him several times.

18     MR. ROBERTS:  He testified that he worked

19  around, not on, around pumps, boilers and

20  turbines.

21     MS. DeMARIO:  Can we take a two minute

22  break?

23     MR. ROBERTS:  Yes, let's take a break.

24     (Whereupon, a recess was held.)

25     MR. ROBERTS:  Let's go back on the

**Montgoris, John 2007-06-04**            **Page 86**

00087

1    record.

2    Q   When we left off, I understand that you

3  worked around boilers, pumps and turbines, but I just

4  want to make sure that we're clear here; the only

5  specific way you testified so far in which you

6  believe you were exposed to asbestos is from working

7  on the pipes; is that correct?

8      MR. ROBERTS:  Don't answer that question.

9    A  No.

10      MR. ROBERTS:  He answered that question.

11     Do the best you can to explain it; is

12  that okay?

13      MS. DeMARIO:  That's what I was going to

14  say.

15    A  All I can tell you, all ships have

16  boilers, all have pump rooms, all have engine rooms.

17    Q  Okay.

18    A  And I was, you know, I was there for six

19  years.

20    Q  And I understand that.

21    A  And I would visit them very frequently to

22  do work down there.  That's about all I can say.

23    Q  And this work that you did down there was

24  with respect to pipes?

25    A  Pipes.  Mostly piping, yes.

00088

1    Q    Okay.

2    A    And valves. If you consider that piping

3 also, right.

4    Q    Okay.

5    A    Flanges, whatever.

6    Q    And I just want to be clear; if we went

7 ship by ship, you wouldn't be able to tell me

8 specific products on each particular ship; is that

9 correct?

10    A    Except what I mentioned.

11    Q    Exactly. Except the Westinghouse and the

12 GE pump; is that correct?

13    A    Yes.

14    MR. ROBERTS: The record speaks for

15    itself. I also thought he said turbines with

16    the manufacturer, but I don't want to put words

17    in your mouth, but the record says whatever it

18    says. You are the one saying pumps only. I

19    think he said turbines as well, and boilers.

20    THE WITNESS: Yes.

21    MS. DeMARIO: I just want to put on the

22    record that if you have an objection, just state

23    objection. Don't testify.

24    MR. ROBERTS: I'm not testifying. You're

25    making statements.

**Montgoris, John 2007-06-04**                    **Page 88**

00089

1        MS. DeMARIO: He is answering yes or no.

2    You're right, let the record speak for itself.

3        MR. ROBERTS: Don't recap things because

4    when you recap things, you are generally going

5    to lose. So, Just ask the question.

6        MS. DeMARIO: I am asking questions. And

7    he is understanding the questions that I'm

8    asking. And he's answering them. And you don't

9    like the answers that he's giving.

10       MR. ROBERTS: I like his answers. So

11   far, he's doing pretty good. We've got pumps,

12   turbines, valves. He's doing great.

13       MS. DeMARIO: Again. Mr. Roberts, state

14   objection and don't testify for him.

15       MR. ROBERTS: You're the one that saying

16   he's not doing good. I'm saying he is doing

17   good.

18       MS. DeMARIO: I never said he's not doing

19   well.

20       MR. ROBERTS: Objection, asked and

21   answered. It is not appropriate to ask that

22   question. It was asked once. You don't need to

23   go into the objections. It's improper. And you

24   shouldn't do it.

25   Q    Okay. Sir, have we now discussed all the

**Montgoris, John 2007-06-04**                    **Page 89**

00090

1   ways you believe you may have been exposed to

2   asbestos, during the time you were at the Navy Yard?

3       A   I don't know the question.

4       Q   My question is; have we now discussed all

5   of the ways you believe you may have been exposed to

6   asbestos, during your time at the Navy Yard?

7       A   I think I was exposed to asbestos almost

8   every day.

9       Q   Okay.  And you told me about the ways you

10  believe you were exposed to asbestos.  And I'm asking

11  you; besides from what we discussed, are there any

12  other ways that you believe you may have been exposed

13  to asbestos, during your time at the Navy Yard, that

14  we have not discussed?

15      A   I don't know.  I don't know.  Can I say I

16  was exposed to asbestos with the welder, with his

17  blanket that he put on to protect himself.  I don't

18  know.  You know, I'm just trying to say.

19      Q   Well, if you believe you were exposed to

20  that --

21      A   Yeah.  After losing my brother there, I

22  know I was exposed to asbestos.  I just don't know

23  where we are going.

24      Q   Yes.

25          MS. FENNO:  I move to strike those

**Montgoris, John 2007-06-04**                    **Page 90**

00091

1    portions of the answer that are not responsive.

2         THE WITNESS:  Okay.

3         MR. ROBERTS:  Very responsive.

4         THE WITNESS:  Well, I'm sorry.  I'm

5    saying what I feel.

6         MR. ROBERTS:  Go ahead.

7    Q    And that's fine.

8         I want to know; have we now discussed

9    over the last hour or two hours that we've been here,

10   all the ways you believe you were exposed to

11   asbestos, while at the Navy Yard?

12   (Ruling.)

13        MR. ROBERTS:  Objection.  Don't answer.

14        THE WITNESS:  I can't answer.

15   Q    Are you following your attorney's

16   instruction not to answer?

17   A    Obviously.

18        MR. DEUTSCH:  What is the objection?

19        MR. ROBERTS:  He can tell you what he

20   did.  He can't tell you every way he was exposed

21   to asbestos.

22        MS. DeMARIO:  I'm asking him --

23   A    Asbestos travels for miles.

24        MR. ROBERTS:  He can tell you the way he

25   believes, not the way you believe.

00092
1       Proceed.

2           MS. DeMARIO:  Okay.  Mark that question

3       for a ruling.

4           MR. ROBERTS:  Mark it for a ruling.

5       Q   Have we now discussed all of the

6   different brands and manufacturers that you can

7   recall?

8           MR. ROBERTS:  You asked that question.

9       He said asbestos was coming from --

10          MS. DeMARIO:  Objection.

11          MR. ROBERTS:  Don't answer.

12          MS. DeMARIO:  Objection.  If you have a

13      problem start with objection.  Don't testify for

14      him.

15          MR. ROBERTS:  Don't answer that.

16      A   I believe I answered that.

17          MR. ROBERTS:  Proceed.

18      Q   All right, sir, after the Navy Yard,

19   where is the next place you worked?

20      A   After the Navy Yard, I took odd jobs in

21   the City of New York.  I took a test as a sewage

22   treatment worker.  That's to work in a sewage plant.

23      Q   Before we get there, I want to go back to

24   the Navy Yard for a second.  You worked with your

25   brothers William and Nick; is that correct?

00093

1    A    Yes.

2    Q    Did you work at the same facility that

3    they worked?

4    A    No.

5    Q    Did you work there at the same time

6    period they worked?

7    A    No.

8    Q    What year or years did William work

9    there, what time period?

10    A    I'm sorry?

11    Q    What year or years did William work at

12    the Navy Yard?

13    A    Well, my brother was there first.  And

14    when I was there, he retired.  And I wasn't there

15    with him, but Nick, he came in '56 through '62.  And

16    he worked two years as an electrician's helper.  We

17    used to meet for lunch.

18    Q    You never, specifically, worked with him

19    side by side; is that correct?

20    A    No.

21    Q    Earlier, you told me one brother had an

22    asbestos-related lawsuit.  And I don't recall if that

23    was Nick or William.

24    A    Nick.

25    Q    Did William have an asbestos-related

**Montgoris, John 2007-06-04**                    **Page 93**

00094

1   lawsuit?

2       A   No.

3       Q   Okay.

4       A   I believe I told you he died of a heart

5   attack.

6       Q   Yes.

7           Back to the City of New York.  You said

8   you took a test.  And you became employed by the City

9   of New York at a sewage treatment plant; is that

10  correct?

11      A   Yes.

12      Q   And what year or years was that?

13      A   1962.

14      Q   Until when?

15      A   I retired in 1990.

16      Q   Did you work there continuously,

17  throughout that time period?

18      A   Yes.

19      Q   From '62 to '90?

20      A   Right.

21      Q   What was your title, while at the sewage

22  treatment plant?

23      A   I'm sorry?

24      Q   What was your title?

25      A   Sewage treatment worker.  And I retired

00095

1  as a senior sewage treatment worker.

2      Q   Okay.

3          MR. ROBERTS:  Like Ralph Kramden?

4          THE WITNESS:  Altogether different.

5      Q   Was there a particular person that you

6  reported to on a daily basis or did you have the same

7  boss for that time period?

8      A   Well, I worked at different plants and

9  the bosses usually was a chief of the plant,

10  different bosses.

11      Q   You said you worked at different plants,

12  what plants?

13      A   I started at what they call 26th Ward,

14  which was on Pennsylvania Avenue, Brooklyn.  I worked

15  there for a short period of time.  I don't remember

16  how long.  And then I transferred over to Jamaica,

17  which is by Kennedy Airport.  And then I went to the

18  Barry Bay Plant which is on Steinway.  And then I

19  went back to Jamaica.  From Jamaica, I went to Tall

20  Man's Island.  From there, I retired.

21      Q   With respect to the 26th Ward, you said

22  that was a short time and you didn't know how long

23  you were there.  What about Jamaica, how long were

24  you there?

25      A   Jamaica, I went there on two occasions.

**Montgoris, John 2007-06-04**                    **Page 95**

00096

1    Q   Correct.

2    A   I worked there -- I would have to think

3 now. It was over 10 years.

4    Q   Collectively, over ten years or can you

5 tell me how long the first time was?

6    A   I have to think about that.

7    Q   Okay.

8    A   I think I'm going to go backwards. I

9 retired in 1990. I think I worked 14 years of

10 15 years as a supervisor, which was the senior sewage

11 treatment worker.

12    Q   At Tall Man's Island?

13    A   Yes, at Tall Man's Island. That would

14 bring me back to '75.

15    Q   Okay.

16    A   I think I worked four years over at Barry

17 Bay. They wanted me back at Jamaica. I didn't put

18 in a year. So, it would have to be -- 14 -- what did

19 I say '54. I must have worked at least ten or

20 11 years at Jamaica, collectively.

21    Q   So. From the mid-'60s to about the

22 mid-'70s; does that sound right, that you were at

23 Jamaica, with the exception of the four years when

24 you were at Barry Bay?

25    A   Yes.

00097

1    Q    Okay.  Did you do the same thing at each

2  particular plant or something different?

3    A    No.  Sometimes, we had to be the

4  operators and we just used the equipment for the

5  operation by taking sewage out and everything.  At

6  other times, you would have to repair things.

7  Everything breaks down.  And you would have to be on

8  repairs.

9    Q    We're going to take each one one at a

10  time.

11    A    Okay.

12    Q    At 26th Ward, was there a particular

13  person that you reported to daily?

14    A    Well, the chief of the plant I remember

15  was Bill Irving.  And he was just our boss.  And they

16  had a supervisor, a senior sewage treatment worker

17  who would give us the jobs.

18    Q    Do you know who that sewage treatment

19  worker was, at that particular site?

20    A    No.

21    Q    What was your shift?

22    A    I was on 8:00 to 4:00 all the time there.

23    Q    At every different site it was 8:00 to

24  4:00?

25    A    No.

**Montgoris, John 2007-06-04**                    **Page 97**

00098

1    Q   Just at 26th Ward it was 8:00 to 4:00?

2    A   Yes, at 26th Ward it was 8:00 to 4:00.

3    Q   Okay. What did your daily duties entail

4 at 26th Ward?

5    A   Repairing all sewage equipment that broke

6 down. When it rains, it plays havoc and things

7 break.

8    Q   How large was this plant? Can you tell

9 me how many blocks long it was?

10    A   Oh, it covers quite an area. I would

11 say, you know, different plants -- what can I say, a

12 plant covers maybe four or five square blocks.

13    Q   Okay.

14    A   Maybe larger.

15    Q   Do you remember how many stories high it

16 was?

17    A   Stories, not stories. Everything is

18 either, you know, on ground level or below.

19    Q   Okay.

20    A   I mean, in the buildings, they are like

21 two stories.

22    Q   You said you would be repairing all

23 equipment that broke down; is that correct?

24    A   Right.

25    Q   Can you tell me what specific equipment

00099

1 broke down at the 26th Ward site?

2     A   Well, you always had, you know, chains

3 that pick up and debris. And they broke. And then

4 you had pumps that were leaking. You had pumps where

5 the impeller broke. And you had to replace that.

6 You had piping that had to be removed to take out

7 clogs and everything else and, generally, just

8 repairing.

9     Q   Okay. Just talking about 26th Ward, can

10 you quantify how much of your time was spent

11 repairing or removing just piping?

12     A  Yes, very little.

13     Q  What about quantifying for me how much of

14 your time was spent working on pumps?

15     A  At 26th Ward?

16     Q  Yes.

17     A  Very little.

18     Q  And you also said that chains would be

19 breaking?

20     A  Yes.

21     Q  Can you quantify for me how much time you

22 spent working on chains?

23     A  Well, I was not there that long. I did

24 work on chains. And I worked on flights in the tanks

25 and repairing them. Flights are just wooden planks

00100

1   that push grit and everything else.  If the load gets

2   too much, they break.

3       Q   Was the majority of your time spent doing

4   that type of work at 26th Ward?

5       A   At 26th Ward, yes.

6       Q   Do you have any reason to believe you

7   would have been exposed to asbestos, while working at

8   26th Ward?

9       A   Only walking down the tunnels or anything

10  else where the pipes were.

11      MS. DeMARIO:  Will you please read that

12  back for me?

13      (Whereupon, the requested testimony was

14  read back.)

15      Q   How do you believe you were exposed to

16  asbestos just from walking down the tunnels?

17      A   Well, they were covered with asbestos

18  there.

19      Q   What did that asbestos look like?

20      A   Well, it was painted green, when I was

21  there.

22      Q   Did that asbestos fall off, while you

23  were walking down?

24      A   Well, no.  Sometimes people were carrying

25  equipment.  And they hit it.  And it just falls.

**Montgoris, John 2007-06-04**                    **Page 100**

00101

1    Q    Do you know the brand name or

2   manufacturer of that asbestos?

3    A    No.

4    Q    Is there any other way you believe you

5   may have been exposed to asbestos, while at the 26th

6   Ward site, aside from what you just told me?

7    A    I can't think of anything else there.

8   Like I said, it was a very short time there.

9    Q    Sir, let's go back to the pumps that you

10  were working on.  You said sometimes they were loose

11  or the impeller would break.  Do you know the brand

12  name or manufacturer of the pumps?

13    A    Yes.

14    Q    Okay.

15    A    We had Wemco and the Aurora pumps.  That

16  was the centrifugal ones.  And Marlow pumps.  I don't

17  know if Marlows were there.  I know Marlows were in

18  Tall Man's Island.  That was my last stop.

19    Q    I don't want you to guess.  If you can

20  give us a fair estimate, that's fine.

21    A    We're talking about at 26th Ward now?

22    Q    Yes.

23    A    Everything is vague there because I was

24  not there that long.

25    Q    You just mentioned same pump

**Montgoris, John 2007-06-04**                    **Page 101**

00102

1 manufacturers. Those pump manufacturers were not at

2 26th Ward?

3    A   The pump manufacturers, yeah. They all

4 had pumps but they had different pumps. And I don't

5 know.

6    Q   I'm asking you; while you while you were

7 at 26th Ward, if you know the brand name or

8 manufacturer of the pumps there?

9    A   No, I can't say that.

10    Q   Can you describe for me what those pumps

11 looked like at 26th Ward?

12    A   At 26th Ward?

13    Q   Yes, were they large, small?

14    A   I didn't work too much on the pumps at

15 all, really, but the Aurora pump -- well, I'm going

16 back. You want to know about 26th Ward.

17    Q   Right.

18    A   No.

19    Q   Do you have a specific recollection in

20 your mind of working on pumps at 26th Ward?

21    A   No.

22    Q   Let's move on.

23       The next place that you worked at was

24 Jamaica. You said that you were there on two

25 different occasions for a grand total of ten years?

00103

1    A   Yes.

2    Q   During those ten years that you were

3  there, did you do the same things or do we need to

4  take them in separate phrases or can we kind of keep

5  it as one time?

6    A   I can only tell you, you know, I was

7  there for a short time.  And they were going to

8  renovate the plant.

9    Q   Okay.

10    A   And they sent me over to Barry Bay.  At

11  Barry Bay, I worked there, I think, about four years.

12    Q   Okay.

13    A   And at Barry Bay, I have memories there

14  of working on pumps, but I don't know, you know, what

15  the names of the pumps were.  I would only be

16  guessing on that.

17    Q   Okay.  So, let's take Barry Bay.  And

18  we'll get back to Jamaica.  Barry Bay was four years.

19  Was there a particular person or supervisor that you

20  reported to on a daily basis?

21    A   The boss' name was Herbert Becker.

22    Q   Is he alive or deceased?

23    A   I imagine deceased.

24    Q   Can you describe for me the dimensions of

25  that site, how large or small it was, Barry Bay.

00104

1      A    I would say about the same size as what I

2    said before.

3      Q    And would it be the same as what you said

4    earlier, that there would be two levels, either a

5    ground level or below ground?

6      A    Mostly everything was on the ground

7    level.  There was no real building to speak of.

8      Q    Do you remember any of your colleagues at

9    Barry Bay?

10     A    At Barry Bay?

11     Q    If you remember.

12     A    Yeah.  I remember Victor Bruno, John

13   Todo.

14     Q    Are they living or deceased?

15     A    I don't know.  I have not talked to them

16   in years.

17     Q    What would your tasks include, at Barry

18   Bay?

19     A    At Barry Bay, on the days when I went in

20   on days, I would work the station, work with the

21   pumps, clean the pumps, if they had to be cleaned or

22   just working the screens, different job, different

23   aspects of working with sewage.

24     Q    And what was your shift at Barry Bay?

25     A    Usually, it would be 8:00 to 4:00, 7:00

00105

1  to 3:00, whatever it was.

2      Q   Did you work on anything, aside from

3  pumps, while you were at Barry Bay?

4      A   Well, we worked operating and we worked

5  on maintenance.

6      Q   When you say operating and maintenance,

7  what does that mean?

8      A   Well, when you operate, you are running

9  the pumps.  You are performing the operation.  When

10  you are on maintenance, you are doing the work to fix

11  the pumps that are broken and out of service, getting

12  them ready for service.

13      Q   Aside from pumps, did you work on any

14  other equipment?

15      A   Valves, leaking, packing, leaking.

16      Q   Do you have any belief that you would

17  have been exposed to asbestos, during your time at

18  Barry Bay?

19      A   Well, with the packing, yes, replacing

20  gaskets, yes.  Pumps, if they were covered with

21  asbestos, yes, but I don't know.

22      Q   Well, let's talk about packing first.

23  We'll try to keep it individual.  How do you belive

24  you were exposed to asbestos from the packing?

25      A   They were made with asbestos.  They were

**Montgoris, John 2007-06-04**                    **Page 105**

00106

1  covered with graphite.  We had to cut them, cut the

2  packing to fit the shaft.  And that came in a roll.

3  So, when you cut it, the graphite, and everything was

4  there.  And it was in a windy area.  And it is not a

5  comfortable area, the pump room because it's all

6  open.  I think maybe I was probably exposed to

7  asbestos.

8       Q    Let me ask you this; did you first have

9  to remove the old packing?

10      A    Yes.

11      Q    Do you believe you were exposed to

12 asbestos from that?

13      A    I would think.  I don't know.

14      Q    Do you know the brand name or

15 manufacturer of the old packing?

16      A    Not at that plant.

17      Q    Okay.  What did the old packing look

18 like?

19      A    The old packing -- well, it's about a

20 square.  It's about the size that it can go around

21 the shaft.  And it would be worn.

22      Q    Do you know the color?

23      A    Grayish black.

24      Q    How long would it take you to remove the

25 old packing?

**Montgoris, John 2007-06-04**                    **Page 106**