00179

1  Bronx.  And they told me and his wife that he had

2  mesothelioma.  And they gave him a couple of months

3  to live.  They couldn't do anything.  And he was

4  gone.

5      Q    Sir, at any of your jobs, did any

6  employers ever hold safety classes?

7      A    Safety classes on asbestos, no.

8      Q    Did they hold safety classes not related

9  to asbestos, like classes of any kind?

10     A    I was talking to my friend.  And he said to

11  be aware of it.

12     Q    I'm asking if there were any type of

13  safety classes held, while you were on your job?

14     A    No.

15     Q    You said that you were talking to your

16  friend and now you are aware, what friend is that?

17     A    Well, I was talking to my friend, Jay.

18     Q    Jay?

19     A    Yes.

20     Q    I have just a couple of more questions.

21  And then we'll end for the day.

22     A    Okay.

23     Q    Sir, I'm going to run through a list of

24  manufacturers.  And you tell me if you ever heard of

25  them.

**Montgoris, John 2007-06-04**                    **Page 179**

00180
1       Have you ever hear of Babcock and Wilcox?

2    A    I've heard of them.

3    Q    Have you ever used any products

4 associated with Babcock and Wilcox?

5    A    It could be, but I don't remember.

6    Q    That's perfectly acceptable.

7       Have you ever heard of a company called

8 48 Insulation?

9    A    Who?

10    Q    48 Insulation?

11    A    No.

12    Q    Standard Insulation?

13    A    Standard, no.

14    Q    Eagle Pitcher?

15    A    Eagle Pitcher is familiar, but I don't

16 know where I saw it.

17    Q    You say it's familiar.  Do you recall if

18 you ever used a product manufactured by Eagle

19 Pitcher?

20    A    It could very well be, but I don't know

21 where.

22    Q    Do you know what type of product it would

23 have been?

24    A    No.

25    Q    Stic-tite?

**Montgoris, John 2007-06-04**                    **Page 180**

00181

1    A    No.

2    Q    Carey or Philip Carey?

3    A    Carey?

4    Q    Carey or Philip Carey?

5    A    No.

6    Q    Armstrong?

7    A    Yes.

8    Q    Have you ever used a product manufactured

9    by Armstrong?

10    A    I think there they are tiles or something

11    like that.  I don't know.

12        MR. ROBERTS:  When you say did he use it,

13    do you mean him personally or if someone else

14    was using the product?  Are you asking just

15    about him?

16        MS. DeMARIO:  Either or.

17    A    Are you asking me if I just know the

18    names?

19    Q    First I'm asking you if you ever heard of

20    them.  And then I follow up with what product.

21    A    Okay, right.

22    Q    Johns-Manville?

23    A    Oh, yeah.

24    Q    Have you ever used one of their products?

25    A    I don't know if I have.

**Montgoris, John 2007-06-04**            **Page 181**

00182

1      Q    Okay.  Do you know what type of products

2   you would have used?

3      A    I think they are in cement.  I don't

4   know.

5      Q    Is it that you don't know where you used

6   that product?

7      A    I don't know where they use the product,

8   you know, what product they make or use.

9      Q    I'm asking if you've ever used one of

10  their products?

11     A    I don't know.

12     Q    That's fine.

13          What about Flexitalic?

14     A    Flexitalic -- it sounds like gaskets, but

15  I don't recall.

16     Q    Okay.

17          Empire Ace?

18     A    No.

19     Q    Pittsburgh Corning?

20     A    Pittsburgh Corning, is that Corning

21  Fiberglas?

22     Q    I'm asking you.

23     A    I know Corning, yes.

24     Q    Have you ever used any products

25  manufactured by Corning?

**Montgoris, John 2007-06-04**                    **Page 182**

00183

1    A   By Corning, yes.

2    Q   What products?

3    A   Fiberglass, insulation.

4    Q   Where would you have used that?

5    A   On my home.

6    Q   When would that have been?

7    A   Maybe 15, 20 years ago.

8    Q   In relation to what would you have used

9  that product?

10    A   For insulating the house.

11    Q   Okay.

12    A   The attic.

13    Q   Do you know how often you used that

14  product?

15    A   How often, as little as I can.

16    Q   Do you believe --

17    A   The attic is only so big.

18    Q   Do you know if that product contained

19  asbestos?

20    A   I don't know.  I know it contained

21  fiberglass.  I don't know what was mixed in with it.

22    Q   What about Celotex?

23    A   No.

24    Q   Sir, I believe those are all the

25  questions that I have for right now.  And I think we

**Montgoris, John 2007-06-04**              **Page 183**

00184

1  are going to break for the day.

2        THE WITNESS:  Thank you.

3        MR. ROBERTS:  Okay.  Thank you.

4        (Whereupon, the witness was excused.)

5        (Whereupon, the court reporter was

6   excused.)

7        (Whereupon, the deposition was adjourned

8   at 4:00 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

00185

1        C E R T I F I C A T E

2            I, PATRICIA SCHWEICKERT, a Notary Public

3    for and within the State of New York, do hereby

4    certify that prior to the commencement of the

5    examination

6            JOHN MONTGORIS

7    was sworn by me to testify to the truth, the whole

8    truth and nothing but the truth.

9            I DO FURTHER CERTIFY that the

10   foregoing is a true and accurate transcript of the

11   testimony as taken stenographically by and before me

12   at the time, place and on the date hereinbefore set

13   forth.

14           I DO FURTHER CERTIFY that I am neither a

15   relative of, nor employee, nor attorney, nor counsel

16   for any of the parties to this action and that I am

17   not financially interested in the action.

18       _____

19       Patricia Schweickert

20

21

22

23

24

25

00186

1  I have read the foregoing transcript of my deposition

2  and find it to be true and accurate to the best of my

3  knowledge and belief.

4  _____

5         JOHN MONTGORIS

6  Sworn and subscribed to before me on

7  this _____ day

8  of _____ 2007.

9  Notary_____

10  My Commission Expires_____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT D

## AFFIDAVIT OF DAVID HOBSON

1.        I joined General Electric Company ("GE") in 1969 and was employed there until 1996, when I retired.  My last position with GE was Manager of Navy Customer Service for GE's Navy and Small Steam Turbine business in Fitchburg, Massachusetts.  Since that time I have been involved in several business ventures related to marine steam turbines and the Navy's use thereof.  Before joining GE, I received a degree in Marine Engineering from the Massachusetts Maritime Academy and was licensed for many years as a second assistant engineer by the United States Coast Guard.  I sailed as an engineering officer on steam ships and worked as an engineer in the shipbuilding industry before my employment with GE.  I was involved in marine engineering during my career at GE.  I have personal knowledge of the facts contained herein.

2.        I submit this Affidavit to attest to the level of supervision and control by the United States Navy and its officers, such as the Inspector of Naval Machinery ("INM"), over the design and manufacture by GE of equipment intended for installation on U.S. Navy vessels, particularly marine steam turbines.

3.        During my 27 years of employment with GE, I had frequent and extensive business dealings on behalf of GE with commissioned officers and civilian employees of the United States Navy in connection with the Navy's purchase and use of marine steam turbines from GE.  Over the same time period, I also had extensive business dealings on behalf of GE with commercial shipyards and/or ship owners in connection with their purchase and use of marine steam turbines from GE.  GE sold its marine steam turbines to the Navy and commercial shipyards and/or ship owners for installation aboard ships.

4.     I have studied military and commercial specifications and other documents dating back to World War II concerning marine steam turbines and have conferred on numerous occasions with Naval officers and others involved in Naval and commercial shipbuilding. I have made frequent trips to Naval and commercial shipyards and have been aboard numerous Naval and commercial vessels in all stages of construction, testing and operation.

5.     I am personally familiar with the extent of U.S. Navy control over the production of turbines built for U.S. Navy vessels by GE because I participated in the design, manufacturing, testing and sea trials of these turbines and personally interacted with the Navy's machinery inspectors. Based on my education, training and experience, I have thorough knowledge of the historical practices of GE with regard to marine steam turbines that were purchased from GE by the Navy and commercial shipyards and/or ship owners for installation aboard ships.

6.     GE manufactured and supplied turbines for U.S. Navy ships under contract between GE and the shipyards and/or United States of America, specifically the Navy Department. That department administered the contract through Navy Sea Systems Command ("NAVSEA"), the Department of the Navy in Washington, D.C., which acted under authority of the Secretary of the Navy. NAVSEA personnel exclusively developed ship designs and plans, as well as comprehensive and detailed guidelines and specifications for all ship equipment. NAVSEA officers supervised, enforced and approved the supplier's compliance with the plans and specifications, which could only be authorized by the Navy through one of its officers.

7.     The INM, a Naval officer subordinate to various levels of command within NAVSEA, supervised GE's production of turbines for Navy vessels. The INM, who worked on-

2

site at GE's Fitchburg and Lynn plants in Massachusetts, exercised direct control over all aspects of GE's production of turbines for Navy vessels. The INM observed the manufacturing process, and enforced compliance with design specifications. All aspects of the design, performance requirements and materials used for construction, including thermal insulation for Navy vessels, were specified by NAVSEA. As manufactured and shipped to the Navy by GE, turbines did not have any thermal insulation materials (whether containing asbestos or otherwise) anywhere on them. GE did not make, sell, or install marine steam turbines with asbestos-containing thermal insulation. Any thermal insulation materials, including thermal insulation blankets, that may have been applied to GE's turbines after they left GE's manufacturing facility would have been supplied and installed by entities other than GE.

8.    GE, during all aspects of its turbine work related to U.S. Navy vessels, performed its work under the immediate supervision of the Navy through NAVSEA officers. Supervision and control were exercised through contract documents, design construction drawings, written specifications and personal oversight of GE's work by ship engineers and machinery specialists employed by the U.S. Navy.

9.    The chain of U.S. Navy authority between GE and the Secretary of the Navy was multi-tiered and staffed by officers of varying levels of responsibility. Virtually no aspect of the development, manufacture and testing of Naval turbines escaped this close control. An extensive set of General Specifications for ships of the United States Navy as well as U.S. Navy specifications or military specifications known as Mil-Specs were already in place prior to construction of a U.S. Navy vessel. The Mil-Specs comprised tens of thousands of pages and

3

governed all aspects of a vessel's design and construction and specified the materials to be used, including asbestos-containing thermal insulation.

10.    The U.S. Navy specifications for GE's marine steam turbines manufactured for the Navy incorporated several lower-level specifications for components or materials used for or with the turbines and governed detailed items like metals, bearings and gaskets. The turbines manufactured and supplied by GE for any U.S. Navy vessel had to meet detailed and precise U.S. Navy specifications. Additionally, each turbine was specifically designed for the vessel or class of vessels in question.

11.    In other words, the turbines for a vessel or class were not interchangeable, but instead, were custom built under direction and control of the Navy. NAVSEA developed the initial conceptual design for all classes of Naval vessels. In the design phase of a turbine project, as in all other phases, the U.S. Navy retained ultimate decision authority. By the time an outside design consultant began to participate in the design phase of a new turbine, the U.S. Navy had specified at least the weight, size, power output, speed, and other design parameters.

12.    If an engineering disagreement arose between the Navy and the outside design consultant, the Navy controlled the design adopted. All final design drawings and specifications required express U.S. Navy approval and adoption. Following the Navy's acceptance of a quotation for manufacture of the prototype turbine, the prototype supplier would begin tooling and constructing under continuing U.S. Navy supervision and oversight during manufacture of a turbine at sites such as the Lynn and Fitchburg plants.

13.    At each of these GE facilities, the INM was on site full time in a separate office called the Defense Contract Management Office. Frequently, GE engineers such as myself dealt

4

directly with the Navy's Turbine Section in Washington, D.C. A number of U.S. Navy civilian employees, including inspectors and engineers, supported the INM on site. At the Lynn and Fitchburg facilities, for example, INM's staff typically included more than three or four full time civilian U.S. Navy inspectors and several mechanical engineers. All members of the INM staff were Navy employees and had access to all areas of the production facility at all times. During the construction of the prototype turbine, all drawings, approvals and any reports of out-of-tolerance machining were submitted to, and approved by, the INM or by the mechanical engineers working under him.

14.     Many steps of the production process required in-process testing. For example, all welds were tested per the Navy design specification. All weld testing reports were reviewed and approved by the INM on site. The INM also approved of the procedures used to test the welds. Similarly, other test results (e.g., balance testing, vibration testing, tolerance measurements, machine variations and the like) were reviewed and approved by the INM. Any reports, which resulted in the replacement of a component part, were also sent to NAVSEA for its review.

15.     Before shipment, the turbine typically was tested per contract specification at the site of manufacture. A detailed test agenda for on-site testing was approved by the U.S. Navy. The agenda included tests for power output or speed at various levels of steam pressure, vibration and noise test, bearing temperature test and the like. The test agenda was then conducted on the turbine. The performance of the test agenda was closely monitored by the INM and all test results were submitted to him. The manufacturer then prepared a final report on the

turbine, including all test reports. The final report was then submitted for approval to the on-site INM.

16.    Following INM approval, the final report was forwarded to NAVSEA in Washington, D.C., where further approval was required before the manufacturer could ship the turbine. Following the completion of the test agenda, the turbine was fully disassembled and inspected. This was carried on in the personal presence of the on-site INM. One or more of the INM's mechanical engineers would also attend the disassembly inspection. Any contract design or manufacturing abnormalities discovered at this point would lead to rejection of the turbine or to modifications and re-testing. A report of each tear-down was prepared and was then approved and signed by the INM.

17.    Paralleling the manufacture of the prototype, the U.S. Navy would prepare a Request for Quotation on the production models of the turbine, subject to any changes developed during the production and testing of the prototype turbine unit. Once received, a quotation would then be subject to a similar review as that described above with respect to prototype unit, including quotation review meeting(s). Approval of a quotation would eventually be given to one or more vendors. Often two vendors were selected to supply production turbines. In many instances, the manufacturer of the prototype unit would secure part or all of the contract work for the production units, but in some instances the manufacturer of the prototype would not be selected for the production contract.

18.    The manufacturing process for the production unit then proceeded under the same level and intensity of U.S. Navy scrutiny and supervision as described above for the prototype unit. The INM, assisted by Navy civilian inspectors and mechanical engineers as described

6

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

JOSEPH S. ZAFONTE and ADRIANE ZAFONTE,

                        Plaintiffs,

VS

GENERAL ELECTRIC COMPANY, et al.,

                        Defendants.

04 CV 9320

JUDGE JONES

AND

RICHARD WELLS and KIYOKO WELLS

                        Plaintiffs,

VS

GENERAL ELECTRIC COMPANY, et al.,

                        Defendants.

04 CV 10018

JUDGE JONES

## AFFIDAVIT OF DAVID HOBSON

David Hobson states as follows:

1.     I provide this Affidavit in further support of the Notices of Removal and in opposition to the Motions to Remand in the above-referenced cases.

2.     In addition to the intense direction and control exercised by the U.S. Navy over GE with respect to the design, manufacture and testing of marine turbines described in my previous Affidavits, the Navy exercised intense direction and control over all written documentation and any safety or caution information that the Navy, in its sole discretion, directed be provided with these turbines.

3.    The U.S. Navy had precise specifications, practices and procedures that governed the content of any communication affixed to machinery supplied by GE to the Navy. GE would not have been permitted, under the specifications, associated regulations and procedures, and especially under the actual practice as it evolved in the field, to affix any type of warning or caution statement to a piece of equipment intended for installation on a naval vessel, beyond those required by the Navy. GE would not have been permitted, under the specifications, associated regulations and procedures, and especially under the actual practice as it evolved in the field, to affix any type of warning or caution statement to a piece of GE equipment intended for installation on a U.S. Navy vessel, such as a naval marine steam turbine, that addressed alleged hazards of products such as insulation materials that were supplied to the Navy by vendors other than GE.

4.    During the course of my career, I have observed many pieces of naval equipment both prior to installation on ships and in place on ships. Depending upon the timeframe, some of these pieces of equipment have had certain safety or caution notices or other data stamped on plates that were attached to them. The content and format of this information, including the decision whether to include or omit certain safety or caution information, was determined by the Navy, not by the equipment manufacturers. As importantly, any safety or caution information the Navy directed a manufacturer to place on its equipment would have related to the equipment produced or supplied by that manufacturer, not a different, unrelated product manufactured, sold, or installed by one or more different companies. The Navy, not GE, determined the nature of hazards to be subject to a precautionary labeling and the content of the labeling in question.

5.    Furthermore, the U.S. Navy had precise specifications, practices and procedures as to the nature of written materials to be delivered with its naval turbines, such as engineering drawings, test reports, and other technical data that could be used as needed by shipboard engineering officers during

### AFFIDAVIT OF ADMIRAL BEN J. LEHMAN, U.S. NAVY, RET.

1.     I am a retired Rear Admiral of the United States Navy.  Before joining the Navy in 1942, I received a Bachelor of Science degree in Mechanical Engineering from the College of the City of New York.  After joining the Navy, I was ordered to study naval architecture and marine engineering at Massachusetts Institute of Technology (MIT).  Later, I completed the United States Post-Graduate School program in Naval Engineering Design.  I received a Master of Science in Mechanical Engineering from Harvard University in 1949.  I have also studied Design Philosophy and Advanced Stress Analysis at Stanford University.  While in the United States Navy, I served as Ship Superintendent and Planning Officer at the Brooklyn Navy Yard between 1942 and 1944, as a Ship Superintendent at the San Francisco Naval Shipyard from 1950 and 1952, and as a Planning Officer at the Assistant Industrial Manager Office in San Francisco from 1952 to 1954.  I was promoted to Rear Admiral in 1977 in the Naval Reserve.     I worked as an engineer at General Electric Company between 1946 and 1948.  I held the positions of Director of Engineering and Vice-President of Engineering at two major ship building companies between 1969 and 1975.  During all these periods I have maintained close contact with the U.S. Navy, including periods of active duty in the Department of Defense and the Naval Sea Systems Command in Washington, D.C.  I have been an independent consultant since 1975.  I have personal knowledge of the facts contained herein.

2.     I submit this Affidavit to attest to the level of supervision and control by the United States Navy and its officers over every aspect of the design and manufacture of equipment intended for installation on Navy vessels.

3.     During my tenure in the Navy and as Ship Superintendent, I was personally involved with the supervision or oversight of ship alterations and equipment overhauls at the New York Naval Shipyard (formerly the Brooklyn Navy Yard).  Any deviation from military specifications of

equipment to be installed on ships would have resulted in significant problems and probable rejection of the equipment. The Navy could not, and did not, permit its contractors to implement any changes because every aspect of every item of equipment had to be: (1) functionally compatible with every other equipment and with available materials from the Navy Supply System; (2) compatible with the shipyard practices, training, tools and capabilities; and (3) consistent with the ability of the crew to maintain the ship during its service when shipyard help was unavailable using materials carried onboard.

4.    In the 1940s and afterward, the Navy had complete control over every aspect of each piece of equipment. Military specifications governed every characteristic of the equipment used on Navy ships, including the instructions and warnings. Drawings for nameplates, texts of instruction manuals, and every other document relating to construction, maintenance, and operation of the vessel was approved by the Navy. This control included the decision of what warnings should or should not be included. Thus, the Navy controlled the decision making with respect to instructions and warnings on every piece of equipment.

5.    Furthermore, the Navy had specifications as to the nature and content of all written material that was delivered with each piece of equipment, including turbines. The Navy was intimately involved with and had final approval of all technical and engineering drawings, operating manuals, safety or hazard information and any other written information that accompanied a piece of equipment. The Navy determined the nature of hazards to be subject to any precautionary labeling and the content of any such labeling. In short, the Navy dictated every aspect of the design, manufacture, installation, overhaul, written documentation and warnings associated with its ships and did not permit deviation from any of its contractors.

NJ/130115v1

*I* declare under penalty of perjury that the foregoing is true and accurate.

Executed this _____ day of October, 2004

Ben J. Lehman, Rear Admiral U.S. Navy, Ret. USN Ret

Sworn and subscribed to before me
on this _____ day of October, 2004

Notary Public

L. McKAY
Notary Public - State of Nevada
Appointment Recorded in Douglas County
No: 99-36380-5 - Expires June 10, 2007

EXHIBIT F

## AFFIDAVIT OF J. THOMAS SCHROPPE IN SUPPORT OF FOSTER
## WHEELER'S NOTICE OF REMOVAL

I, J. Thomas Schroppe, being under penalty of perjury, declare and say:

1.      I am a 1962 graduate of the New York State Maritime College with a degree in
Marine Engineering. For three months in 1962, I worked as a Third Assistant Engineer for
American Export Lines. I began my career at Foster Wheeler in 1962 as a Proposal Engineer
in the Marine Department. As a Proposal Engineer, I was responsible for taking shipyard
specifications and designing a boiler to meet the thermal performance and physical
requirements of those specifications. In 1967, I became the Manager of the Proposal
Department and reviewed all proposals. In 1969, I was promoted to Vice President of
Engineering at which point I supervised both proposal and contract execution activities.
From 1975 to 1982, I was President of Foster Wheeler Boiler Corporation. In 1982, I
became Managing Director of Foster Wheeler U.K. From 1984 to my retirement in 1999, I
was Executive Vice President of Foster Wheeler Power Systems.

2.      I am personally familiar with the degree of supervision and control exercised by the
Navy and its agencies in procurement contracts with Foster Wheeler for boilers and auxiliary
equipment because I was personally involved in such contracts at all the various stages of
development, from inquiry and bid through production, testing, and sea trials and, ultimately,
acceptance.

3.      I submit this affidavit to attest to the degree of involvement, supervision, direction and
control exercised by the U.S. Navy and its authorized agents and officers in connection with
procurement contracts with Foster Wheeler for equipment to be installed aboard U.S. Naval
vessels. The following paragraphs describe the contract process from the perspective of Foster
Wheeler as the vendor, as well as the levels of interaction between Foster Wheeler and the
Navy agents and personnel through the various stages of a given contract.

4.      Foster Wheeler furnished and fabricated marine propulsion boilers and related auxiliary
systems for U.S. Navy, Maritime Commission, and Coast Guard ships under contract between
Foster Wheeler and the shipyards and/or the United States Navy Department and its authorized
agencies, officers and personnel (hereafter collectively referred to as the "Navy").

5.      The Navy was responsible for all phases of the design of a vessel, which was
accomplished by the Naval architect. Specifically, the Naval architect would prepare the ship
design which involved the entire vessel, including the machinery space, and all performance
requirements. In general, the ship design for any given class of ship would be contained in a
Ship Specification ("Ship Spec") which covers all aspects of the vessel including the machinery space.
As it relates to the boiler, the Ship Spec would cover all boiler operating criteria, performance
requirements, and maximum physical dimension of the boiler(s). In general, the Ship Spec was
written and prepared by the naval architect and approved by the Navy and, in the course of its
projects with the Navy, Foster Wheeler was required to design, fabricate and furnish equipment
which complied strictly with the requirements in the Ship Spec.

6.      In addition to the Ship Spec, Foster Wheeler was also obligated to comply with Military
Specifications ("Mil Specs") which cover all specific components of the boiler, including

accessories, subcomponents, and materials required to fabricate the boilers and its components.

7.     The normal process by which Foster Wheeler sold marine boilers to the Navy first involved receipt and response to an inquiry from either BuShips (Bureau of Ships) or the shipyard, depending on the Navy's procurement process. The boiler inquiry would be assigned to a proposal engineer at Foster Wheeler's marine department who would review the inquiry, which consisted of the Ship Spec and the associated drawings, for the performance requirements and size limitations of the boiler.

8.     The performance requirements are contained in the specifications, namely MIL-B18381 and the Ship Spec, which must be followed. I must point out that deviations from these specs were not acceptable as the boiler is just one piece of the entire power plant which was designed by BuShips or by a designated naval architecture firm such as Gibbs and Cox. In addition, the Foster Wheeler proposal engineer was aware that these requirements would be tested during the sea trials, so all calculations had to precisely conform with the Ship Spec.

9.     During the proposal phase, Foster Wheeler would prepare design drawings and related materials in conformance with the Ship Spec (which included performance specs and size limitations) and other requirements contained in MIL-B-18381 which was the Mil Spec pertaining to Naval propulsion boilers. I am personally familiar with the MIL-B-18381 as I saw it and referred to it throughout my career at Foster Wheeler. Foster Wheeler would prepare a proposal drawing and proposal specification that would outline the design and scope of material and equipment contained in the proposal. The boiler proposal submitted by Foster Wheeler would incorporate the specific requirements set forth in the Ship Spec and MIL-B18381.

10.     Approximately half way through the proposal process, information is forwarded to Foster Wheeler's estimating department to start to prepare an estimate of the boiler cost. In parallel, the proposal engineer starts calling vendors to obtain quotes for the various boiler accessories such as burners, sootblowers, gage glasses, safety valves, etc. All Navy approved vendors were asked to provide a quotation for the material in accordance with the Mil Spec covering their equipment or product.

11.     The finished boiler proposal consisted of an approximately 25 page booklet, a proposal drawing and an offering letter to the entity requesting a proposal so stating that the offering was in accordance with the Ship Spec and all required Mil Specs.

12.     The boiler proposal would be reviewed by the shipyard with the understanding that the proposed design, prepared specifically for the Navy in accordance with the Ship Spec. at issue, conformed to all appropriate specifications stated above. Once final price negotiations were complete, the contract was awarded to Foster Wheeler.

13.     The boiler specifications would provide detailed requirements for the boiler and would always reference the boiler Mil Spec (MIL-B-18381) which dictated very specific material requirements such as:

(a)    Boiler tubes: Type of tube, tube diameter, tube thickness, material, and tensile strength.

(b)    Refractory and Insulation: Specification identified the material, arrangement of various bricks and insulating materials on various boiler walls and provided specific Mil Specs for each type of insulating/refractory material.

(c)    Boiler accessories: All accessories applied to the boiler, such as burners, safety valves, soot blowers, must conform to a specific Navy Mil Spec for each such component.

14.    At receipt of an order the same Foster Wheeler proposal engineer is assigned the project as a contract engineer which will entail a more detailed recalculation of the thermal performance for the boiler. In addition, calculations of all the pressure drops, design of drum de-superheaters and final selection of all boiler accessories are made. All this work will be double checked by the head of engineering. In parallel, the contract engineer will commence discussions with the contract design department who will make all the drawings required for both manufacture, for submission to the shipyard and the Navy for review and approval. Foster Wheeler would not commence production of the boilers until the Navy issued final approval of these contract drawings. The approved drawings prepared during this phase would eventually be incorporated into the technical manuals.

15.    The contract design department also provides the material requisitions to the purchasing department so they may procure materials in accordance with Mil Specs. With regard to procurement of insulating and refractory material, the specific requirements for insulation and refractory items are listed in MIL-B-18381, which then references additional Mil Specs for each specific type of refractory/insulating material required. Foster Wheeler's procurement process would involve the purchasing department contacting the vendor and requesting a quotation for the material. The Foster Wheeler purchase order would reference the appropriate Mil Spec for each item shipped. The vendor, in turn, would supply materials that conformed to the Mil Spec and ship it directly to the shipyard. Finished products such as burners, sootblowers, and all refractory and insulating materials, etc. are shipped direct to the shipyard so they may be incorporated into the final boiler erection. Upon arrival at the shipyard, there would be a receipt inspection to ensure what was on bill of materials was delivered.

16.    During manufacture of the boiler, a Navy resident inspector was present at Foster Wheeler's shops. The Navy inspector would review all fabrication processes, welding procedures, pressure part welding, and all weld x-rays for conformity to Mil Specs. The inspector would also ensure that all materials used at this stage, e.g., steel, flanges, tubes, etc., conformed to applicable Mil Specs. All manufacturing was performed to drawings which had been reviewed and approved by the Navy.

17.     Once individual components (e.g., headers, tubes, pressure parts) were manufactured, inspected by a Foster Wheeler quality control inspector, and inspected and stamped with approval by the resident Navy inspector, the materials/components were moved to the shipping area. At this point, the boiler fabrication was complete, though the boilers were in a "knocked down" condition (unassembled) for shipment. The boiler components and related materials were wrapped and/or boxed in accordance with Mil Specs relating to packaging and shipment of materials, which is also referred to in Mil Spec MIL-B-18381.

18.     The knocked down boilers are then shipped from Foster Wheeler's facility to the shipyard for assembly. For those not familiar with Naval propulsion boilers, they are simply too large and heavy to be shipped assembled. The assembly is done by shipyard workers with a Foster Wheeler employee on site to interpret drawings and answer questions that may arise during the assembly process. Resident Navy inspectors also witness the boiler assembly process.

19.     A critically important inspection item is the hydrostatic test put on the boiler after complete assembly of the pressure parts. This test is a water pressure test of the boiler at 50% over the boiler design pressure. At this point, leaks, even small ones, are not acceptable to the Navy. Formal written acceptance at this stage by the Navy inspector is a requirement. The boilers now sit idle in the ship as the remainder of the engine room and the balance of the ship are being completed. It is at this point that all the engine room piping is connected to the various connections on the boiler. Following the piping tests (shipyard responsibility) the shipyard insulates all piping up to the boiler casings.

20.     Upon completion of the vessel by the shipbuilder, dock trials start to test the various machinery systems in the engine room. The boilers are run at low power since the main turbine cannot be run very fast at the dock because any higher powers would tear the ship loose from the pier. Full power testing is done during sea trials where all aspects of the boiler performance are thoroughly tested. Foster Wheeler would send a service engineer to witness these tests and answer any questions which may arise. Foster Wheeler frequently sent the contract engineer on the first ship of a new class to obtain first-hand data on the boiler performance. Sea Trials were performed on every ship and formal approval by the head Navy inspector was required. Any punch list items which were identified had to be corrected before final acceptance of the boilers.

21.     In addition to the above design, manufacture and testing there remains an obligation by Foster Wheeler to provide technical manuals for the boilers furnished in a given Navy contract. The Navy exercised intense direction and control over all written documentation to be delivered with its naval boilers such as engineering drawings, test reports and other technical data that could be used as needed by shipboard engineering officer during the life of the equipment. The Navy required that every piece of equipment be supplied with a defined number of copies of one or more technical manuals. Navy personnel participated intimately in the preparation of this kind of information and exercised specific direction and control over its contents. These manuals included safety information related to the operation of naval boilers only to the extent directed by the Navy.

22.    Furthermore, the Navy had precise specifications, practices and procedures that governed the content of any communication affixed to machinery supplied by Foster Wheeler to the Navy. Foster Wheeler would not be permitted, under the specifications, associated regulations and procedures, and especially under actual practice as it evolved in the field, to affix any type of warning or caution statement to a piece of equipment intended for installation onto a Navy vessel, beyond those required by the Navy.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct. Executed this _16TH_ day of March, 2006 at Newark, New Jersey.

J. Thomas Schroppe

THE STATE OF NEW JERSEY

ESSEX COUNTY                    )

Personally appeared before me this        day of March, 2006, J. Thomas Schroppe, who made oath that the statements contained in the affidavit above are true and correct to the best of his knowledge.

Subscribed and sworn to before me this _10th_ day of _March_, 2006. My commission expires _4/1/07_

Notary Public        HEDWIG BACHLER
A NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES APRIL 1, 2007

EXHIBIT G

## AFFIDAVIT OF ADMIRAL BEN J. LEHMAN, U.S. NAVY, RET.

1.      I am a retired Rear Admiral of the United States Navy.  Before joining the Navy in 1942, I received a Bachelor of Science degree in Mechanical Engineering from the College of the City of New York.  After joining the Navy, I was ordered to study naval architecture and marine engineering at Massachusetts Institute of Technology (MIT).  Later, I completed the United States Post-Graduate School program in Naval Engineering Design.  I received a Master of Science in Mechanical Engineering from Harvard University in 1949.  I have also studied Design Philosophy and Advanced Stress Analysis at Stanford University.  While in the United States Navy, I served as Ship Superintendent and Planning Officer at the Brooklyn Navy Yard between 1942 and 1944, as a Ship Superintendent at the San Francisco Naval Shipyard from 1950 and 1952, and as a Planning Officer at the Assistant Industrial Manager Office in San Francisco from 1952 to 1954.  I was promoted to Rear Admiral in 1977 in the Naval Reserve.     I worked as an engineer at General Electric Company between 1946 and 1948.  I held the positions of Director of Engineering and Vice-President of Engineering at two major ship building companies between 1969 and 1975.  During all these periods I have maintained close contact with the U.S. Navy, including periods of active duty in the Department of Defense and the Naval Sea Systems Command in Washington, D.C.  I have been an independent consultant since 1975.  I have personal knowledge of the facts contained herein.

2.      I submit this Affidavit to attest to the level of supervision and control by the United States Navy and its officers over every aspect of the design and manufacture of equipment intended for installation on Navy vessels.

3.      During my tenure in the Navy and as Ship Superintendent, I was personally involved with the supervision or oversight of ship alterations and equipment overhauls at the New York Naval Shipyard (formerly the Brooklyn Navy Yard).  Any deviation from military specifications of

NJ/130115v1

equipment to be installed on ships would have resulted in significant problems and probable rejection of the equipment. The Navy could not, and did not, permit its contractors to implement any changes because every aspect of every item of equipment had to be: (1) functionally compatible with every other equipment and with available materials from the Navy Supply System; (2) compatible with the shipyard practices, training, tools and capabilities; and (3) consistent with the ability of the crew to maintain the ship during its service when shipyard help was unavailable using materials carried onboard.

4.    In the 1940s and afterward, the Navy had complete control over every aspect of each piece of equipment. Military specifications governed every characteristic of the equipment used on Navy ships, including the instructions and warnings. Drawings for nameplates, texts of instruction manuals, and every other document relating to construction, maintenance, and operation of the vessel was approved by the Navy. This control included the decision of what warnings should or should not be included. Thus, the Navy controlled the decision making with respect to instructions and warnings on every piece of equipment.

5.    Furthermore, the Navy had specifications as to the nature and content of all written material that was delivered with each piece of equipment, including turbines. The Navy was intimately involved with and had final approval of all technical and engineering drawings, operating manuals, safety or hazard information and any other written information that accompanied a piece of equipment. The Navy determined the nature of hazards to be subject to any precautionary labeling and the content of any such labeling. In short, the Navy dictated every aspect of the design, manufacture, installation, overhaul, written documentation and warnings associated with its ships and did not permit deviation from any of its contractors.

**I** declare under penalty of perjury that the foregoing is true and accurate.

Executed this ____ day of October, 2004

Ben J. Lehman, Rear Admiral U.S. Navy, Ret.

Sworn and subscribed to before me
on this ____ day of October, 2004

_____
Notary Public

L. McKAY
Notary Public - State of Nevada
Appointment Recorded in Douglas County
No: 99-36380-5 - Expires June 10, 2007

EXHIBIT H

## AFFIDAVIT OF ADMIRAL BEN J. LEHMAN, U.S. NAVY, RETIRED
## IN SUPPORT OF FOSTER WHEELER'S NOTICE OF REMOVAL

I, Ben J. Lehman, understanding and being under the penalty of perjury, declare:

1.       I am a Rear Admiral, Retired, of the United States Navy [U.S. Navy]. I received notice of my commission as an Ensign in April, 1942 and commenced active duty in the U.S. Navy on June 1, 1942. Immediately prior to commencing active duty in the U.S. Navy, I attended the College of the City of New York. I had been a "student engineer" at the Mack Manufacturing Co. [Mack Trucks] in Allentown, PA and had been enrolled as a special student at Lehigh University, Bethlehem, PA from June 1941 until January 1942. I returned to the College of the City of New York in order to complete my course work there and then enter military service. I had already completed two years of U.S. Army ROTC. On entering active duty, the U.S. Navy ordered me to study naval architecture and marine Engineering at the Massachusetts Institute of Technology [MIT]. Later, I was ordered to the U.S. Naval Academy Post-Graduate School at Annapolis [now the U.S. Navy Post-Graduate School in Monterey, CA]. I received a Master of Science [SM] from Harvard University in 1949. I studied Design Philosophy and Advanced Stress Analysis at Stanford University in 1957 and 1958. In the U.S. Navy, I served as a Ship Superintendent and Dry Docking Officer at the New York Naval Shipyard [formerly the Brooklyn Navy Yard], between 1942 and 1944, as a Ship Superintendent at the San Francisco Naval Shipyard from September 1950 to May 1952, and as a Planning Officer at the Assistant Industrial Manager, San Francisco from 1952 to 1954. In the Navy, I have always been an Engineering Duty Officer. I was promoted to Rear Admiral in 1977 in the Naval Reserve. I was employed as an engineer by the General Electric Co. between 1946 and 1958, and by the Bethlehem Steel Co.'s Shipbuilding Division in 1949 and 1950. I held the positions of Director of Engineering at a major shipbuilding company in Seattle, WA from 1969 to 1972 and of Vice President of Engineering in

Pascagoula, MS from 1972 to 1975. During all these periods I have maintained close contact with the U.S. Navy. During times of civilian employment, I have had periods of active duty in the Department of Defense [DOD], the Naval Sea Systems Command [NAVSEA] in Washington, D.C., and shipyards. My experience has caused me to be thoroughly familiar with U.S. Navy specifications by means of which the U.S. Navy controlled its contracts and inspection procedures, and thereby controlled its suppliers. Since my retirement in 1982 my specific knowledge of new procedures has decreased. I have been an independent consultant since 1975. I have personal knowledge of the facts herein.

2.       I submit this Affidavit in support of Foster Wheeler's Notice of Removal to attest to the levels of direction, control, and supervision exercised by the U.S. Navy over the design and manufacture of equipment, including boilers and their auxiliary equipment [collectively referred to as "boilers"] designed and constructed for installation on ships of the U.S. Navy.

3.       During my service in the U.S. Navy as a Ship Superintendent, I was personally involved with supervision and oversight of ship's overhauls and alterations. I was fully aware that only boilers especially designed and built for the propulsion of U.S. Navy combat vessels, including Foster Wheeler boilers, could be installed. These were designed and manufactured in accordance with detailed specifications written, approved, and issued by the U.S. Navy, specifically NAVSEA or its predecessors, including the Bureau of Engineering.

4.       The U.S. Navy chain of command concerning ship construction comprised several layers. The Secretary of the Navy [subject to the President and Congress] had the ultimate authority related to contractual and technical control. An Under Secretary was directly concerned with ship acquisitions. The Under Secretary position has now been eliminated, and that authority now rests with the Chief of Naval Operations who provides NAVSEA with the

desired ship characteristics, and oversees its performance. In the 1930s, Foster Wheeler, as a boiler and heat exchanger manufacturer, was under the cognizance of the Bureau of Engineering. The representative of that Bureau at the plant was an Inspector of Naval Machinery. The Bureau of Engineering and the Bureau of Construction and Repair were combined in 1940 to create the Bureau of Ships: for a time Approvals were required from both the Inspector of Machinery and the Supervisor of Shipbuilding for the lead ships of a class. Later, the Inspectors of Naval Machinery were renamed Inspectors of Naval Material. About 1958, the Bureau of Ordnance was merged with the Bureau of Ships to form NAVSEA. As a reduction in the pace of shipbuilding continued, routine inspection responsibilities were assumed by a new organization: the Defense Contract Administration Services Agency [DCASA]. This organization had many responsibilities, but lesser technical qualifications. Technical questions were referred to the Bureaus [Commands] in Washington. Throughout all of these reorganizations there were no changes in the ultimate authorities or the responsibilities of those authorities. Suppliers of equipment and the builders of ships have had the U.S. Navy's acceptance of their products determined by representatives of different organizations at different times but NAVSEA or its predecessors always had the ultimate authority and the professional competence to accept or reject them.

5.      Under NAVSEA, as under its predecessors, the U.S. Navy's shipbuilding and acquisition of equipment for the ships comprised several levels of authority. Detailed technical control over ship design, construction, repair, and inspection was in NAVSEA. The Commander of Naval Supply Systems Command [NAVSUP] had contractual control of some procurements. Each of these two organizations had oversight responsibilities regarding, among other things, boilers manufactured for U.S. Navy vessels. Compliance with the specifications and standards was directly monitored by Inspectors of Naval Machinery under both these divisions: those

under NAVSUP generally worked on site at the supplier's [in this case Foster Wheeler's] manufacturing facilities and Machinery Superintendents or Inspectors of Naval Machinery carried out their responsibilities at the shipbuilding yards. Moreover, it was common in my experience for technical personnel from the Propulsion Equipment Groups of NAVSEA to inspect the manufacturing and quality assurance processes at supplier's plants and the boiler erection and inspection procedures at the shipyards. In my experience, it was machinery inspectors who exercised primary, front line control over the work performed for the Navy by suppliers such as Foster Wheeler in the production of boilers and other equipment. The Inspectors of Naval Machinery [or those with other titles who succeeded them] were responsible for assuring that contractors such as Foster Wheeler complied with the contract specifications every detail. Further, the Inspectors of Naval Machinery would report to their superiors any violations of, or failures to comply with specifications, refuse to apply their stamp of approval, and not authorize shipment. This was true whether the installation was to be done by government shipyards or government contract shipyards.

5.     The U.S. Navy retained the "final say" over the design of any piece of equipment, and made the ultimate decisions, whether engineering or contractual.

6.     Further, I can attest that the military specifications for boilers and other equipment intended for use on vessels of the U.S. Navy, known as "MilSpecs", were drafted, approved, and maintained by the U.S. Navy, specifically NAVSEA or its predecessors, to encompass all aspects of shipboard equipment, including the material requirements.

7.     These contract specifications reflected the state of the art and the special needs of vessels destined for combat. NAVSEA maintained and controlled the MilSpecs because it had direct contact with the forces afloat and the shipyards, and therefore superior knowledge of the

demands and requirements of vessels ready for combat, and the availability of processes and materials.

8.     The U.S. Navy's unique specifications for boilers were communicated to boiler suppliers such as Foster Wheeler when the U.S. Navy, either directly or through its contractors, issued a negotiated contract or a Request for Proposal for equipment. The U.S. Navy specifications included the nature of any communication affixed to boilers or other equipment supplied to the U.S. Navy.

9.     The U.S. Navy had complete control. It could not, and did not, permit its contractors to implement any changes. Every aspect of every item needed to be controlled because:

    a.    it had to be consistent with the ability of the crew to operate the ship, especially on its combat missions;

    b.    it had to be compatible with the ability of the crew to maintain the ship and perform emergency repairs during its service using materials and parts carried on board when shipyard assistance was not available;

    c.    every item had to be functionally compatible, fit in the space available, and be maintainable and operable with materials available from the U.S. Navy's supply system.

10.     The U.S. Navy had complete control over every aspect of every piece of equipment. Military specifications governed every significant characteristic of the equipment used on U.S. Navy ships, including the instructions and warnings. Drawings for nameplates, the texts of instruction manuals, and every other document relating to construction, maintenance, and operation of the vessel was approved by the U.S. Navy. This control included the decision of which warnings should or should not be included. Thereby, the U.S. Navy controlled the decisions with regard to instructions and warnings on every piece of equipment. The U.S. Navy would not, and could not, permit any equipment manufacturer or supplier to interfere with the Navy's mission by placing warnings on any equipment [or in any instructions or manuals which accompanied the

equipment] on any U.S. Navy ships or in any shipyards in which U.S. Navy ships were built or repaired that might cause Sailors or workers to deviate from their mission or require the U.S. Navy to devote scarce resources to programs it deemed not essential, in its unilateral view.

11.     In addition to specifications for the design and manufacture of the equipment itself, the U.S. Navy also had detailed specifications that governed the form and content of the written materials to be delivered with the equipment, including boilers, supplied to the U.S. Navy. The U.S. Navy was intimately involved with and had final approval of all technical and engineering drawings, operating manuals, safety or hazard information and any other written information that accompanied or related to any piece of equipment. The U.S. Navy determined the nature of hazards to be subject to any precautionary labeling and the content of such labeling. In short, the U.S. Navy dictated every aspect of the design, manufacture, installation, overhaul, written documentation and warnings associated with its ships and did not permit deviation from any of its contractors.

12.     The U.S. Navy would never permit a supplier to suggest, advise, or require any actions that would be disruptive to the normal operation of the ship in its primary function of defending our Country. Procedures for operation were taught and enforced by officers of all ranks, from Petty Officers to Captains. Any written material regarding procedures for working around boilers that differed would have interfered with the normal and necessary operations of U.S. Navy ships. Indeed, in its specifications for manuals the U.S. Navy specifically limited warning information to items and events dealing with the operation of equipment. By definition, the application or removal of insulation would not have been included.

13.     Asbestos was rampant throughout U.S. Navy ships. Sailors and civilian personnel were exposed at all times when they were aboard ships regardless of where they were stationed or where they worked. In order to protect all these individuals from exposure to asbestos, the U.S.

Navy would have had to allocate scarce resources to provide respiratory protection for all sailors and workers every hour of every day that they were on board. Implementing wet down procedures and creating containment areas would also have been required to implement effective industrial hygiene programs. The U.S. Navy made a conscious decision on allocation of its resources in light of its knowledge of the hazards of asbestos and its mission to protect our Country. The U.S. Navy conducted extensive research concerning the hazard of exposure to asbestos starting in the 1930's. In the early 1940's, the Navy's Bureau of Medicine and Surgery, in coordination with the U.S. Maritime Commission, set standards based on the report of Dr. Drinker and Fleischer and Marr. Through its participation in government programs and conferences into the 1980's, the Navy stayed abreast of the latest information, including the results of research. The U.S. Navy made a conscious and informed decision about how asbestos would be used on its ships and how exposures would be controlled, if at all, on its ships.

14.    The U.S. Navy would not have allowed its equipment suppliers, such as Foster Wheeler, to affix any warning related to any asbestos hazards on their equipment. This would have included boilers. Further, the U.S. Navy would not have allowed Foster Wheeler to place any warnings related to asbestos hazards in any written material provided by Foster Wheeler to the U.S. Navy or to a U.S. Navy contractor in accordance with its contracts, including its technical and operations manuals. To do so would have interfered with the U.S. Navy's mission and control of its ships and personnel.

I declare under penalty of perjury that the foregoing is true and correct, and that if called as a witness, I could competently testify to the foregoing facts, all of which are within my own personal knowledge.

Ben J. Lehman, Rear Admiral, U.S. Navy, Ret.

Before me, the undersigned officer, personally appeared Ben J. Lehman, Rear Admiral, U.S. Navy, Ret. known to me to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seal  acknowledge.

Executed this  12th  day of  July  2007.

On this 12 day of 07, 2007, before me, a Notary Public,



Josh Martin

MY COMMISSION EXPIRES  August 28, 2010

JOSH MARTIN
NOTARY PUBLIC
STATE OF NEVADA
APPT. No. 06-109087-5
MY APPT. EXPIRES AUGUST 28, 2010

EXHIBIT I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

ROBERT NESBIET,

                    Plaintiff,

        - against -

GENERAL ELECTRIC CO., et al.,

                    Defendants.
------------------------------------------------------------X

                                    <u>OPINION AND ORDER</u>

                                    04 Civ. 9321 (SAS)

SHIRA A. SCHEINDLIN, U.S.D.J.:

On October 26, 2004, Robert Nesbiet ("Nesbiet") sued General

Electric Company ("GE") and other defendants in New York state court alleging,

among other things, that he was exposed to asbestos-containing products while

employed at the Brooklyn Navy Yard, where he worked on the USS Missouri

between 1943 and 1944. Nesbiet is suing GE solely on the theory that it failed to

warn of the dangers relating to asbestos used as insulation in marine steam

turbines manufactured by GE. On November 29, 2004, GE filed a timely notice of

removal asserting federal jurisdiction under the federal officer removal statute.[1]

Nesbiet now moves to remand this action to state court.[2]

---------------------------------

[1]     *See* 28 U.S.C. § 1442(a).

[2]     In addition, GE has moved to stay all proceedings in this Court
pending a decision by the Judicial Panel on Multidistrict Litigation on whether to
transfer and consolidate this action pursuant to 28 U.S.C. § 1407. This case is

# I.  BACKGROUND

## A.  Plaintiff's Allegations

Nesbiet's exposure to asbestos occurred, in part, during his employment at the Brooklyn Navy Yard, where he worked as a welder and shipfitter during World War II.[3] In October, 2004, Nesbiet was diagnosed with mesothelioma, a cancer of the lining of the lungs caused by exposure to asbestos.[4] GE has confirmed that it manufactured marine steam turbines that were installed on the USS Missouri, a Navy ship that Nesbiet helped construct.[5] Nesbiet has ~~stated that the insulation on these turbines~~ was a source of his asbestos exposure.[6] He alleges that GE failed to provide any warnings regarding asbestos on its

---

scheduled to be considered for transfer to MDL 875, *In re Asbestos Products Liability Litigation*, on March 31, 2005.

[3]        *See* Plaintiff's Responses to Defendant's Fourth Amended Standard Set of Interrogatories and Request for Production of Documents, Ex. C to Certification of Michael A. Tanenbaum, Counsel to GE, in Support of Defendant's Memorandum of Law ("Tanenbaum Cert."), at 24.

[4]        *See id.* at 9.

[5]        *See* GE's Notice of Removal ("GE Not.") ¶ 6.

[6]        *See* Plaintiff's Memorandum of Law in Support of His Motion to Remand at 5 ("Nesbiet Mem.").

of asbestos.

## B.    Grounds for Removal

In its notice of removal, GE avers that "in the manufacture and sale of turbines and other equipment for the U.S. Navy, including all aspects of warnings associated with those turbines and equipment, GE was acting under an officer or agency of the United States within the meaning of 28 U.S.C. § 1442(a)(1)."[8]  In support of removal, GE has proffered the following evidence.

### 1.    David Hobson's Affidavits

*First*, GE has submitted four affidavits of David Hobson ("Hobson"), a former GE employee.[9]  Hobson began his employment with GE in 1969 and over the course of the following twenty-seven years, "had frequent and extensive business dealings on behalf of GE with commissioned officers and civilian employees of the United States Navy in connection with the Navy's purchase and

---

[7]    *See* Weitz & Luxenberg, P.C., Amended Standard Asbestos Complaint for Personal Injury No. 7, Ex. A to Tanenbaum Cert., ¶ 173.

[8]    GE Not. ¶ 6.

[9]    *See* 10/17/03 Affidavit of David Hobson; 3/31/04 Affidavit of David Hobson ("Hobson 2"); 10/6/04 Affidavit of David Hobson ("Hobson 3"); 2/4/05 Affidavit of David Hobson ("Hobson 4"), Exs. 1-4 to Defendant's Memorandum of Law in Opposition to Plaintiff's Motion to Remand ("GE Opp.").

-3-

use of marine steam turbines from GE.[10]  Prior to his employment by GE, Hobson
worked as an engineer at a shipyard and on steam ships, from 1965 until 1969.[11]

The Hobson affidavits show that GE manufactured and supplied
turbines for U.S. Navy ships under contracts between GE and the Navy
Department or contracts between GE and shipyards that had themselves contracted
with the Navy Department.[12]  The Navy Department administered these contracts
through Navy Sea Systems Command, whose personnel exclusively developed
ship designs and plans, as well as comprehensive and detailed guidelines and
specifications for all equipment on U.S. Navy ships.[13]  This portion of the
affidavits is uncontroverted.

Nesbiet strenuously objects, however, to those portions of Hobson's
affidavits regarding the Navy's control over warnings and, more specifically,
whether the Navy prevented GE from providing warnings on the dangers of
asbestos.  Hobson declares, in relevant part:

> [T]he Navy had precise specifications as to the nature of any
> information that was to be affixed to equipment supplied to the

---

[10]   Hobson 2 ¶ 3.

[11]   *See id.* ¶ 1.

[12]   *See id.* ¶ 6.

[13]   *See id.*

-4-

Navy by GE. Under the Navy's specifications and procedures, as well as under actual Navy practice as it evolved in the field, GE would not have been permitted to affix any type of warning or caution to a piece of equipment intended for installation onto a naval vessel, beyond those expressly specified by the Navy. The Navy also had precise specifications as to the nature and contents of all written materials that were to be delivered with naval turbines. . . . These [materials] included safety and hazard information only to the extent directed by the Navy. [14]

Nesbiet argues that this and other similar statements contained in Hobson's affidavits could not possibly be based on Hobson's personal knowledge and, in any case, have no basis in fact. [15] When deposed concerning the first two of his affidavits, Hobson admitted that he has no personal knowledge concerning the relationship between GE and the Navy prior to 1965; mentoring from the previous generation of GE engineers was his only source of knowledge with respect to the relevant time period. [16] There is no indication that this mentoring included the subject of the Navy's specifications, procedures or practice concerning asbestos-related warnings during World War II. [17] It follows that Hobson lacks personal

---

[14]     Hobson 3 ¶¶ 4-5.

[15]     Nesbiet Mem. at 7-16.

[16]     *See* Continued Deposition under Oral Examination of David Hobson on July 21, 2004, Ex. B. to Affidavit of Bryan Belasky ("Belasky"), Counsel to Nesbiet, at 217-18.

[17]     After his deposition, Hobson submitted two additional sworn affidavits: Hobson 3 and 4. In the first of these, Hobson asserts that "[b]y virtue

-5-

knowledge as to the Navy's control over such warnings when Nesbiet was

working on the USS Missouri.  Therefore, to the extent that Hobson's affidavits

suggest that during the relevant time period the Navy prohibited warnings

concerning the dangers of asbestos, the statements are without foundation — and

therefore inadmissible — as being beyond the scope of Hobson's personal

knowledge and experience.[18]

2.    Admiral Ben J. Lehman's Affidavit

*Second*, GE has submitted the affidavit of Ben J. Lehman

("Lehman"), a retired Rear Admiral of the U.S. Navy, who served as a ship

---

of the knowledge I have obtained over the course of my career concerning the
historical practice of GE and the U.S. Navy with regard to marine steam turbines, I
can state that the practices described in my October 17, 2003 affidavit [Hobson 2]
concerning the U.S. Navy's control and direction related to marine steam turbines
would have been applicable at least as far back in time as World War II." Hobson
3 ¶ 2.  This assertion is insufficient to establish personal knowledge with regard to
whether a particular kind of warning was forbidden over twenty years prior to the
start of Hobson's career.

[18]    Nesbiet has requested an opportunity to depose Hobson concerning
his last two affidavits.  This request was granted.  As of the date of this opinion,
however, Nesbiet has not yet been able to further depose Hobson.  Nonetheless,
because this Court has concluded that Hobson cannot offer competent evidence
concerning the Navy's control over asbestos-related warnings during the relevant
time period, Nesbiet is in no way prejudiced by his inability to depose Hobson a
second time.

-6-

superintendent for repairs at the Brooklyn Navy Yard between 1942 and 1944."

In that capacity, Lehman "was personally involved with the supervision or oversight of ship alterations and equipment overhauls."[20] Lehman's affidavit states, in relevant part:

> In the 1940s and afterward, the Navy had complete control over every aspect of each piece of equipment. Military specifications governed every characteristic of the equipment used on Navy ships, including the instructions and warnings. . . . This control included the decision of what warnings should or should not be included. . . . Furthermore, the Navy had specifications as to the nature and content of all written material that was delivered with each piece of equipment, including turbines. The Navy was intimately involved with and had final approval of all . . . safety and hazard information and any other written information that accompanied a piece of equipment. The Navy determined the nature of the hazards to be subject to any precautionary labeling and the content of any such labeling. In short, the Navy dictated every aspect of the . . . warnings associated with its ships and did not permit deviation from any of its contractors.[21]

The affidavit thus raises the inference that GE did not provide a warning concerning the dangers of asbestos because the Navy did not permit any such warning.

---

[19]    *See* Affidavit of Admiral Ben J. Lehman ("Lehman Aff."), Ex. 6 to GE Opp., ¶ 1.

[20]    *Id.* ¶ 3.

[21]    *Id.* ¶¶ 4-5.

Plaintiff deposed Lehman concerning the foundation for the statements contained in his affidavit. Based on this deposition, plaintiff contends that Lehman, like Hobson, has no personal knowledge of the relevant facts.[22] In that deposition, however, plaintiff did not attack Lehman's competence to make the statements in his affidavit. Rather, plaintiff attacks Lehman's conclusion by asserting that he lacks direct knowledge of warnings or instructions on GE's marine steam turbines in the 1940s. While the deposition reveals that Lehman has no direct knowledge as to whether the Navy specifically prohibited GE, or other manufacturers, from providing warnings about asbestos,[23] Lehman made no such assertion in his affidavit. But, as stated earlier, his affidavit raises the *inference* that the Navy prohibited warnings about asbestos because, based on Lehman's knowledge and experience, the Navy exercised *complete* control over *all* warnings placed on equipment or in accompanying technical manuals by its contractors. By virtue of the position he occupied at the Brooklyn Navy Yard during the relevant time period, Lehman is competent to make the statements contained in his affidavit.

Nesbiet further contests the factual basis for Lehman's affidavit by

---

[22]     *See* 3/24/05 Letter of Belasky to the Court, at 1.

[23]     *See* Deposition of Ben Lehman at 32, 77-78, 103-04.

submitting a number of military specifications, or "milspecs," covering the

contents of instruction manuals for electrical and mechanical equipment,[24] which

Nesbiet contends "imposed an affirmative requirement to warn on contractors such

as GE since at least the 1950s and possibly even earlier."[25]  However, Nesbiet has

mischaracterized this so-called requirement.  For example, the earliest of these

milspecs, dated October 20, 1952, states that an instruction manual "shall contain

data such as the following:  (a) Safety notice (where high voltages or special

hazards are involved) (see figure 9)."[26]  "Figure 9" itself consists of detailed

instructions on how to safely handle equipment that involves high voltages.[27]  If

anything, the milspec requires that the manufacturer provide safety instructions,

such as those regarding high voltages, *as dictated by the Navy.*  Moreover, the

---

[24]    *See* Military Specifications, MIL-M-15071A-G, Exs. C through I to
Affidavit of Bryan Belasky ("Belasky Aff."), Counsel to Nesbiet.

[25]    Nesbiet Mem. at 15.  Nesbiet proffers that he has been unable to
locate the milspec that was in force during WWII. *See id.* at 16 n.5.

[26]    Interim Military Specification, MIL-M-15071A ("1952 Milspec"),
Ex. I to Belasky Aff., at 5.  The second oldest of the milspecs submitted by
Nesbiet, dated August 18, 1954, contains identical language to that found in the
1952 milspec.  *See* Military Specification, MIL-M-15071B, Ex. H to Belasky Aff.,
at 6.

[27]    *See* 1952 Milspec at fig. 9. (stating, for example, "MAKE SURE
YOU ARE NOT GROUNDED whenever you are adjusting equipment or using
measuring equipment. . . .  In general, USE ONE HAND ONLY when servicing
live equipment.").

1952 milspec indicates that the content of instruction manuals is subject to the approval of the Navy.[28]  Therefore, these milspecs appear to support, rather than undercut, Lehman's affidavit.

In sum, Lehman's affidavit establishes, for the purposes of this motion, that the Navy controlled the nature of warnings to be included on all equipment (or in the accompanying technical manuals) to be installed on its ships. This evidence in turn supports the inference that no warnings appeared on the turbines or in the written materials because the Navy prohibited them.

### 3.    Dr. Lawrence Stillwell Betts's Affidavit

*Third*, GE has submitted the affidavit of Lawrence Stillwell Betts ("Betts"), a medical doctor and retired U.S. Navy Captain.  During his Navy career, which began in 1971 and ended in 2001, Betts became a "qualified surface warfare medical department officer," in which capacity he became "generally familiar with the industrial products that were used by the Navy."[29]  Through his training and experience, Betts is also familiar with "the history and practice of the

---

[28]    *See id.* at 4 ("Prior to the printing of the final instruction books, a preliminary instruction book shall be prepared and submitted in duplicate to the bureau or agency concerned via the Government inspector for approval.").

[29]    Affidavit of Lawrence Stillwell Betts ("Betts Aff."), Ex. 5 to GE Opp., ¶ 1; Curriculum Vitae of Lawrence Stillwell Betts, Ex. A to Betts Aff., at 2-3.

Navy occupational health program from . . . before World War II until the present time."[30] Betts has supported his conclusions by attaching to his affidavit numerous journal articles, reports, and other documents dating back to before World War II.

Betts's testimony indicates that the Navy's knowledge of the health hazards associated with the use of asbestos aboard Navy vessels during the 1940s represented the state-of-the-art.[31] Consequently, according to Betts's affidavit, GE could not have possessed any information regarding the dangers posed by the use of asbestos-containing products in marine steam turbines that was not already known by the U.S. Navy.[32]

## II.   APPLICABLE LAW

Section 1442(a) of Title 28 provides, in relevant part:

A civil action or criminal prosecution commenced in a State court against any of the following may be removed by them to the district of the United States for the district and division embracing the place wherein it is pending:
(1) The United States or any agency thereof or any officer (or any other person acting under that officer) of the United States or of any agency thereof, sued in an official capacity for any act

---

[30]   *Id.* ¶ 2.

[31]   *See id.* ¶ 31.

[32]   *See id.* ¶¶ 30-31.

-11-

This statute overcomes the well-pleaded complaint rule by providing a method to remove a case brought in state court against a federal officer, or any person acting under a federal officer, despite the absence of a federal cause of action.[33] The Supreme Court has noted that one of the purposes of the federal officer removal statute is to ensure that a federal court will adjudicate the validity of a defendant's official immunity defense.[34] To remove a state court action under the statute, a private party must establish that (1) it has a colorable federal defense, (2) it acted under the direction of a federal agency or officer, and (3) there is a causal nexus between the claims and the conduct performed under the color of federal office.[35]

A defendant seeking removal bears the burden of demonstrating

---

[33]    *See Jefferson County v. Acker*, 527 U.S. 423, 431 (1999).

[34]    *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981).

[35]    *See id.*; *Mesa v. California*, 489 U.S. 121, 124-25, 134-36 (1989). A corporation is a "person" within the meaning of section 1442(a). *See, e.g., Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th Cir. 1998); *McGillick v. World Trade Ctr. Props., LLC*, No. 04 Civ. 3747, 2004 WL 2049260, at *2 (S.D.N.Y. Sept. 13, 2004); *Isaacson v. Dow Chem. Co.*, 304 F. Supp. 2d 442, 447 (E.D.N.Y. 2004); *Arness v. Boeing N. Am., Inc.*, 997 F. Supp. 1268, 1272 (C.D. Cal. 1998); *Good v. Armstrong World Indus.*, 914 F. Supp. 1125, 1127-28 (E.D. Pa. 1996).

-12-

federal subject matter jurisdiction." Although federal courts generally construe

the removal statutes narrowly, remanding doubtful cases to state court,[37] the

Supreme Court has emphasized that "the federal officer removal statute is not

narrow or limited."[38] Indeed, "the policy favoring removal 'should not be

frustrated by a narrow, grudging interpretation of § 1442(a)(1).'"[39] Furthermore,

"it is axiomatic that the right of the states, consistently with the Constitution and

the laws of the United States, to make and enforce their own laws is equal to the

right of the federal government to exert exclusive and supreme power in the field

that by virtue of the Constitution belongs to it. The [federal officer] removal

statute . . . is to be considered with highest regard for such equality."[40]

The first requirement for federal officer removal — a colorable

federal defense — is broadly construed. "We . . . do not require the officer

---

[36]    *See California Pub. Employees' Ret. Sys. v. WorldCom, Inc.*, 368 F.3d 86, 100 (2d Cir. 2004).

[37]    *See Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28, 31 (2002); *Somlyo v. J. Lu-Rob Enters., Inc.*, 932 F.2d 1043, 1045-46 (2d Cir. 1991).

[38]    *Willingham v. Morgan*, 395 U.S. 402, 406 (1969) (quotation marks omitted).

[39]    *Manypenny*, 451 U.S. at 242 (quoting *Willingham*, 395 U.S. at 407).

[40]    *State of Colorado v. Symes*, 286 U.S. 510, 518 (1932).

-13-

virtually to "win his case before he can have it removed."[41]  Thus, a defense may

be colorable even if the court ultimately rejects it.[42]  "[A]t the removal stage, it is

not the Court's role to assess the validity of a particular defense.  The Supreme

Court made it clear in [*Willingham v. Morgan*[43]] that the phrase 'under color of . . .

office' allows removal even if, on the record then existing, it could not be said that

'the officers had a clearly sustainable defense.'"[44]

A defendant meets the second requirement — acting under the

direction of a federal officer — by showing a "substantial degree of direct and

detailed federal control over the defendant's work."[45]  By contrast, a person or

corporation establishing only that the relevant acts occurred under the general

auspices of a federal agency or officer is not entitled to removal under section

---

[41]    *Jefferson County*, 527 U.S. at 431 (quoting *Willingham*, 395 U.S. at 407).

[42]    *See id.*

[43]    395 U.S. 402.

[44]    *Reiser v. Fitzmaurice*, No. 94 Civ. 7512, 1994 WL 54326, at *3 (S.D.N.Y. Feb. 8, 1996) (alteration in original).  *See also Symes*, 286 U.S. at 519 (when a defendant seeks removal  pursuant to the federal officer removal statute, "no determination of fact is required but it must fairly appear from the showing made that [the defendant's removal] claim is not without foundation and is made in good faith").

[45]    *Isaacson*, 304 F. Supp. 2d at 447.

-14-

Courts generally have not found jurisdiction where the government officer did not directly require a purported agent to take specific actions."[47]

Finally, to satisfy the third requirement — the existence of a causal nexus — the defendant must show that the state lawsuit "has arisen out of the acts done by [the defendant] under color of federal authority and in enforcement of federal law."[48]  In the context of a failure to warn claim, the defendant must establish that the government's control over warnings directly interfered with the defendant's ability to fulfill its state law obligation to warn of safety hazards.[49]

## III.   DISCUSSION

---

[46]     See Ryan v. Dow Chem. Co., 781 F. Supp. 934, 947 (E.D.N.Y. 1992); Good, 914 F. Supp. at 1128.

[47]     McGillick, 2004 WL 2049260, at *3.

[48]     Mesa, 489 U.S. at 131-32.

[49]     See Freiberg v. Swinerton & Walberg Prop. Servs., Inc., 245 F. Supp. 2d 1144, 1155 (D. Colo. 2002) ("What [the defendants] must establish for purpose of . . . § 1442(a)(1) is that the government authority under which they worked required them to act as they did.  For purposes of [p]laintiff's failure to warn claims . . . [the defendants] must establish [that the government's] direction and control of their activities directly interfered with their ability to fulfill their state law obligation to warn employees of safety hazards."); Faulk v. Owens-Corning Fiberglass Corp., 48 F. Supp. 2d 653, 663 (E.D. Tex. 1999) (holding that the causal nexus requirement of the federal officer removal statute was not satisfied "[b]ecause the federal government provided no direction or control on warnings when using asbestos [and] did not prevent [d]efendants from taking their own safety precautions heeding state-law standards").

-15-

GE asserts the military contractor defense.[50] This defense shields contractors from liability under state tort law for defects in military equipment supplied to the United States when "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States."[51] In the context of a failure-to-warn claim, the Second Circuit has held that in order to satisfy the first element of the military contractor defense, the defendant must show that the government itself dictated or otherwise controlled the content of the warnings meant to accompany the product.[52]

In order to satisfy the first prong of section 1442(a), GE must demonstrate merely that its claim to the military contractor defense is "colorable." GE has met this burden. *First*, the Lehman affidavit establishes for the purposes of this motion that the Navy's specifications controlled all aspects of the design

---

[50]    *See* GE Mem. at 12.

[51]    *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988). *See also Grispo v. Eagle-Picher Indus., Inc.*, 897 F.2d 626, 629 (2d Cir. 1990) (holding that the *Boyle* test may apply to a state law failure-to-warn claim).

[52]    *See Grispo*, 897 F.2d at 630.

and manufacture of marine steam turbines, including the nature of warnings to be affixed to or included with these turbines.[53] *Second*, Lehman asserts that any deviation from these specifications would likely have resulted in rejection of the equipment.[54] This proffer is sufficient, for the purpose of the "colorable defense" prong, to satisfy the requirement that the equipment and accompanying warnings, if any, conformed to the Navy's specifications. *Third*, Betts's affidavit establishes that the Navy's knowledge of the dangers of asbestos on board its ships was state-of-the-art and, therefore, the Navy would have known of any dangers that were known to GE.[55] Thus, GE has shown it has a colorable federal defense.

> **B.**    "Acting Under" and "Causal Nexus" Requirements

As stated earlier, GE's proffer has established that the Navy determined the nature of warnings to be included on the turbines and in the accompanying technical manuals and, furthermore, did not permit contractors to deviate from any of its specifications. This evidence in turn raises an inference that GE's alleged failure to warn of the dangers of asbestos resulted from the Navy's prohibition of any such warning. Nesbiet has not effectively rebutted this

---

[53]    *See* Lehman Aff. ¶¶ 4-5.

[54]    *See id.* ¶¶ 3, 5.

[55]    *See* Betts Aff. ¶ 31.

-17-

inference with any evidence of his own. In fact, the milspecs submitted by Nesbiet support rather than undermine GE's evidence. GE's proffer thus establishes, for the purposes of this motion, that (1) the Navy exercised a substantial degree of direct and detailed control over GE's provision of warnings and (2) the Navy's control over warnings directly interfered with GE's ability to fulfill its state law obligation to warn about the dangers of asbestos. GE has therefore satisfied "acting under" and "causal nexus" requirements under section 1442(a).[56]

Nesbiet suggests that in order to meet the "causal nexus" requirement GE must provide direct evidence that the Navy "specifically prohibited it from warning about asbestos."[57] This is more than GE is required to do. The Supreme Court has admonished, "[j]ust as requiring a 'clearly sustainable defense' rather than a colorable defense would defeat the purpose of the removal statute . . . so

_____

[56]    *See Carter v. Acands, Inc.*, No. 3:02-CV-00009, 2002 WL 31682352, at *4 (E.D. Tex. June 27, 2002) (holding in a case that included a failure-to-warn claim against a manufacturer of turbines for the Navy that the "acting under" requirement of the federal officer removal statute was satisfied because the Navy had ultimate control over warnings affixed to equipment or included in the accompanying written materials); *Madden v. Able Supply Co.*, 205 F. Supp. 2d 695, 702 (S.D. Tex. 2002) (stating in a case that included a failure-to-warn claim against a manufacturer of turbines for the Navy that "any warnings promulgated (or not promulgated) with respect to the turbines were governed by Navy guidelines. Thus, the causal nexus is axiomatic.").

[57]    Reply Memorandum of Law in Further Support of Plaintiff's Motion to Remand at 5.

-18-

case to the Eastern District of Pennsylvania is moot. The Clerk of the Court is directed to close these motions (docket # 5 and # 7).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:    New York, New York
          March 28, 2005

-21-

**For Plaintiff:**

Bryan Belasky, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, NY 10038
(212) 558-5500


For Defendant:

Michael A. Tanenbaum, Esq.
Sedgwick, Detert, Moran & Arnold, LLP
Three Gateway Center, 12th Floor
Newark, NJ 07102
(973) 242-0002

-22-

EXHIBIT J

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/1/2007

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

TALBOT P. FRAWLEY and JOAN
FRAWLEY,

                Plaintiffs,                06 Civ. 15395 (CM)

    -against-

GENERAL ELECTRIC COMPANY, et al.,

                Defendants.

------------------------------------------------------------ x

## MEMORANDUM ORDER

McMahon, J.:

     On November 15, 2006, plaintiffs Talbot P. Frawley and his wife Joan filed this diversity action in the New York State Supreme Court, Index No. 117089-06, alleging that Talbot Frawley's exposure to asbestos during various times in his working life had injured his lungs, causing him to suffer from the life-threatening illness mesothelioma.

     The complaint that was filed was a *pro forma* complaint, which contained specific allegations only against Exxon Mobil Corporation. In keeping with a procedure devised by the New York State Supreme Court for the efficient management of asbestos cases, the allegations against all the other defendants are found in a form complaint that is incorporated by reference at the end of the complaint to which the above-noted index number was assigned by the County Clerk. The First, Second, Third and Fourth Causes of Action in that complaint (known as NYAL – Weitz & Luxenberg, P.C. Standard Asbestos Complaint for Personal Injury No. 7, hereinafter "W&L Cplt. No. 7") carve out of their general allegations claims relating to any "asbestos exposures which are alleged to have occurred aboard any military vessel or vehicle, or at any shipyard or on or at any governmental facility or location." (Riegel Aff. Ex. 2 – W&L cplt. No. 7). The claims so excepted – all of which arise under state law – include claims for negligent failure to use products other than asbestos in the design and manufacture of the item to which plaintiff was exposed (¶ 169 of the First Cause of Action); negligent failure to design products containing asbestos in a way that prohibits or minimizes the release of airborne dust and fibers (¶ 170 of same); negligent design and manufacture of the product to which the plaintiff was exposed (¶ 172 of same ); breach of express and implied warranty (Second Cause of Action); placing an inherently defective product in the stream of commerce (Third Cause of Action); and the entire Fourth Cause of Action except insofar as it alleges a "failure to warn" claim. (I should note that the aspect of the First Cause of Action that was not carved out for exposures occurring, *inter alia*, on military vessels is a failure to warn claim as well). Thus, the only claims alleged against

companies in connection with exposure to asbestos on military vessels are failure to warn claims (First and Fourth Causes of Action) and a claim for maintaining an unsafe workplace (Fifth Cause of Action).

Defendant General Electric Corporation ("General Electric" or "GE") filed a Notice of Removal on December 22, 2006. General Electric relied on the "federal officer" removal statute, 28 U.S.C. § 1442(a)(1), invoking that statute because it has been held to protect federal contractors working to specifications in federal contracts. One of plaintiffs' allegations, as identified in a response to an interrogatory answered on November 20, 2006,[1] is that plaintiff was exposed to asbestos while working as a civilian employee of the United States Navy. It appears that plaintiff worked on two ships, the U.S.N.S. Upshur and the U.S.N.S. General Maurice Rose, both of which carried asbestos-containing steam turbines built by GE pursuant to government contract. Because W&L Cplt. No. 7 did not exempt exposures on military vessels from its claims, GE contended, it was entitled to remove the case to this court.

The Notice of Removal was not filed within thirty days of the complaint and was not joined by any other defendant. General Electric maintains that it could not have discerned from the allegations of the original complaint that plaintiff was alleging asbestos exposure on naval vessels prior to receiving the response to its interrogatory, and argues that removing the case within thirty days of receipt of the interrogatory response was proper. Plaintiffs do not challenge this assertion, and after reviewing a copy of W&L Cplt. No. 7, it is quite apparent that the real substantive allegations relating to plaintiff Frawley's asbestos exposure is found in the answers to interrogatories, which specify where he worked and when. Removal pursuant to the federal officer statute, of course, does not require the consent of all defendants. See In re Franklin Nat'l Bank Sec. Litig., 532 F.2d 842, 846 (2d Cir. 1976); see also Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1253 (9th Cir. 2006).

Almost as soon as the case was removed, on January 16, 2007, plaintiffs filed a motion for leave to amend their complaint to delete any and all allegations *against GE* by virtue of plaintiff's exposure to the turbines on the two Navy ships. (See Riegel Aff. Ex. 2, Proposed Amended Complaint, ¶¶ 22-24.) The amended complaint left intact allegations against GE that grew out of exposure allegedly suffered by Frawley while working as a member of the merchant marine on

---

[1] Case management orders entered in the New York Asbestos Litigation substantially expedite various procedural aspects of the hundreds of cases filed in the Supreme Court, New York County. One of those orders, it seems, permits a plaintiff to file some sort of form complaint (referred to in Ex. A to the Notice of Removal as Weitz and Luxenberg P.C. Standard Asbestos Complaint for Personal Injury No. 7), rather than recreating a new complaint for each new lawsuit. A second order requires a plaintiff who has filed a lawsuit to respond immediately to a set of interrogatories that the various "usual suspects" in the asbestos cases have on file with the court. These interrogatories, which are in the nature of a bill of particulars, detail various aspects of the injuries suffered by the plaintiff and contain additional information about the alleged nature and source of the exposure.

ships that were owned by the federal government. The proposed amendment did not purport to dismiss any claims against any party except GE. Indeed, the amending paragraphs follow a caption that says, "Specific Allegations Pertaining to Defendant General Electric Company."

Under this court's rules, GE, as the removing party, was required to file a copy of all records and proceedings in the state court within twenty days after filing the notice of removal. Local Civil Rule 81.1(b). The court's docket sheet does not indicate that any defendant, including GE, had filed an answer to the original complaint, and nothing in either the Notice of Removal or the papers filed in support of this motion indicated that answers had been filed. Under the Federal Rules of Civil Procedure, until twenty days have passed following the filing of answers, no motion to amend is necessary; plaintiffs have an absolute right to amend their complaint one time, and they may delete any claims they wish in that amended pleading. Fed. R. Civ. P. 15(a). As far as the court is concerned, plaintiffs were amending as of right, pursuant to the rules of the court into which the case had been brought by GE.[2]

The obvious purpose of plaintiffs' amending their complaint was to avoid litigating in federal court. And indeed, the amendment of the complaint was followed, as the night the day, by the filing of a motion to remand this action.

It is important to note that, in their motion, plaintiffs do not contest the propriety of GE's removal of the case. Plaintiffs concede the obvious – the federal officer removal statute, which has been applied to government contractors, permits a federal contractor defendant to remove a case in which no federal claim is asserted, as long as the defendant intends to assert a defense dependent on federal law (i.e., federal officer immunity, based on the following of government specifications in the manufacture of the asbestos-containing product).

Instead, plaintiffs urge this court to decline to exercise supplemental jurisdiction over the remaining claims in the Amended Complaint – claims that arise entirely under state law, and in which there is allegedly no federal interest, due to the abandonment of any and all claims against GE arising out of the plaintiff's naval experience.

Plaintiffs are correct that the proper issue for the court's consideration is not whether GE could have asserted a federal immunity defense against the now-abandoned claims, but rather whether this court should retain the case now that those claims are out of the case. As the Second Circuit held in Mizuna Ltd. v. Crossland Fed. Sav. Bank, 90 F.3d 650, 655 (2d Cir. 1996), whether to retain a removed case after post-removal dismissal of all claims that made the case properly removable presents an entirely different issue than whether removal was proper in the first place – an issue that is decided in accordance with entirely different principles. Since no one contests the proposition that the case was properly removed, it is to the retention question that I now turn.

_____

[2] After removal, the relevant rules of civil procedure are those of the federal court, not the state court.

Contrary to GE's assertion, no less an authority than the United States Supreme Court has held that a properly removed case *can* be remanded to the state court after the complaint is amended to remove the allegations that made removal proper. Carnegie-Mellon University v. Cohill, 484 U.S. 343 (1988). This has nothing to do with the propriety of the initial removal, which is the issue that GE erroneously insists on arguing. Nor is it a question of subject matter jurisdiction, as plaintiffs mistakenly contend. In Carnegie Mellon, the Supreme Court concluded that a federal court to which a complaint was properly removed had jurisdiction over the "entire action," which jurisdiction persisted following the elimination of the claims that gave rise to removal jurisdiction. The new federal supplemental jurisdiction statute, 28 U.S.C. § 1367, which was passed several years after Carnegie-Mellon, states explicitly that a federal district court, once vested with subject matter jurisdiction (as occurred upon removal in this case), has the power to exercise supplemental jurisdiction over purely pendent claims, even after the claim that gave rise to removal jurisdiction is dismissed.

So the question is not whether this court may retain the case – it may – but rather whether this court should retain the case.

The Carnegie Mellon court indicated that "in each case, and at every stage of litigation," a federal district court should consider and weigh "values of judicial economy, convenience, fairness, and comity" in determining whether to exercise supplemental jurisdiction once the federal issues are out of the case. Subsequently, Congress passed 28 U.S.C. § 1367 which, *inter alia*, set forth the factors that could lead a district court, in an exercise of its discretion, to decline to retain pendent claims or parties. In the Second Circuit, a district court may only decline to exercise supplemental jurisdiction if one of the factors enumerated in Section 1367(c) is present. Treglia v. Town of Manlius, 313 F.3d 713, 723 (2d Cir. 2002); Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 443, 448 (2d Cir. 1998). Dismissal of all claims over which a district court has original jurisdiction is one of the enumerated factors. So *if this court has indeed dismissed all the claims over which original jurisdiction exists,* I have the discretion to remand the case to the New York State Supreme Court, after considering and weighing the factors of comity, judicial economy, convenience and fairness to litigants. See Motorola Credit Corp. v. Uzan, 388 F.3d 39, 55-56 (2d Cir. 2004); Dunlop v. City of New York, No. 06-CV-433, 2006 WL 2853972, at *5 (S.D.N.Y. Oct. 4, 2006).

Factors of judicial economy and convenience clearly militate in favor of remanding this case to the New York State Supreme Court. That court is presently handling thousands of asbestos cases, under the leadership of an able and experienced jurist, who has developed appropriate procedures for expediting this class of lawsuit. That court is fully familiar with all the issues that arise in these complex product liability cases, including the relevant issues of federal law (see below), whereas this court will have a rather steep learning curve. Because of the way work is allocated in the New York State Supreme Court, the judge handling the asbestos cases has no responsibility for criminal matters, so the progress of this case toward trial will not be interrupted by the handling of criminal trials. This court, by contrast, has several criminal trials pending, and was recently assigned to handle a three defendant death penalty case, which takes

4

precedence over other matters.

GE correctly notes that its co-defendants can assert cross-claims for contribution against GE, alleging that it was plaintiff's exposure to GE's turbines on the two ships, rather than any exposure to their products, that was responsible, in whole or in part, for plaintiff's mesothelioma. Because such cross-claims would insert the issue of GE's federal contractor immunity right back into the case, GE argues that the lawsuit should remain here.

However, the potential for cross-claims that will be subject to a government contractor defense does not necessarily mean that this court ought to retain jurisdiction over what is essentially a state court matter. In other contexts, defenses and counterclaims to state law causes of action, and even cross-claims between various defendants, present issues of federal law. But removal is not available to deal with federal issues that arise in counterclaims and cross-claims. See 14B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3722 & n.21 (3d ed. 2006). As a result, state courts deal with issues of federal law all the time.

Federal actor removal represents an exception to the usual rule that the existence of a federal defense does not confer federal jurisdiction. But once the plaintiffs' claim against a government contractor is out of the case, it stretches the principle for a federal court to retain the case against the possibility that cross-claims will be pled. If plaintiff had not originally pleaded failure to warn and to maintain a safe workplace claims against GE arising out of his work for the Navy, GE could not have removed the case to this court pursuant to the federal officer removal statute, even though the potential for cross-claims implicating federal interests would have existed. GE would have had to assert its government contractor defense to those cross claims in the state court. Indeed, it is only because W&L did not originally exempt all claims against government contractors from its form complaint that this issue arises at all.[3]

GE is of course correct that there is a strong federal interest in having that issue decided as a matter of federal law. Where GE goes off the rails is in asserting that only a federal judge can apply the governing federal law to the facts of this case. No such rule exists. That the New York State courts are familiar with the government contractor defenses in appropriate cases is abundantly clear. See In re New York City Asbestos Litig., 256 A.D.2d 250, 251 (Sup. Ct. N.Y. Co. 1998).

The cases cited by GE at pages 15-18 of its brief hold only that federal rather than state *law* governs the claims of immunity that government contractors assert, not that federal rather

---

[3] As the Second Circuit has noted on more than one occasion, with respect to claims against federal officers (and, by extension, government contractors), "The Supreme Court has held that [§ 1442(a)(1)] does not furnish an independent ground for federal jurisdiction absent some federal question implicated in either the claim or by way of defense." Mizuna, 90 F.3d at 655 (citing Mesa v. California, 489 U.S. 212 (1989)); see also Parker v. Della Rocca, 252 F.3d 663, 665 n.2 (2d Cir. 2001).

than state *courts* must adjudicate those claims. Suggesting that only a federal court can handle such a matter is insulting to the judges of the State of New York – especially the experienced jurist who has handled literally thousands of cases like plaintiffs' and can be trusted to know every possible nuance. Justice Freedman is perfectly capable of applying the correct law (which is federal law) to GE's immunity claim if cross-claims are asserted against it based on plaintiff's work with the Navy. Indeed, given her vast experience with asbestos litigation, she would probably do a better job of it than I could. Considerations of comity militate strongly in favor of remand.

If this court were sure that GE was the only defendant herein sued whose products were present on the two Navy ships where plaintiff briefly worked, I would not hesitate to remand the case back to the New York State Supreme Court – where, as the above discussion suggests, I think it belongs. The problem is that I cannot remand the case until I know whether I have dismissed all of the claims over which the court has "original jurisdiction" – which, as I understand it, includes any and every claim asserted by plaintiffs against any federal contractor who, like GE, had a right of removal under 42 U.S.C. § 1442(a)(1).[4]

Unfortunately, I have absolutely no idea whether any of the other named defendants had asbestos-containing products on either the U.S.N.S. Upshur or the U.S.N.S. General Maurice Rose, and so qualifies as a government contractor. As noted above, W&L responded to GE's notice of removal by using its one and only "of right" amendment to dismiss only claims *against GE* arising out of plaintiff's work for the Navy. W&L did not amend the pleading to dismiss similar claims against any other defendant who might have been a federal contractor on either of the Navy ships where plaintiff worked. One might conclude that none of the other defendants was eligible for federal actor status. However, in its reply brief in support of the motion to remand, W&L stated, "As for the other Defendants in this case, none of whom joined in GE's removal, they still can raise in state court their government contractor defenses to plaintiffs' failure to warn claims regarding Mr. Frawley's asbestos exposures on the two Navy ships." (Pl. Reply Br. at 4.) This court views this sentence as an implicit acknowledgment that there are other (or at least may be) other defendants who could have removed this case under 42 U.S.C. §1442(a)(1).

It is of absolutely no moment that no other defendant "joined" in GE's notice of removal. As noted above, any single federal actor can remove the case without obtaining the consent of

---

[4] The use of the phrase "original jurisdiction" is somewhat misleading. This court did not have "original jurisdiction" over any of the claims asserted in any traditional sense, since there is no federal question apparent from the face of the complaint and diversity is lacking. In this case, the only basis for removal is the existence of a "government contractor" defense on behalf of a private party who receives the benefit of federal actor status. The concept of "original jurisdiction" is not ordinarily applied to a defense; but in the federal actor context, Section 1367(c)(3) makes little sense unless the phrase "all claims over which it has original jurisdiction" is read to encompass claims as to which a government contractor defense may be asserted. The court has not found any precedent addressing this precise issue.

6

other defendants, and once the case is removed, there is no requirement that other defendants who might have been able to exercise the same right "join" in the removal in order to reap the benefit of the federal forum. If indeed there are other government contractors, they might well have elected to remove the case, had GE not done so first; but they had no need to exercise their right to remove once GE did so. This court has "original jurisdiction" (in the sense that the term is used in this case) over all claims against *all* government contractors who can assert federal actor status – not just over the removing defendant, GE – and Second Circuit precedent does not permit this court to remand the case if any claims over which this court has original jurisdiction remain in suit.

Additionally, considerations of fairness would weigh heavily in favor of retaining this case if there are other government contractor defendants, because those defendants have by now lost their right to remove the case due to the passage of time.

Accordingly, any defendant who plans to assert that it was a government contractor who fabricated an asbestos-containing product pursuant to a contract with the United States Navy for either or both of the vessels on which plaintiff Frawley worked must notify the court and all parties of its existence and intent to assert such a defense by March 12, 2007. If any such defendant exists, the case will remain here. If no defendant identifies itself as a Government contractor, I will assume that there are no other federal contractors in the case, and the matter will be remanded.

A final note: While plaintiffs have used their one and only "of right" amendment, they may of course move for leave to amend their complaint to remove failure to warn claims against any other Government contractors who surface. However, this court would view any such motion as "manipulative behavior" of the sort that the Supreme Court in Carnegie-Mellon said should be factored into any decision on remand, see Carnegie-Mellon, 484 U.S. at 357.

Dated: March 1, 2007

_Colleen McMahon_
U.S.D.J.

BY FAX TO ALL COUNSEL

7